FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 3 0 2005

JAMES R. LARSEN, CLERK
_____ DEPUTY
YAKIMA, WASHINGTON

1
2
3
4
5              UNITED STATES DISTRICT COURT

6              EASTERN DISTRICT OF WASHINGTON

7
8  CITY OF MOSES LAKE,                    )
   a Washington municipal corporation,    )   No. CV-04-0376-AAM
9                                          )
                                           )   **ORDER GRANTING**
10                                         )   **MOTION TO DISMISS**
              Plaintiff,                   )
11                                         )
          vs.                              )
12                                         )
   The UNITED STATES OF AMERICA,           )
13 et al.,                                 )
                                           )
14                                         )
                                           )
15                                         )
              Defendants.                  )
16 _____)

17        **BEFORE THE COURT** is the United States defendants' Motion To Dismiss (Ct. Rec. 110).

18  This motion was heard with oral argument on December 15, 2005. Steven G. Jones, Esq., argued

19  on behalf of plaintiff City of Moses Lake ("Moses Lake"). Christina M. Falk, Esq., argued on behalf

20  of the United States.

21

22  **I. BACKGROUND**

23        Moses Lake has brought this action against Lockheed Martin Corporation, Boeing Company,

24  and the United States of America, and various agencies of the United States of America (Department

25  of Defense, Department of the Air Force, Department of the Army, and Army Corps of Engineers),

26  seeking damages, declaratory relief, and injunctive relief for the contamination of certain wells it

27  obtained from the United States. Plaintiff asserts claims against all of the defendants under the

28  Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), against

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **1**

Boeing and Lockheed under Washington's Model Toxics Control Act (MTCA), and against the United States defendants under the Federal Tort Claims Act (FTCA). FTCA liability is alleged under theories of public nuisance, private nuisance, trespass, and negligence.

The United States defendants, pursuant to Fed. R. Civ. P. 12(b)(1), seek to dismiss the FTCA claims, asserting they are time-barred and therefore, this court does not have subject matter jurisdiction to entertain them.

## II. FACTS

The City of Moses Lake is located near the former Larson Air Force Base (LAFB). After closing the LAFB, the United States conveyed almost all of the land and properties that comprised LAFB to Moses Lake in 1966. In a separate transaction in June 1967, the United States conveyed to Moses Lake the LAFB's drinking water system, a sewer system, and a waste water treatment plant. The drinking water system originally consisted of five wells (ML 21, ML 22, ML 23, ML 28, and ML 29), now situated within a City-defined water distribution zone known as "the Larson Zone." In 1982, Moses Lake constructed a sixth Larson Zone well known as ML 24.

In 1988, Moses Lake was informed by the Washington Department of Social and Health Services (DSHS), now known as the Department of Health (DOH), that samples taken from three of its wells tested positive for trichloroethylene (TCE). Moses Lake learned of the contamination through required testing and regulatory action under what is commonly known as the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f, et seq.  The testing of the wells through 1988-89 showed levels of TCE in wells ML 21, ML 22, and ML 28 at concentrations above the MCL (maximum contaminant level) of 5 ppb (parts per billion).

As a result of a July 1988 meeting between DOH and Moses Lake, DOH determined that Moses Lake should sample the three wells on a quarterly basis and notify the public of the contamination. DOH also advised Moses Lake that the adequacy of the casing and sealing of the three wells should be examined. Also in July 1988, a meeting was held in Moses Lake with participants from the United States Environmental Protection Agency (EPA), DOH, and the Washington State Department of Ecology (DOE), discussing TCE in the three city wells. DOH

**ORDER GRANTING**
**MOTION TO DISMISS-**                                    **2**

1    again recommended Moses Lake investigate well casing and sealing. The need for public

2    notification and partial well sealing was reiterated by DOH in a follow up letter to Moses Lake.

3    Although Moses Lake initially objected to both DOH recommendations, it did take ML 22 out of

4    service in August 1988, and on December 14, 1988, published a press release advising the public of

5    the TCE contamination and that it was "continu[ing] to work with DSHS, EPA and Ecology to

6    monitor the city's water supply to determine the source of the contamination."

7        In 1988, Moses Lake was provided information about the initial stages of a CERCLA

8    investigation. In September 1988, the DOE issued a Preliminary Assessment Report for Grant

9    County Municipal Airport discussing the TCE contamination in relation to former occupants of the

10   airport and concluding that DOE's work should be coordinated with DOH's ongoing investigation

11   of drinking water contamination and the investigation by the U.S. Army Corps of Engineers

12   (USACE) into past practices at LAFB. In November 1988, DOE provided Moses Lake with the

13   EPA's Potential Hazardous Waste Site Disposition Report which recommended the USACE conduct

14   an historic site investigation of its LAFB activities. DOE and DOH officials met with the city and

15   explained this report would further the CERCLA investigation process.

16       On January 5, 1989, the Acting Municipal Services Director for Moses Lake provided the

17   City Manager a plan outlining the steps necessary to reduce the levels of TCE in the wells to below

18   the MCL, while still maintaining an adequate water production capacity. The plan provided that the

19   city would line and seal the upper portions of ML 22 so that the well could draw water from the

20   deeper, clean portion of the aquifer. The city would study other forms of treatment and monitoring

21   for the other aging municipal wells. The plan also provided that anticipated lost production capacity

22   due to the proposed sealing would be addressed by constructing an additional well, repairing an old

23   well (ML 29), and constructing a reservoir to create additional storage capacity. In July 1989, Moses

24   Lake applied for a $1.4 million loan from the State of Washington Public Works Trust Fund to

25   construct "a reservoir, well and associated water lines on the Larson system." (Ex. 16 to Falk

26   Declaration). The application was prepared for the 1990 funding cycle and the loan was granted.

27   By the end of 1989, the city's Municipal Services Director recommended the city retain a consultant

28   to assist in the review of CERCLA documents and "identify the course of the contamination for

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **3**

1    potential future litigation." (Exs. 2 and 21 to Falk Declaration, at p. 3).

2        In January 1990, the USACE determined that what was to become known as the Moses Lake

3    Wellfield Contamination Site ("Site") was eligible for funding for further environmental

4    investigation as a Formerly Used Defense Site (FUDS) under the Defense Environmental Restoration

5    Program (DERP). 10 U.S.C. §2701. In January 1991, Moses Lake hired a consulting firm, Golder

6    & Associates (Golder), to undertake an investigation to assess the contamination to the extent

7    possible and to propose options to assure a clean water supply to the Larson system. In March 1991,

8    Moses Lake was told the USACE had budgeted approximately $1 million for an environmental

9    investigation at LAFB, and that the USACE anticipated starting the investigation, at the earliest, in

10   October 1991. Also, in March 1991, USACE's lead civil investigator at the site, John Vogel,

11   informed Moses Lake he had hired Dames & Moore to drill 20 monitoring wells to determine the

12   extent of the TCE contamination, and that the work would begin in July or August 1991. The

13   USACE initially targeted four possible TCE source areas for investigation, but told the city in May

14   1991 that their original plan "had been modified to include a wider evaluation of potential

15   contaminant sources in the Larson area . . . . [and] [i]f source areas are found in this initial program

16   that can be traced to the military, then additional investigations would be undertaken." (Ex. 14 to

17   Jones Declaration). On October 28, 1991, Golder delivered its *Report to the City of Moses Lake on*

18   *Hydrogeological Evaluation of Larson Area, Moses Lake, Washington.*

19       In or about March 1992, Vogel proposed the USACE take an "intermediate remedial

20   action" (IRA) and construct extensions to two of the city's wells so water could be drawn from the

21   lower areas of the aquifer believed to be free of TCE contamination. In a press release, the USACE

22   advised that it was requesting Department of Defense (DOD) funds to reconstruct or replace two city

23   wells and to treat the water from two other public wells. Vogel recommended the IRA be funded

24   by the USACE, consistent with his conclusion DOD was at least partially responsible for

25   contaminating the wellfield. Vogel requested funding in the amount of $1,630,200. In June 1992,

26   EPA wrote to support the USACE's proposal. Vogel obtained local approval from the USACE's

27   Seattle District for this proposed IRA and then submitted his recommendation and the funding

28   request to senior USACE officials. The USACE managers at the Missouri River Division (MRD)

**ORDER GRANTING**
**MOTION TO DISMISS-**         **4**

1  rejected Vogel's request in June 1992 and instead said the USACE would commence identification

2  of and negotiation with other potentially responsible parties (PRPs) at the site.

3          In October 1992, EPA placed the wells, the adjacent privately owned Skyline Water System,

4  and a number of individual residential wells, on the CERCLA National Priorities List ("NPL" or

5  "Superfund") to be collectively addressed by EPA as the "Moses Lake Wellfield Contamination

6  Site." 42 U.S.C. §9605(a)(8).  The EPA contacted PRPs pursuant to CERCLA §104(e), 42 U.S.C.

7  §9604(e), and on July 13, 1993, the EPA sent a PRP letter to the Deputy Assistant Secretary of the

8  United States Air Force inquiring about that agency's former ownership and/or operation of LAFB

9  and the agency's voluntary participation in the anticipated  CERCLA cleanup.

10         Also in July 1993, Moses Lake retained legal counsel who on August 2, 1993, wrote a letter

11  to the Deputy Assistant Secretary of the United States Air Force, noting that the EPA had already

12  identified the Air Force as a PRP under CERCLA, and that Moses Lake had "incurred substantial

13  costs in investigating and responding to the contamination in its drinking water wells." Moses Lake

14  asked the United States to execute a tolling agreement to permit settlement discussions and in

15  January 1994, such an agreement was executed by both the United States and Moses Lake.  The

16  agreement provided that effective August 2, 1993:

17                    Each party agrees that the statute of limitations and any
                      other applicable statutory or common law time limitations or
18                    defenses shall be tolled during the term of this Agreement with
                      respect to any action . . . arising out of any damages
19                    suffered as a result of environmental contamination at or in the
                      immediate vicinity of the Moses Lake Wellfield Contamination
20                    Superfund Site in Moses Lake, Washington (the "Site"), including,
                      without limitation, damage to the City's municipal drinking water
21                    wells.

22  (Ex. 27 to Falk Declaration).

23         The agreement also provided, however, that it "shall not limit or affect any defense based on

24  the statute of limitations, laches or any other applicable statutory or common law time limitations

25  to the extent such defense could have been asserted before August 2, 1993."  The United States

26  expressly reserved "all rights and defenses, other than as specified herein, including jurisdictional

27  defenses."

28         In December 2003, Moses Lake filed an FTCA administrative claim with the United States

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **5**

1    Air Force, in which it requested payment of damages for: 1) the sealing of wells ML 21, ML 22 and

2    ML 28; 2) the repair of old well ML 29; 3) the Larson Feasibility Study (the Golder study); 4) the

3    construction of Reservoir 7 and the costs associated with tying the Larson Zone wells to the new

4    reservoir, and the cost of tying the Larson Zone to the Knolls Vista Zone; 5) the cost of constructing

5    well ML 17 as representing the cost of replacing the lost pumping capacity of ML 21, ML 22 and

6    ML 28 after they were sealed at the shallow zones; 6) lost revenue due to water rationing that

7    occurred from June 1989 through September 1992 while ML 21, ML 22 and ML 28 were taken out

8    of service for rehabilitation; 7) loss of water rights; and 8) diminution of property value. (Ex. 15 to

9    Falk Declaration). In April 2004, Moses Lake filed an amended claim seeking additional damages

10   including "project design and construction costs incurred with Well 28 rehabilitation, Reservoir 7

11   construction, and Well 21 rehabilitation." (Ex. 29 to Falk Declaration).

12        Between 1989 and 1992, Moses Lake sealed and lined the shallow zones of ML 21, ML 22

13   and ML 28. In 1991, Moses Lake began construction of the new reservoir.[1]  Since the discovery of

14   TCE in ML 21, ML 22 and ML 28, the Larson system wells have been tested routinely for the last

15   seventeen years. Sampling data maintained by DOH shows that since 1992, the levels of TCE in ML

16   21 and ML 28 have decreased to below the MCL or to "non detect." For the last ten years, ML 21

17   and ML 28 have been at "non detect" for TCE. Because ML 22 was taken out of service by Moses

18   Lake, DOH test results end in 1991. At that time, the well was just slightly above non-detect and

19   less than 1 ppb for TCE. For the ten year period from 1994 to 2004, ML 24 and ML 29 have tested

20   at non-detect for TCE, and for the same ten year period, TCE levels in ML 23 were less than 2 ppb

21   with several non-detect values. Between 1988 and 1992, ML 24 always tested at non-detect levels,

22   and ML 23 and ML 29 never exceeded the MCL, unlike ML 21, ML 22 and ML 28. (Ex. B to

23   Declaration of Dr. Remy J.-C. Hennet).

24   //

25   //

26   _____

27        [1] A DERP Project Executive Summary from October 1992 stated: "By deep sealing the
     existing city wells, and construction of a new water reservoir, the City of Moses Lake has
28   restored the supply of safe drinking water to their customers." (Ex. 27 to Jones Declaration).

**ORDER GRANTING
MOTION TO DISMISS-**                              **6**

1    **III. DISCUSSION**

2        Under the FTCA, 28 U.S.C. §2401(b), a tort claim against the United States is barred unless

3    it is presented in writing to the appropriate federal agency "within two years after such claim

4    accrues." Here, the United States defendants contend Moses Lake's tort claim accrued at the latest

5    in April 1991, and hence, its administrative claim filed December 2003 was untimely, the claim is

6    barred, and must be dismissed by this court for lack of subject matter jurisdiction.

7

8        **A.  Applicable Standard- Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6)/56?**

9        Moses Lake contends the FTCA statute of limitations is not jurisdictional, relying on *Irwin*

10   *v. Veterans Admin.*, 498 U.S. 89, 111 S.Ct. 453 (1990).  *Irwin* was not an FTCA case, however.

11   Furthermore, *Irwin* did not hold that federal statutory time limitations on suits against the United

12   States are not jurisdictional.  Instead, the Supreme Court recognized that in an action under Title VII

13   of the Civil Rights Act of 1964, the 30 day time limit for filing such an action following receipt of

14   the notice of final action by the Equal Employment Opportunity Commission, while jurisdictional,

15   is subject to equitable tolling in an appropriate circumstance.  Stated the Court:

16           Once Congress has made such a waiver [of sovereign immunity],
             we think that making the rule of equitable tolling applicable to
17           suits against the Government, in the same way that it is applicable
             to private suits, amounts to little, if any broadening of the congressional
18           waiver.  Such a principle is likely to be a realistic assessment of
             legislative intent as well as a practically useful principle of interpretation.
19           We therefore hold that the same rebuttable presumption of equitable
             tolling applicable to suits against private defendants should also apply
20           to suits against the United States.  Congress, of course, may provide
             otherwise if it wishes to do so.
21
     *Id.* at 95-96.
22
23       This court recognizes there are certain decisions from the Ninth Circuit Court of Appeals

24   interpreting *Irwin* as holding that federal statutory time limitations on suits against the United States

25   are not jurisdictional.  *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 n. 2 (1995);

26   *Washington v. Garrett*, 10 F.3d 1421, 1437 (9th Cir. 1993).  The simple fact, however,  is that the

27   Supreme Court in *Irwin* did not expressly say that such time limitations are not jurisdictional, and

28   had the Court intended to say something that important, it undoubtedly would have done so

     **ORDER GRANTING**
     **MOTION TO DISMISS-**                    **7**

1   expressly. Confirmation of this is found in a much more recent Ninth Circuit decision, *McGraw v.*
2   *United States*, 281 F.3d 997, 1001 (9th Cir. 2002), which declared the two year FTCA limitation to
3   be "a threshold jurisdictional requirement."

4        There are two types of 12(b)(1) motions. The first type of motion attacks subject matter
5   jurisdiction solely on the basis of the allegations in the complaint (a "facial attack"). With regard
6   to this type of motion, the court must consider the allegations of the complaint to be true. *Gould*
7   *Electronics Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000). The second type of motion is
8   a "speaking motion" which attacks subject matter jurisdiction as a matter of fact (a "factual attack").
9   The court is not limited to considering the allegations in the complaint, but can consider extrinsic
10  evidence. If this extrinsic evidence is disputed, the court can weigh the evidence and determine the
11  facts in order to satisfy itself that it has power to hear the case. *Roberts v. Corrothers*, 812 F.2d
12  1173, 1177 (9th Cir. 1987). "Where the jurisdictional issue is separable from the merits of the case,
13  the court may consider the evidence presented with respect to the jurisdictional issue and rule on that
14  issue, resolving factual disputes if necessary." *Thornhill Publishing Company, Inc. v. General*
15  *Telephone & Electronics Corporation*, 594 F.2d 730, 733 (9th Cir. 1979). Faced with a "factual
16  attack" on subject matter jurisdiction, the court may proceed in a manner different from that under
17  Rule 12(b)(6) (dismissal for failure to state a claim) or Rule 56 (summary judgment). *Id.* No
18  presumption of truthfulness attaches to the allegations in the plaintiff's complaint, and the existence
19  of disputed material facts does not preclude the trial court from evaluating for itself the merits of the
20  jurisdictional claims. *Id.* Furthermore, the burden of proof is on the plaintiff, the party who invoked
21  jurisdiction. *Id.*; *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989);
22  *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987).

23       In the case at bar, the defendants' motion is a "speaking," "factual attack" motion which is
24  not limited to the allegations in plaintiff's complaint. The defendants rely on extrinsic evidence and
25  do not assert a lack of jurisdiction based solely on the pleadings. *Morrison v. Amway Corp.*, 323
26  F.3d 920, 924 n.5 (11th Cir. 2003). There is authority that an evidentiary hearing must held where
27  a 12(b)(1) motion requires resolution of issues of credibility or disputed material facts. *Gould*, 220
28  F.3d at 177. Here, plaintiff submits that not only are there disputed issues of material fact, but that

**ORDER GRANTING**
**MOTION TO DISMISS-**                        **8**

these issues "go to the merits" (issues of jurisdiction and substance are intertwined), and therefore, the defendants' 12(b)(1) motion must be denied until such issues can be determined by the "trier of fact."[2] Where the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the Rule 56 summary judgment standard applies and it is the defendants' burden to establish there are no material facts in dispute and that they are entitled to prevail as a matter of law. *Roberts*, 812 F.2d at 1177. Plaintiff contends Rule 56 is the applicable standard and that because there are disputed issues of material fact, defendants' motion must be denied. Alternatively, plaintiff contends the motion should be denied under Rule 56(f) since discovery is ongoing.

Defendants contend that issues of jurisdiction and substance are not intertwined and hence, the Rule 56 standard need not be applied. According to defendants, "the factual determination required to decide the statute of limitations here- whether the City knew or should have known of its injury in the late 1980s- in no way implicates the issues of whether the United States was negligent at LAFB prior to 1967." Moreover, defendants contend there are no disputed issues of material fact and therefore, even under Rule 56, they would be entitled to summary judgment as a matter of law.

"Jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773 (1946)." *Sun Valley Gas., Inc. v. Ernst Enters*, 711 F.2d 138, 140 (9th Cir. 1983). According to the Supreme Court in *Bell*, jurisdictional dismissals are warranted "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." 327 U.S. at 682-83. The question of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

---

[2] In an FTCA case, the court is the "trier of fact" with regard to the merits of the FTCA claim. 28 U.S.C. §2402.

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **9**

1    Because there is no doubt that the FTCA is the basis for subject matter jurisdiction and
2    Moses Lake's substantive claim for relief, and because it is not evident that said claim is clearly
3    "immaterial" or "wholly insubstantial and frivolous," this court finds the jurisdictional and
4    substantive issues are intertwined and therefore,  the motion of the United States will be treated as
5    one for summary judgment under Rule 56 (essentially a 12(b)(6) motion to dismiss converted to a
6    motion for summary judgment because of the reliance on extrinsic evidence).

7    The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as
8    to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S.
9    1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where
10   the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty*
11   *Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th
12   Cir. 1985).  Summary judgment is precluded if there exists a genuine dispute over a fact that might
13   affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

14   The moving party has the initial burden to prove that no genuine issue of material fact exists.
15   *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).
16   Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply
17   show that there is some metaphysical doubt as to the material facts." *Id.*  The party opposing
18   summary judgment must go beyond the pleadings to designate specific facts establishing a genuine
19   issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

20   In ruling on a motion for summary judgment, all inferences drawn from the underlying facts
21   must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.
22   Nonetheless, summary judgment is required against a party who fails to make a showing sufficient
23   to establish an essential element of a claim, even if there are genuine factual disputes regarding other
24   elements of the claim. *Celotex*, 477 U.S. at 322-23.

25

26   **B. When did Moses Lake's FTCA claims accrue?**

27   In *United States v. Kubrick*, 444 U.S. 111, 113, 100 S.Ct. 352 (1979), a medical malpractice
28   action, the Supreme Court addressed the issue of whether an FTCA claim accrues when the plaintiff

knows both the existence and the cause of his injury, or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice. The Supreme Court held it was the former because:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts of causation may be in control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Id.* at 122.

As *Kubrick* makes clear, a plaintiff need not know that he has a cause of action in order for an FTCA claim to accrue. 444 U.S. at 123 ("[w]e thus cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted"). All that the plaintiff needs to know is the existence of the injury and its cause. Moreover, in *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984), the Ninth Circuit Court of Appeals observed that "[d]iscovery of the cause of one's injury, however, does not mean knowing who is responsible for it." Rather, the "'cause' is known when the immediate physical cause of the injury is discovered." *Id.*, citing *Davis v. United States*, 642 F.2d 328, 331 (9th Cir. 1981).

*Dyniewicz* was a wrongful death action arising out of the deaths of Mark and Carol Dyniewicz who, on March 17, 1980, were killed when a flood swept their car off a highway on the island of Hawaii. Their estates and their minor children filed suit against the State of Hawaii on October 6, 1980, alleging negligence for failure to close the road in question. During the course of the state suit, the plaintiffs discovered that negligence of U.S. National Park Service rangers might have been a cause of the accident. The plaintiffs contended the first indication that United States' employees might have been involved was a dispatcher's tape-recording discovered on June 12, 1982. Plaintiffs filed an administrative claim with the U.S. Department of Interior on July 30, 1982. The claim was denied on the basis that the claims were not presented within two years after they accrued.

**ORDER GRANTING**
**MOTION TO DISMISS-**          **11**

The court of appeals ultimately agreed:

> Appellants knew both the fact of injury and its immediate physical cause, the flooded highway, when the bodies of Mr.and Mrs. Dyniewicz were found. The cause of action accrued at that time. Their ignorance of the involvement of United States employees is irrelevant.

*Id.* at 487.

### 1. Permanent Torts

A "permanent" tort is distinguished from a "continuing" tort by the fact that whereas a "continuing" tort is not terminated by a single act or fact, a "permanent" tort is. For example, "[a] nuisance is generally considered to be continuing if it can be discontinued or abated." *Bartleson v. United States*, 96 F.3d 1270, 1275 (9th Cir. 1996). "[R]easonable abatability of an intrusive condition is the primary characteristic that distinguishes a continuing trespass from permanent trespass." *Fradkin v. Northshore Utility District*, 96 Wn.App. 118, 125, 977 P.2d 1265 (1999). A "trespass is abatable, irrespective of the permanency of any structure involved, as long as the defendant can take curative action to stop the continuing damages." *Id.* at 126. The condition must be one that can be removed without unreasonable hardship and expense. If an encroachment is abatable, the law does not presume that such an encroachment will permanently be maintained. The trespasser is under a continuing duty to remove the intrusive substance or condition. *Id.*

The "permanent" torts at issue in this case arise from the United States defendants' alleged dumping of TCE into the soil during the time LAFB was in operation prior to 1967. For these "permanent" torts, the plaintiff concedes the *Kubrick* discovery rule applies (claim accrues when plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause).

The United States defendants contend Moses Lake knew of its injury and its cause in 1989 because by that time it had already discovered ML 21, ML 22 and ML 28 were contaminated with TCE; had identified a remedial plan calling for well sealing and reservoir construction; begun the well-sealing program; identified a location for a proposed reservoir; and sought $1.4 million to fund a project that included reservoir construction and well repair.

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **12**

1   Plaintiff counters that its "permanent" torts did not accrue until either October 28, 1991,

2   when it received a recommendation from Golder and Associates (its retained engineering consultant)

3   to abandon its wells[3], or until June 1992 when after being assured by the USACE that it would

4   remedy the wells, abate the injury and provide the city with a permanent source of clean drinking

5   water, the USACE withdrew its offer.  Because of the tolling agreement effective in August 1993,

6   plaintiff contends the administrative claim filed in December 2003 is timely.

7   In support of its argument, plaintiff relies on *Bartleson v. United States*, cited *supra*.  In

8   *Bartleson*, the owners of large ranches adjacent to a military base brought claims against the United

9   States for damages under the FTCA, alleging nuisance from artillery shells landing on their property.

10  The United States contended that because the plaintiffs were aware of shells hitting their property

11  more than two years before they filed their administrative complaints under the FTCA, a permanent

12  nuisance claim was barred.  The district court found that although the plaintiffs were both aware of

13  the shelling of their properties by 1981 and 1987 respectively, they were not aware of the nature of

14  the injury to their properties until 1989 and therefore, their administrative complaints made in

15  September 1989 and October 1990 were timely.  According to the district court, prior to 1988, the

16  shelling of the properties was so infrequent that the plaintiffs did not become duty-bound to disclose

17  to potential buyers that the properties had been shelled.  With the numerous shelling incidents in

18  1988 and 1989, however, it became incumbent upon the plaintiffs to make such a disclosure.  The

19  district court found that because the plaintiffs at first received contradictory assurances from the

20  government regarding abatement of the shelling, a permanent nuisance did not come into effect until

21  April 29, 1989, which resulted in a diminution of the value of the plaintiffs' properties.  The Ninth

22  Circuit Court of Appeals agreed:

23          The district court's conclusions regarding the accrual of the
            statute of limitations are based on the shellings evidenced in
24          the record, and the reasonable conclusion that diminution in
            property value would not occur until the plaintiff realized that
25          they could not be given assurances regarding future shelling
            and that they would not be required to report such shelling to

26

27      [3] This recommendation was contained in Golder's *Report to the City of Moses Lake on
28  Hydrogeological Evaluation of Larson Area, Moses Lake, Washington.*

**ORDER GRANTING**
**MOTION TO DISMISS-**               **13**

> future purchasers.    It is at that point that the plaintiffs should
> have expected to discover that the nuisance was 'permanent.'

*Id.* at 1277.

*Bartleson* is based on a fairly unique set of facts, distinguishable from the facts in the instant case. Artillery shelling, by its very nature, is something which can be abated immediately, if the government is so willing. In *Bartleson*, the few shells lobbed here and there at the plaintiffs' property did not cause any damage to the plaintiffs. There was no "injury" to plaintiffs' property values until the shelling picked up considerably and it became apparent the government did not intend to discontinue the shelling. On the other hand, when the City of Moses Lake was informed in 1988 that three of its wells were contaminated with TCE, the nature of its injury (contamination of its wells) and its cause (TCE) became immediately apparent to Moses Lake, no matter what the USACE subsequently may have promised and failed to deliver.[4]

Alternatively, Moses Lake asserts the earliest date on which it had sufficient information to determine both its injury and its cause was October 28, 1991, when Golder provided the city with the diagnosis of the problem and its likely cause. Once again, however, there is no doubt Moses Lake knew of the fact of its injury in 1988 (contamination) and the immediate physical cause (TCE), even though it may not have known for certain at that time that the United States was a source of the contamination. The discovery of the contamination prompted Moses Lake to take certain remedial measures (i.e., sealing wells), and to conduct its own investigation of the source of the contamination. The October 1991 Golder report noted that: "Prior to 1980, documentation of waste materials is not available, but interviews with site personnel indicate that TCE and a number of other solvents . . . may have been used at the facility [LAFB]." (Page 28 of Golder Report). This merely served to confirm for Moses Lake what it had been informed of previously. According to the September 1988 DOE report (Ex. 10 to Falk Declaration at p. 4), "[a] number of potential sources may be responsible for the TCE contamination of the municipal wells. These include past

---

[4] Further discussion regarding this is found *infra* regarding "equitable tolling."

**ORDER GRANTING**
**MOTION TO DISMISS-**                                      **14**

maintenance and waste management practices of the Air Force . . . ."[5] The report recommended (at p. 10) that "further investigation of this facility [Grant County Municipal Airport] should be coordinated with the ongoing DSHS investigation of drinking water contamination and the Army Corps of Engineers investigation into past practices at Larson Air Force Base." This report was forwarded to the City of Moses Lake in November 1988, (Ex. 12 to Falk Declaration), along with the EPA's "Potential Hazardous Waste Site Disposition" which recommended investigative action be taken and which stated that although "the source of the contamination is unknown, possible sources include current or past airport [Grant County Airport], various business[es] leasing space at the airport, and the former Larsen (sic) air force base operations." (*Id*.). Furthermore, in April 1989, Moses Lake received a "scope of work proposal" which had been submitted to EPA and which stated it was "probable that past air base and maintenance activities were associated with TCE use." (Ex. 2 to Falk Declaration at p. 13).

With all of this information, it was not unreasonable to expect the city to file its administrative FTCA claim certainly by mid-1991, if not sooner. By that time, Moses Lake was in possession of the critical facts that it had been injured (contaminated wells) and the immediate physical cause of the injury (TCE). It was also in possession of the non-critical fact that a potential tortfeasor was the United States. If it had not already done so by then, Moses Lake could have and should have contacted counsel since litigation was already a possibility. And indeed, in a December 13, 1989 memorandum, the Moses Lake Municipal Services Director recommended to the City Manager that a consultant familiar with TCE contamination be retained to "review the work of other agencies and make recommendations for the potential of site specific investigation that could identify the source of the contamination for potential future litigation." (Ex. 21 to Falk Declaration at GLD000572).

In *Kubrick*, the Supreme Court dismissed the notion that "technical complexity" of a claim

---

[5] Attached to the September 1988 Preliminary Assessment Report prepared for DOE was an EPA Preliminary Assessment Form which contained a notation that "[t]he source of the TCE is most likely past practices at the defunct Air Force base or current practices at the Grant County Airport." (Ex. 10 to Falk Declaration at GLD000637).

**ORDER GRANTING
MOTION TO DISMISS-**                          **15**

1 constituted a valid excuse for delaying the filing of an administrative claim when a plaintiff

2 otherwise knows of its injury and the cause. According to the Court:

> And if in this complicated malpractice case, the statute is not
> to run until the plaintiff is led to suspect negligence, it would
> be difficult indeed not to apply the same accrual rule to
> medical and health claims arising under other statutes and to
> a whole range of other negligence cases arising under the [FTCA]
> and other federal statutes, where the legal implications or
> complicated facts make it unreasonable to expect the injured
> plaintiff, who does not seek legal or other appropriate advice,
> to realize that his legal rights may have been invaded.

8 444 U.S. at 124.

9       This language from *Kubrick* is one reason plaintiff's citation to *Lhotka v. United States*, 114

10 F.3d 751 (8th Cir. 1997), is not persuasive. In *Lhotka*, the plaintiffs brought an action against the

11 U.S. Fish and Wildlife Service alleging it exceeded the scope of an easement when it constructed

12 dikes which caused rain water to remain impounded on the plaintiffs' property for a longer period

13 of time than it had in previous years. The Eighth Circuit Court of Appeals reversed the district

14 court's determination that plaintiffs' administrative claim was untimely filed, finding there were

15 issues of material fact regarding when the claim accrued. One reason was that the plaintiffs "could

16 not have assessed the latent water damage because they lacked the technical expertise to evaluate the

17 work completed by the Fish and Wildlife Service and how it would affect the duration of seasonal

18 flooding." *Id*. at 753. The other reason was that "outward signs of any tort remained hidden until

19 the rainy season began, and water remained impounded on the property beyond the time in which

20 it normally would have dissipated." *Id*. This is quite distinguishable from the situation in the case

21 at bar where Moses Lake knew in 1988 that its wells were already contaminated with TCE by virtue

22 of testing which had been performed. Unlike *Lhotka*, by no later than mid-1989, both the fact of

23 Moses Lake's injury and its immediate physical cause were not too speculative for Moses Lake to

24 seek a remedy. *Id*.

25       Moses Lake contends that in 1989 it lacked knowledge necessary to comply with FTCA

26 notice of administrative claim requirements which include: "(1) a written statement sufficiently

27 describing the injury to enable the agency to begin its own investigation, and (2) a sum certain

28 damages claim." *Blair v. I.R.S.*, 304 F.3d 861, 865-66 (9th Cir. 2002). Moses Lake asserts it did not

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **16**

have sufficient information to calculate a "sum certain" of damages until the latter half of 1992 when it learned the cost of the USACE's proposed remedy was $1.6 million. As defendants point out, however, the record shows that in July 1989, Moses Lake applied for a $1.4 million loan from the Public Works Trust Fund for "[c]onstruction of a reservoir, well and associated water lines on the Larson system" and that the estimated contract cost was $1.56 million. (Ex. 16 to Falk Declaration). This indicates that Moses Lake did know in July 1989 the "sum certain" it was going to take to make the "Larson system" safe to use for drinking water at that time.

Moses Lake's "permanent" tort claims accrued sometime in 1989 and should have been presented to the United States in an administrative claim filed sometime in 1991. As a result, the tolling agreement executed in January 1994 and effective August 1993 is of no consequence. The tolling agreement does not preclude the United States from asserting a statute of limitations defense which could have been asserted before August 2, 1993. If "permanent tort" claims accrued in 1989 and the two year limitation period expired in 1991, the United States certainly could have asserted a limitations defense prior to August 2, 1993. It is apparent the tolling agreement was intended to apply only to claims for which the applicable statute of limitations may not have run by August 2, 1993. Moreover, only Congress, by way of statute, could have tolled the running of this jurisdictional limitations period. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767 (1941); *United States v. Shaw*, 309 U.S. 495, 500-02, 60 S.Ct. 659 (1940). Consequently, even if plaintiff's claims did not accrue until October 1991 or June 1992, the tolling agreement would still not save plaintiff's "permanent" tort claims.[6]

### 2. Equitable Tolling Re Permanent Tort Claims

Even though the FTCA statute of limitations is jurisdictional in nature, that does not preclude

---

[6] At oral argument, the United States contended that at the very latest, Moses Lake's tort claims accrued in April 1991 when a local newspaper (the Columbia Basin Herald) reported that John Vogel thought the most likely suspect in the contamination was the federal government. (Ex. 16 to Jones Declaration). If the claims accrued in April 1991, an administrative claim needed to be filed by April 1993. That was before the effective date of the tolling agreement.

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **17**

1    equitable tolling. *Irwin*, 498 U.S. at 95-96; *Alvarez-Machain v. United States*, 107 F.3d 696, 701

2    (9th Cir. 1997). In *Alvarez-Machain*, the Ninth Circuit Court of Appeals found that "[n]othing in the

3    FTCA indicates that Congress intended for equitable tolling not to apply." *Id.* The court observed

4    that equitable tolling had been applied in two kinds of situations, the first being where a plaintiff was

5    prevented from asserting a claim by some kind of wrongful conduct on the part of the defendant, and

6    the second being where extraordinary circumstances beyond the plaintiff's control made it

7    impossible to file the claims on time. *Id.*

8         Moses Lake contends that through 1991 and 1992, the United States assured the city that it

9    was going to remedy the problem with the wells (ML 21, ML 22 and ML 28) and that it would do

10   so at government expense. In 1992, however, says Moses Lake, "the United States decided it would

11   not abate the nuisance it had created, despite its earlier assurances" and "[t]he City was left to fend

12   for itself." Moses Lake asserts the United States induced it into postponing consideration of legal

13   options and therefore, the limitations period should be tolled until June 1992 when the USACE

14   decided it was not going to provide funds to reconstruct or replace two city wells and to treat the

15   water from two other public wells.

16        The United States "believes" that *Alvarez-Machain* is of little precedential value in light of

17   the Supreme Court's holding in *United States v. Beggerly*, 524 U.S. 38, 48, 118 S.Ct. 1862

18   (1998), that "[e]quitable tolling is not permissible where it is inconsistent with the text of the

19   relevant statute." The United States notes that at least one district court from the Tenth Circuit has

20   held in light of *Beggerly* that equitable tolling does not apply to the FTCA. *Wukawitz v. United*

21   *States*, 170 F.Supp.2d 1165, 1168-69 (D. Utah 2001). *Beggerly* was not an FTCA case, nor was

22   *Brockamp v. United States*, 519 U.S. 347, 117 S.Ct. 849 (1997), upon which *Beggerly* relied.

23   *Wukawitz*, 170 F.Supp.2d at 1168-69. Furthermore, in *Wukawitz*, the district court observed that in

24   previous cases, the Tenth Circuit Court of Appeals had assumed without deciding that equitable

25   tolling applies to the limitations period of the FTCA in order to demonstrate that application of the

26   doctrine in those cases would have made no difference to their outcomes. *Id.* at 1168. This is not

27   the case in the Ninth Circuit where the court of appeals has stated without hesitation that "equitable

28   tolling is available for FTCA claims in the appropriate circumstance." *Alvarez-Machain*, 107 F.3d

**ORDER GRANTING**
**MOTION TO DISMISS-**                              **18**

1   at 701. So, despite the fact the Ninth Circuit Court of Appeals apparently has not revisited the issue

2   since *Beggerly* and *Brockamp*, the law in this circuit is that equitable tolling applies to FTCA claims

3   in the appropriate circumstance.

4        Such a circumstance does not exist here, however, as there is nothing in the record that could

5   be construed as misconduct on the part of the United States. *Irwin*, 498 U.S. at 96 ("We have

6   allowed equitable tolling . . . where the complainant has been induced or tricked by his adversary's

7   misconduct into allowing the filing deadline to pass"). Moses Lake knew in 1988 that its wells had

8   tested positive for TCE and not long thereafter, knew LAFB was a likely source. Moses Lake started

9   sealing those wells and planning/constructing a reservoir before the USACE even formally proposed

10  any funding in March 1992. The remedial measures commenced by Moses Lake indicate it was not

11  banking on any assurances by the United States that there would be federal funding.[7] Moses Lake

12  started to abate the nuisance (the contamination of ML 21, ML 22 and ML 28) before federal funding

13  was proposed and continued to abate it after funding was rejected by the USACE.[8] During this time,

14  there is no evidence the USACE (or any other federal governmental entity) made any representation

15  to Moses Lake that the FTCA statute of limitations should be of no concern to Moses Lake. There

16  was nothing to prevent Moses Lake from filing an FTCA administrative claim, and as noted above,

17  a December 13, 1989 report from the Moses Lake Municipal Services Director to the City Manager

18  indicates the city was aware of "potential future litigation." (Ex. 21 to Falk Declaration at Bates No.

19  ――――――――――

20  [7] There is nothing in the record from which it could be inferred that the USACE outright
    guaranteed there would be federal funding and that the CERCLA "PRP" route would not be

21  resorted to. Choosing the CERCLA "PRP" route can hardly be characterized as "misconduct" on
    the part of the United States.

22

23  [8] According to the December 2003 administrative claim filed by Moses Lake:

24          Rather than waiting to ascertain all of the parties that might be
            liable for the costs of remediation of the contamination or pursue

25          (sic) preemptive recovery of those costs, the City immediately
            responded to the threat to health and welfare of its citizens

26          resulting from the contamination.

27

28  (Ex. 15 to Falk Declaration at p. 17).

**ORDER GRANTING**
**MOTION TO DISMISS-**              **19**

1    GLD000572).  Equitable tolling is not appropriate where "the claimant has failed to exercise due

2    diligence in preserving his legal rights."  *Irwin*, 498 U.S. at 96.

3           Moses Lake contends the tolling agreement itself justifies equitable tolling.  According to

4    Moses Lake, if, as the United States argues, the tolling agreement had no effect on the FTCA claims,

5    the United States knew of the fact when it executed the agreement and therefore, this "deliberate

6    concealment and inducement amounts to the exact circumstances in which courts equitably toll the

7    FTCA statute of limitations."  First of all, there is no evidence in the record to indicate the United

8    States entered into the agreement with knowledge that only Congress could toll the statute of

9    limitations and that a trial attorney from the U.S. Department of Justice Environment & Natural

10   Resources Division had no authority with regard to tolling.  (Ex. 27 to Falk Declaration).  There is

11   no evidence of fraud as opposed to mere negligence and ignorance of the law.  Besides that, as

12   discussed above, the statute of limitations had already expired by the time the tolling agreement was

13   executed.  The agreement stated it was effective August 2, 1993, and by its terms, did not limit or

14   affect any statute of limitations defense that could have been asserted by the United States prior to

15   August 2, 1993.  The only way "equitable tolling" could possibly work based on the tolling

16   agreement is if, in the first instance, the FTCA claim had not accrued until October 1991 or June

17   1992 so that by August 1993 the two year limitations period had not yet expired.

18          In sum, there is no basis for equitable tolling.

19

20   **3. Continuing Torts**

21          To the extent Moses Lake has any "continuing tort" claims, it would be limited to recovery

22   of damages incurred within the two years preceding filing of its administrative claim in December

23   2003.  *Arcade Water District v. United States*, 940 F.2d 1265, 1269 (9th Cir. 1991); *Bradley v.*

24   *American Smelting and Refining Company*, 104 Wn.2d 677, 693-94, 709 P.2d 782 (1985).  All of

25   the damages claimed in the December 2003 administrative claim filed by Moses Lake were incurred

26   prior to December 2001.  In other words, they were not incurred within the two years preceding the

27   filing of the administrative claim (i.e., costs for rehabilitation of the ML 21, ML 22 and ML 28 wells

28   and construction of the reservoir).

**ORDER GRANTING**
**MOTION TO DISMISS-**                                         **20**

Moses Lake notes that recent sampling by the USACE at the site in late 2004 and early 2005 shows TCE in the range of 80 ppb in the upper aquifer, and in the 30 ppb range in the lower aquifer. The upper aquifer is the aquifer from which Moses Lake used to draw its drinking water. It is also known as the "shallow aquifer." The lower aquifer is also known as the "deep aquifer" from which Moses Lake currently draws its water supply. According to Moses Lake, "[t]he contamination in the deep aquifer is directly upgradient (sic) of one of the **new** City wells that was drilled after contamination was discovered in the shallow aquifer." (Emphasis added). Moses Lake adds that "the most troubling aspect of these recent sampling results is that they show that the contamination has progressed below [the] basalt layer that had previously been thought to be an effective aquitard." and "[b]ecause TCE now threatens the deeper portion of the aquifer from which the City currently draws its water supply, a permanent solution to the contamination may only be available through the development of an entirely new wellfield."

In *Warminster Township Municipal Authority v. United States*, 903 F.Supp. 847 (E.D. Pa. 1995), a municipality brought an FTCA action against the United States, the United States Department of Navy, and the Secretary of Navy, claiming one of its water wells became contaminated as a result of the release of hazardous substances from a naval facility. The municipality conceded it became aware of the injury in 1979 and failed to file an administrative claim until 1994. It argued, however, that its tort claims were not time-barred because the "[d]efendants' conduct constitutes a continuing tortious activity resulting in ongoing injury for which a new cause of action has accrued, is presently accruing, and will continue to accrue, each day until the harm is abated or discontinued." The court concluded the injury complained of by the municipality was permanent and not continuous, explaining its conclusion as follows:

> First, we note that Warminster discovered the injury in 1979; and that in 1985 it installed a groundwater system which it describes as a "permanent or long lasting removal action." [Citation omitted]. Moreover, the treatment system is designed to operate for forty years. Thus, the damages that Warminster allegedly incurred as a result of the contamination of Well 26 were permanently abated in 1985. Finally, we note that Warminster has set forth a detailed breakdown of the past and future damages it incurred. This leads us to conclude that the extent of the damages is ascertainable in a single action. Therefore, because Warminster failed to initiate the appropriate administrative

**ORDER GRANTING**
**MOTION TO DISMISS-**                    **21**

1    action within two years of discovery of the harm, we hold that
     the FTCA claims are time-barred.
2

3    *Id.* at 851.

4        *Warminster* bears striking similarity to the case at bar. Moses Lake discovered its injury in

5    1988 or 1989 and then proceeded to seal its contaminated wells and build a new reservoir. That

6    permanently abated the problem at the time which was the contamination of wells ML 21, ML 22

7    and ML 28. Those wells have tested at "non-detect" for TCE during the last ten years. Moreover,

8    as is apparent from the December 2003 administrative claim (as amended by the April 2004 claim),

9    Moses Lake has set forth a detailed breakdown of the damages it incurred in abating the

10   contamination of wells ML 21, ML 22 and ML 28. (See p. 18 to Ex. 15 to Falk Declaration, Bates

11   No. A004657). The extent of those damages is therefore ascertainable in a single action and as such,

12   the contamination of wells ML 21, ML 22 and ML 28 has to be considered a permanent injury. As

13   discussed above, the December 2003 administrative claim (as amended April 2004) is untimely with

14   respect to that permanent injury.

15       What about the threat to the city's new production wells because of the recent sampling data

16   or the potential loss of water rights? That does not qualify as a "continuing tort." If anything, it

17   represents a potentially new tort claim which has yet to accrue because there has been no injury as

18   yet. There is no allegation that these wells have in fact been contaminated or the water rights have

19   in fact been lost. There is only a "threat" of contamination and a "threat" of the loss of water rights.

20   If and when there is a contamination problem and/or an actual loss of water rights, and the city can

21   then be deemed to know of its injury and its cause, it can submit an FTCA administrative claim for

22   the damages associated with said contamination and loss of water rights. Until then, the "threat" can

23   be addressed by the remedial process of CERCLA and the equitable relief available pursuant to that

24   statute. As pointed out by defendants, the FTCA does not provide equitable relief, only damages.

25   *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992).

26   **IV. CONCLUSION**

27       Summary judgment in favor of the United States on the FTCA claims is warranted. While

28

**ORDER GRANTING
MOTION TO DISMISS-**                    **22**

1    there may be some disputed facts, there is no dispute about certain essential, material facts which

2    reveal that by the time Moses Lake filed its administrative claim in 2003, the two year limitations

3    period had long expired, there is no basis for equitable tolling, and Moses Lake does not have any

4    continuing tort claims.  Additional discovery is not going to change these undisputed material facts

5    and so there is no basis for granting Moses Lake relief pursuant to Rule 56(f).

6        The United States defendants' Motion To Dismiss (Ct. Rec. 110) is **GRANTED**.  Because

7    the motion is converted to one for summary judgment, the United States defendants are awarded

8    judgment on the FTCA claims asserted by plaintiff Moses Lake.

9        **IT IS SO ORDERED**.  The District Executive is directed to enter this order and forward

10   copies to counsel.

11       **DATED** this **30**ᵗʰ of December, 2005.

12

13

       ALAN A. McDONALD
14     Senior United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER GRANTING
MOTION TO DISMISS-**                    **23**