FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 30 2005

JAMES R. LARSEN, CLERK
_____ DEPUTY
YAKIMA, WASHINGTON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF MOSES LAKE,<br>a Washington municipal corporation,<br><br>Plaintiff,<br><br>vs.<br><br>The UNITED STATES OF AMERICA,<br>et al.,<br><br>Defendants. | No. CV-04-0376-AAM<br><br>**ORDER GRANTING MOTIONS<br>TO AMEND COMPLAINT AND<br>FOR PRELIMINARY INJUNCTION** |

**BEFORE THE COURT** are plaintiff's Motion To Amend Complaint (Ct. Rec. 141) and Motion For Preliminary Injunction (Ct. Rec. 150). These motions were heard with oral argument on December 22, 2005. Steven G. Jones, Esq., argued on behalf of plaintiff City of Moses Lake ("Moses Lake"). Mary Anne Zivnuska, Esq., and Michael J. Zevenbergen, Esq., argued on behalf of the United States.

**I. BACKGROUND**

Moses Lake brought this action against Lockheed Martin Corporation, Boeing Company, and the United States of America, and various agencies of the United States of America (Department of Defense, Department of the Air Force, Department of the Army, and Army Corps of Engineers), seeking damages, declaratory relief, and injunctive relief for the contamination of certain wells it obtained from the United States when the former Larson Air Force Base (LAFB) was sold to Moses

Lake. Moses Lake asserts claims against all of the defendants under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), against Boeing and Lockheed under Washington's Model Toxics Control Act (MTCA), and against the United States defendants under the Federal Tort Claims Act (FTCA).

Moses Lake now seeks to amend its complaint to add a claim under CERCLA against the United States Army Corps of Engineers (USACE) and the United States Environmental Protection Agency (EPA) for violation of 42 U.S.C. §9620 (§120). Moses Lake proposes to bring this claim pursuant to the citizen suit provisions of CERCLA, 42 U.S.C. §9659(a)(1) and (2).[1] In addition, based on that proposed claim, Moses Lake seeks a preliminary injunction enjoining the USACE and EPA "from issuing any Proposed Plan or other document identifying or selecting a remedial action at the [Moses Lake Wellfield Contamination] Site until such time as they have complied with the provisions of 42 U.S.C. §9620(f) by providing the City with all information required under that statute, and until they have allowed the City to participate in the planning and selection of the remedy at the Site."

## II. DISCUSSION

### A. Preliminary Injunction Standard

In order to obtain a preliminary injunction, a moving party must demonstrate either (1) a probability of success on the merits and the possibility of irreparable injury or (2) serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor. *Roe v. Anderson*, 134 F.3d 1400, 1401-02 (9th Cir. 1998). These standards are not inconsistent, but represent a single continuum of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success must be shown. *State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988).

---

[1] Moses Lake also seeks to amend its complaint to clarify that its CERCLA claim against defendant Boeing Company includes an allegation of liability based on Boeing's current ownership of a facility at the former LAFB. Boeing has consented to this proposed amendment.

**ORDER GRANTING MOTIONS TO AMEND**
**COMPLAINT AND FOR PRELIMINARY INJUNCTION- 2**

"Serious questions" are substantial, difficult and doubtful so as to make them a fair ground for litigation. "Serious questions" need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits. *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)(citations omitted).

Where the public interest is involved, the court must examine whether the public interest favors the party moving for an injunction. *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir. 2002). While this inquiry is sometimes subsumed into the balancing of hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected. *Id.* at 974.

### B. Jurisdictional Bar

42 U.S.C. §9620(f) (§120(f)) provides:

> The Administrator [of the EPA] and each department, agency, or instrumentality responsible for compliance with this section shall afford to relevant State and local officials the opportunity to participate in the planning and selection of the remedial action, including but not limited to the review of all applicable data as it becomes available and the development of studies, reports, and action plans. In the case of State officials, the opportunity to participate shall be provided in accordance with section 9621 of this title.

In a letter dated September 16, 2005, counsel for Moses Lake asked that, pursuant to §9620(f), the USACE provide Moses Lake with certain specific items (i.e., the draft Soils Feasibility Study). (Ex. 6 to Jones Declaration In Support of Motion To Amend Complaint, Ct. Rec. 144). The letter also asked that:

> Consistent with the Corps' statutory duties, please notify the City of all upcoming meetings with federal agencies in which the Corps will be discussing the planning and selection of the remedy for the Site. To date, the City has not been invited to] participate in any of the Corps' meetings with the EPA, although we understand from your discovery responses that such meetings have occurred regularly, dating back to at least 1990. We expect the City to be extended an invitation to future Corps' meetings with EPA regarding remedy selection.

**ORDER GRANTING MOTIONS TO AMEND**
**COMPLAINT AND FOR PRELIMINARY INJUNCTION- 3**

*Id.*[2]

In a letter dated September 26, 2005, counsel for the USACE responded as follows:

> We are working with EPA and there will be time for notice and comment. To date the City has been provided numerous opportunities to participate in public meetings and to provide comments on documents, as well as to review and comment upon anything in the Administrative Record for the NPL Site response actions. The City will continue to be provided an opportunity to participate in the remedy selection process by participating in public meetings and offering comments on documents concerning response actions. Please note the public repository is updated and you should periodically check it for new information.

(Ex. 7 to Jones Declaration in Support of Motion to Amend Complaint, Ct. Rec. 144).

This response was not to Moses Lake's satisfaction and so in a letter dated September 29, 2005, Moses Lake notified the United States that it intended to file a civil action against the USACE and the EPA under 42 U.S.C. §9659(a) "for failure to perform their mandatory duties and comply with certain statutory requirements, as set forth in 42 U.S.C. §9620(f)." The letter advised that pursuant to 42 U.S.C. §9659(d), the City would file suit within 60 days after the government's receipt of the letter. (Ex. 8 to Jones Declaration in Support of Motion to Amend Complaint, Ct. Rec. 144). On or about the last full week of November 2005, counsel for Moses Lake found out through a third-party (counsel for the State of Washington), that EPA intended to issue its Draft Proposed Plan on Monday, November 28, exactly 60 days after the September 29 notice of suit. Upon learning this, Moses Lake promptly filed its motions to amend complaint and for preliminary injunction.

The United States contends that Moses Lake's proposed citizen suit alleging a claim under §9620(f) is jurisdictionally barred by another provision of CERCLA, 42 U.S.C. §9613(h) (§113(h)), which states in relevant part:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (related

---

[2] Counsel for Moses Lake previously sent a letter to counsel for the USACE on August 24, 2005, and followed up with an e-mail on September 13, complaining about violation of §9620(f) rights. (Exs. 3 and 4 to Jones Declaration in Support of Motion to Amend Complaint, Ct. Rec. 144).

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 4**

to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, [with certain exceptions not applicable here].

§9613(h) was passed in order to "protect[] the execution of a CERCLA plan *during its pendency* from lawsuits that might interfere with the expeditious cleanup effort." *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995). (Emphasis in original). It does not, however, preclude all lawsuits, only those that are "directly related to the goals of the cleanup itself." *Id.* at 330. For example, a lawsuit brought to enforce minimum wage requirements would be insufficiently related to the goals of the cleanup to qualify as a "challenge" to the cleanup and therefore, would not implicate §9613(h). *Id.*

Relying on *Fort Ord Toxics Project, Inc. v. California Environmental Protection Agency*, 189 F.3d 828 (9th Cir. 1999), Moses Lake contends the cleanup at the Moses Lake Wellfield Contamination Site is a §120 (§9620) cleanup, as opposed to a §104 (§9604) cleanup, and therefore, not subject to the jurisdictional bar of §113(h)(§9613(h)). In *Fort Ord*, there was no dispute that the cleanup of the military installation at Fort Ord was pursuant to §120 and that it was a "remedial action." The Ninth Circuit Court of Appeals found that as such, the jurisdictional bar of §113(h) did not apply. *Id.* at 834. The court's reasoning was as follows:

> If §120 creates a grant of authority separate from §104, then the plain language of §113(h) would exempt §120 cleanups from its jurisdictional bar. Determining which provision governs a particular cleanup requires a close look at the different types of CERCLA cleanups and at the specific grants of authority in §120. CERCLA distinguishes between two types of cleanups: removal actions and remedial actions. *See* 42 U.S.C. §9601(23) and (24). In short, removal actions are temporary measures taken to protect against the threat of an immediate release of hazardous substances into the environment, whereas remedial actions are intended as permanent solutions. Under §120(e)(2), the Administrator of the EPA is granted authority to conduct remedial actions on federal property. *See* 42 U.S.C. §9620(e)(2). There is no analogous authority under §120 for the commencement of removal actions. Thus, removal actions on federal property must fall under the general provisions of §104. *See* 42 U.S.C. §9604(a).
>
> The text of §113(h), then, would preclude challenges to a CERCLA *removal* action on federal property, because such actions are conducted under §104's grant of authority. But §113(h) would not preclude challenges to a CERCLA *remedial* action because such actions are conducted under §120 's grant of authority. Whether the

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 5**

legislators who voted for §113(h) subjectively intended this distinction is unclear to us. . . . But we are not concerned with the wisdom of Congress' policy choice, and we lack the luxury to entertain the subjective intentions of various legislators. Our job is to effectuate Congressional intent as expressed in the statutory text. Thus, despite any misgivings we may have, we adopt this distinction between removal and remedial actions at federal facilities because the statutory language seems to require it.

*Id.* at 833-34. (Emphasis in original).

The United States contends *Fort Ord* is distinguishable from the case at bar because: (1) the Moses Lake Wellfield Contamination Site is not a "federal facility;" and (2) EPA's Draft Proposed Plan is a "removal" action under §104, instead of a "remedial action" under §120.

The Moses Lake Wellfield Contamination Site is not currently owned an/or operated by the United States, but part of it was used at one time as a federal facility (Larson Air Force Base) and hence, the United States Department of Defense (DOD) has been named by EPA as a "potentially responsible party" (PRP). Beyond merely pointing out that *Fort Ord* involved a facility currently owned and/or operated by the United States, the United States defendants in the case at bar do not explain why that distinction is significant. Indeed, in *Shea Homes Limited Partnership v. United States of America*, ____ F.Supp.2d _____, 2005 WL 3020123 (N.D. Cal. Nov. 10, 2005), the district court apparently did not consider it significant.

Shea Homes Limited Partnership purchased a 10 acre parcel of property which was previously part of the Hamilton Air Force Base prior to its closure in 1974. Shea subsequently acquired an adjoining 18 acre parcel. The combined 28 acre property adjoined a part of the former air force base which used to be the primary repository for garbage generated at the base, known as Landfill (LF) 26. Shea developed the 28 acres and transferred ownership of some or all of the property to third parties. It contended, however, that the United States failed to meet its obligations to address the contamination at LF 26, causing Shea to suffer damages. Since 1986, the USACE had been engaged in efforts to investigate, remedy, and monitor the waste in LF 26 pursuant to the Defense Environmental Restoration Program-Formerly Used Defense Sites ("DERP-FUDS"). Shea did not challenge the remedy selected by the USACE, but asserted the Corps has failed to properly and timely implement its remedy and to satisfactorily abate the contamination.

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 6**

A threshold issue was whether the CERCLA cleanup was proceeding pursuant to §104 or §120. The district court stated: "Section 120 contains provisions applicable to clean ups on federal facilities, **such as the former Hamilton Air Force Base.**" *Id.* at *6.  (Emphasis added). Nevertheless, the district court concluded this was not a §120 clean up:

> Importantly, it was undisputed in *Fort Ord* that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by §120. [Citation omitted]. The site at Fort Ord was placed by the EPA on its National Priorities List and the clean up was being conducted pursuant to EPA's delegated authority through an interagency agreement between the EPA, the Army, and California state agencies. [Citation omitted]. Indeed, the EPA administrator has been delegated much of the authority for administering CERCLA. [Citation omitted].
>
> In this case, however, the site at issue is not included on the National Priorities List and the EPA is not involved. As a result, authority to undertake the clean up has been delegated to the Secretary of Defense [pursuant to Section 104 of CERCLA].
>
> Thus the rationale underlying the holding in *Fort Ord*- the creation of a separate authority in §120 for the Administrator to conduct remedial actions at federal facilities- is simply not applicable here. . . . . [T]he response actions in this case were authorized by §104 and are thus governed by §113(h).

*Id.* at *7 and *8.

In the case at bar, the USACE began investigating contamination at the former LAFB in 1987 pursuant to the Defense Environmental Restoration Program (DERP) because LAFB is a formerly used defense site (FUDS).  The Department of Defense is required to investigate and remedy contamination at FUDS sites under 10 U.S.C. §2701. Pursuant to that statute, cleanup activities are to be "carried out subject to, and in a manner consistent with, section 120 (relating to Federal facilities) of CERCLA (42 U.S.C. §9620)." 10 U.S.C. §2701(a)(2).  In October 1992, the EPA placed the former LAFB on the National Priorities List (NPL). And in 1999, the Department of the Army entered into an interagency agreement (IAG) with the EPA concerning the preparation and performance of the RI/FS (Remedial Investigation/Feasibility Study) for the Moses Lake Wellfield Contamination Site.  The IAG specifically states that the EPA and the Army enter into "this Agreement pursuant to their respective authorities contained in Sections 101, 104, 107, **120** and 122" of CERCLA. (Ex. 10 to Jones Declaration in Support of Motion for Preliminary Injunction, Ct. Rec.

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 7**

152). (Emphasis added).

While there are some clear factual similarities between *Fort Ord* and the case at bar, and while there is a reference to §120 in the IAG, the critical issue here is whether EPA's Draft Proposed Plan constitutes a "removal" action, or a "remedial action."[3] If it is a "removal" action, it has to be pursuant to §104 as explained by *Fort Ord*, and therefore, the jurisdictional bar of §113(h) applies. If, however, it is a "remedial action," it is pursuant to §120 and §113(h) does not apply. A proposed plan was not at issue in *Fort Ord*, and it appears no case has ever dealt with the precise issue of whether a proposed plan is a "removal" action or a "remedial action" under CERCLA.

"Remedial action" is defined in 42 U.S.C. §9601(24):

> The terms "remedy" or "remedial action" means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

"Removal" is defined in 42 U.S.C. §9601(23) as:

> The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access,

---

[3]Whether a response action is a "removal" action or a "remedial action" is a question of law for the court. *Carson Harbor Village, Ltd. v. Unocal Corporation*, 287 F.Supp.2d 1118, 1157 (C.D. Cal. 2003).

**ORDER GRANTING MOTIONS TO AMEND COMPLAINT AND FOR PRELIMINARY INJUNCTION- 8**

> provision of alternative water supplies, [and] temporary evacuation and housing of threatened individuals not otherwise provided for . . . .

In *United States v. W.R. Grace & Co.*, ___ F.3d ___, 2005 WL 3216827 at *2 and *3 (9th Cir. Dec. 1, 2005), the Ninth Circuit Court of Appeals was "unable to discern Congress's intent through the normal tools of statutory interpretation" and so it declared the meanings of "removal" and "remedial action" under CERCLA to be "inescapably vague." *Id.* at *14. The court observed that "[t]he tangled language of CERCLA hardly lends itself to clearcut distinctions between the two types of actions." *Id.* at *6. *Grace* was a CERCLA cost recovery action by the United States against the operator/owner of an asbestos mine. The court held that EPA's characterization of a cleanup as a "removal" action was supported by the administrative record and withstood scrutiny under the modified level of deference afforded by the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164 (2001). *Id.* at *10. According to the court:

> The administrative posture of CERCLA presents two types of agency interpretations. One is the National Contingency Plan [NCP] which carries the force of law. The second relates to informal agency interpretations, which at a minimum receive respect, and depending on the interplay of *Mead* and *Brand X*[4], may even deserve *Chevron*[5] deference. Whichever of these applies, we reach the same result: We hold that the EPA has rationally construed CERCLA and that construction deserves our respect. [Citation omitted]. **As interpreted by the EPA, the removal/remedial distinction boils down to whether the exigencies of the situation were such that the EPA did not have time to undertake the procedural steps required for a remedial action, and, in responding to a time-sensitive threat, the EPA sought to minimize and stabilize imminent harms to human health and the environment.** The EPA did so here.

*Id.* (Emphasis added).

The one consistent thread in the decisions dealing with whether an action is "remedial" or "removal" in nature is that "removal actions generally are immediate or interim responses, and

---

[4] *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, ___U.S. ___, 125 S.Ct. 2688 (2005).

[5] *Chevron U.S.A. Inc. v. National Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778 (1984).

**ORDER GRANTING MOTIONS TO AMEND COMPLAINT AND FOR PRELIMINARY INJUNCTION- 9**

remedial actions generally are permanent responses." *California v. Neville*, 358 F.3d 661, 667 (9th Cir. 2004), quoting *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 926 (5th Cir. 2000). *See also Carson Harbor Village, Ltd. v. Unocal Corporation*, 287 F.Supp.2d 1118, 1158 (C.D. Cal. 2003) (property owner's cleanup of tar-like and slag materials was "remedial action" because there was no evidence that the materials posed the type of threat to human health and welfare that required immediate action); *Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 810 (N.D. Cal. 1999)(removal actions are "short-term action[s] taken to halt the immediate risks posed by hazardous wastes"); *Channel Master Satellite Systems, Inc. v. JFD*, 748 F.Supp. 373, 385 (E.D. N.C. 1990) ("The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions").

Citing *Neville*, the United States asserts the proposed plan is part of the "'removal' since it involves continuation of the process begun with the RI/FS (Remedial Investigation/Feasibility Study), of identifying and selecting the permanent remedy." "Simply put," says the United States, "the proposed plan is not the permanent remedy; it is an interim step in the process of defining the permanent remedy." As such, the United States contends that a proposed plan could never be anything other than a "removal" action because it is not "consistent with permanent remedy taken." It is true that in *Neville*, the Ninth Circuit Court of Appeals declared that for an action to be "'consistent with permanent remedy,' a permanent remedy must already have been adopted" and that "[n]either party can know for sure whether a given action is consistent with permanent remedy until that permanent remedy is determined." 358 F.3d at 667. In *Neville*, "as in most cases, the permanent remedy was selected when the final RAP [remedial action plan] was approved." *Id.* Accordingly, the court of appeals held that "initiation of physical on-site construction of the remedial action can only occur after the remedial action" is adopted. *Id.* at 671.

The RI/FS is what is used to prepare the proposed plan. The proposed plan is the culmination of the RI/FS. The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. 40 C.F.R. §300.430(d). The primary objective of the feasibility study (FS) is to ensure

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 10**

that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected. 40 C.F.R. §300.430(e). Once a remedy is selected, the EPA issues a ROD (Record of Decision) notifying the public of the selection. Case law recognizes that an RI/FS may constitute either "removal" or "remedial action." *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236 (9th Cir. 1995). In *Razore*, the Ninth Circuit Court of Appeals specifically held that an RI/FS satisfied the statutory definition of a "removal" action under 42 U.S.C. §9601(23), in particular "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." *Id.* at 239, citing *South Macomb Disposal Auth. v. EPA*, 681 F.Supp. 1244, 1246 (E.D. Mich. 1998) ("[i]t is clear . . . that a RI/FS taken by the EPA is a 'removal action' within the meaning of the statute"). In *Razore*, however, the court did not expressly or impliedly preclude an RI/FS from being a "remedial action" in an appropriate circumstance (in addition to being a "removal" action, or to the exclusion of a "removal" action). *See also Acme Printing Ink Co. v. Menard*, 812 F.Supp.1498, 1509 (E.D. Wis. 1992)("RI/FS in this action constitutes remedial as well as removal activity"). The EPA's NCP (National Contingency Plan) regulations also appear to recognize as much. 40 C.F.R. §300.425(b)(1) refers to "removal" actions as "including remedial planning activities, RI/FSs, and other actions taken pursuant to CERCLA section 104(b)." Another regulation, 40 C.F.R. §300.505(d)(2)(iii), includes RI/FSs among "remedial phase activities."

The issue in *Neville* was not whether an RI/FS or a proposed plan constitutes a "removal" or a "remedial action." Moreover, in *Grace*, the court of appeals limited its discussion of *Neville* to a footnote in which it stated:

> Although we have touched on the interplay between removal and remedial actions under CERCLA in prior decisions, the specific contexts in which those cases arose render them of limited use in our decision here. *See California v. Neville Chem. Co.*, 358 F.3d 661, 667, 670 (9th Cir. 2004)(concluding that for the purposes of the "onset of the limitations period for recovery of remedial action costs under CERCLA, no action can be "remedial" until adoption of a final action plan . . . .

(Pg. *24 at fn. 17). And while in *Grace*, the EPA had specifically characterized its action as "removal" in nature, there is nothing in the case at bar to indicate that at any point, prior to the filing

**ORDER GRANTING MOTIONS TO AMEND COMPLAINT AND FOR PRELIMINARY INJUNCTION- 11**

of Moses Lake's motions to amend and for preliminary injunction, EPA specifically characterized the cleanup at the Moses Lake site to be either "removal" or "remedial," or specifically designated a point at which the cleanup evolved from "removal" to "remedial." As pointed out by Moses Lake, the EPA and the Corps have referred to "remedial action" in several documents spanning a 13 year period. (Exs. 1-3 to Jones Declaration in Support of Reply Memorandum on Motion for Preliminary Injunction, Ct. Rec. 173). They have done so in a generic sense, however. These documents do not constitute an admission, nor do they allow for a definite conclusion, that this cleanup is now in its "remedial" phase as opposed to a "removal" phase, and that the proposed plan is a "remedial action" as opposed to a "removal" action. There is no question that "removal" actions are part of an overall remediation of a site.

Nevertheless, the court is ultimately persuaded that the proposed plan is a "remedial action." For approximately the past 18 years, the United States has concerned itself with cleaning up the Moses Lake site. It was over 13 years ago that the site was placed on the NPL by the EPA. The TCE (trichloroethylene) contamination discovered in 1988 in certain of the city's wells was abated by approximately 1992, remedying that immediate problem. Moses Lake asserts there is now a threat of contamination to its new wells, as revealed by sampling results from late 2004 and early 2005, but the EPA has not characterized this as an "immediate" threat necessitating "immediate" action by way of the proposed plan. The proposed plan does not represent a "short-term action taken to halt [an] immediate risk." The EPA makes no claim the proposed plan is "rapid action" intended to address an urgent situation.[6] Indeed, it would be difficult for EPA to make such a claim considering the RI/FS process began in March 1999 pursuant to the IAG entered into by EPA and the USACE. (Reid Declaration, Ct. Rec. 161 at Paragraph 4, p. 2). The RI lasted until 2003, and the FS from August 2004 to February 2005. (Martin Declaration, Ct. Rec. 162 at Paragraph 4, p. 3). Obviously, the proposed plan has been a work in progress for a considerable period of time.

Certainly, the proposed plan is, by definition, "interim" and "temporary," pending selection

---

[6] This should be compared with USACE's July 1999 delivery of bottled water to the Skyline Community, described as a "removal" action to reduce the risk of human exposure to TCE contaminated water. (Roper Declaration, Ct. Rec. 165 at Paragraph 5, p. 4).

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 12**

of a permanent remedy through EPA's issuance of a ROD. It is necessary, however, to view the proposed plan in a broader context. In this particular case, the proposed plan is part and parcel of the selection of a permanent remedy for the Moses Lake Wellfield Contamination Site. The proposed plan is a pending "remedial action" intended to effect a comprehensive resolution of the TCE contamination problem. *Grace* at * 20. The proposed plan is in response to a "non-urgent" threat which is not "time-sensitive," at least as perceived by EPA. Unlike the situation in *Grace*, the proposed plan indicates that EPA did have time to undertake the procedural steps required for a remedial action. The proposed plan is one of those procedural steps. It is not intended to "minimize and stabilize imminent harms to human health and the environment."

Since the proposed plan is not a §104 "removal" action, but a §120 "remedial action," Moses Lake is not jurisdictionally barred from seeking relief.

### C. Non-Discretionary Duty

The United States contends §9659(a)(1) (Section 310(a)(1))[7], authorizes only actions to enforce substantive provisions of CERCLA and does not authorize suits against the head of an administrative agency based on administration of CERCLA. Since §9620(f) pertains to "administration of CERCLA," the United States asserts that a citizen suit under §9659(a)(1) is not possible. Instead, the United States says the only possible avenue of relief is the citizen suit provision in §9659(a)(2), referring to non-discretionary duties.[8] Citing the rationale from the United

---

[7] 42 U.S.C. §9659(a)(1) (Section 310(a)(1)) authorizes suits:

> against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter.

[8] 42 U.S.C. §9659(a)(2) (Section 310(a)(2)) authorizes suits:

> against the President or any other officer of the United States (including the Administrator of the Environmental Protection

**ORDER GRANTING MOTIONS TO AMEND**
**COMPLAINT AND FOR PRELIMINARY INJUNCTION- 13**

States Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154, 173, 117 S.Ct. 1154 (1997), a case involving citizen suit provisions under the Endangered Species Act ("ESA"), similar to §9659(a)(1) and (a)(2), the United States says that if it were subject to suit under §9659(a)(1), then the separate cause of action authorized by §9659 (a)(2) would be rendered superfluous because any suit actionable under (a)(2) would also be encompassed by (a)(1).

Moses Lakes offers no argument or authority to the contrary. Accordingly, the question is whether its citizen suit can proceed pursuant to §9659(a)(2) (alleged failure to perform any act or duty under section 9620 which is not discretionary). Notwithstanding the use of the word "shall" in §9620(f), the United States contends the provision is nevertheless "discretionary" in the sense that it affords the EPA discretion in how the duty is implemented. According to the United States:

> Nothing in Section 120(f) contains a requirement- much less a "specific" and "clear-cut" requirement- stating that EPA must share its <u>proposed</u> actions with State or local officials before it makes its proposals public. Section 120(f) requires inclusion of State and local officials in the development of "studies, reports, and action plans." However, nothing in Section 120(f) specifies how this must be done. The essence of the City's argument is that this requirement is met only if the Proposed Plan is shared with local officials prior to being made public. But reading such a specific requirement- or, for that matter, other specific requirements that other municipalities might desire for other stages of CERCLA cleanups around the country- into this general language would contradict the discretionary nature of the President's cleanup authority under CERCLA.

§120(f) does not specifically state the EPA must share a proposed plan with state and local officials before issuing it to the public at large. It does, however, specifically and plainly state that relevant local officials shall be afforded the opportunity "to participate in the planning and selection of the remedial action, including but not limited to the review of all applicable data as it becomes available and the development of studies, reports, and action plans." It is reasonable to

---

> Agency and the Administrator of the ATSDR) where there is alleged failure of the President or of such other officer to perform any act or duty under section 9620 of this title (relating to Federal facilities), which is not discretionary with the President or such other officer.

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 14**

conclude that a proposed plan constitutes "planning" and/or an "action plan." Once the proposed plan is issued to the public at large, the "planning" stage is over and the remedy selection phase begins. And Moses Lake notes that under 42 U.S.C. §9617(a) of CERCLA (§117(a)), it is already entitled, along with the rest of the public, to notice of formal issuance of the proposed plan and the right to tender comment regarding the proposed plan. The plain terms of §120(f) require something more than the rights already afforded by §117(a) and that something more has to include review of the proposed plan. Without reviewing the proposed plan and its alternative remedies (including EPA's preferred remedy), there is simply no way for the City of Moses Lake to meaningfully and intelligently "participate in the planning and selection of the remedial action . . . and the development of . . . action plans."

### D. Irreparable Harm and Public Interest

Based on the discussion *supra*, it should be apparent that if EPA were to issue its proposed plan immediately without allowing review by Moses Lake, Moses Lake's §120(f) rights would be violated and the city would be irreparably harmed. In turn, there is no doubt that the "public interest" is served by enforcement of §120(f) rights. These are rights which belong to the "public," specifically in this case, the citizens of Moses Lake.

The court fails to see how the United States is harmed by divulging the proposed plan to Moses Lake prior to formal issuance of the same. The fact this may not be the "usual" procedure is unpersuasive. The fact that municipalities across the nation may henceforth similarly demand such access is also unpersuasive, provided the municipality is simply enforcing §120(f) rights in conjunction with a "remedial action" taken by the United States.

## III. CONCLUSION

Moses Lake's Motion To Amend (Ct. Rec. 141) and Motion For Preliminary Injunction (Ct. Rec. 150) are **GRANTED**.

Within ten (10) days of the date of this order, Moses Lake shall serve and file its First Amended Complaint.

ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 15

The EPA and the USACE are hereby **PRELIMINARILY ENJOINED** from formally issuing the proposed plan pending further order of this court. Within ten (10) days of the date of this order, EPA and the USACE shall make the proposed plan available to counsel for Moses Lake and all "relevant" Moses Lake officials involved in decision-making with regard to the Moses Lake Wellfield Contamination Site. **Moses Lake is strictly prohibited from sharing the proposed plan with any third-party, including Boeing and Lockheed.**

Within fifteen (15) days thereafter, Moses Lake shall request of EPA and USACE what it **specifically** believes is further necessary to satisfy its §120(f) rights (i.e., what specific data it needs to review).[9] Within fifteen (15) days thereafter, the EPA and USACE shall respond. It is, of course, the court's hope that Moses Lake's request can be satisfied without dispute, but as that may not be entirely realistic, the court stands ready to adjudicate any such dispute. While it would certainly not be appropriate to leave it entirely to EPA and USACE to determine whether they have satisfied their obligations under §9620(f), it would be equally inappropriate to leave it entirely to Moses Lake to determine how EPA and USACE are to satisfy their obligations. Let there be no doubt, however, that it is the United States who ultimately selects the remedy, subject of course to the ROD being challenged on the appropriate legal grounds. And for reasons stated by the court during oral argument, let there also be no doubt that Moses Lake's CERCLA cost recovery action is potentially subject to being delayed depending on when EPA's administrative process is completed.

//

//

---

[9] Moses Lake requests the court enjoin EPA from issuing the proposed plan until Moses Lake "is allowed to participate in the development and selection of a remedy for the Site, consistent with 42 U.S.C. §9620(f)." That is much too broad.

Fed. R. Civ. P. 65(d) provides that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in its terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ." The primary purpose of Rule 65(d) is "to assure adequate notice to parties faced with the possibility of contempt." *Davis v. City & County of San Francisco*, 890 F.2d 1438, 1450 (9th Cir. 1989). Language that merely enjoins a party to "obey the law" or "to comply with an agreement" is not sufficient. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1991).

**ORDER GRANTING MOTIONS TO AMEND COMPLAINT AND FOR PRELIMINARY INJUNCTION- 16**

No bond for the injunction will be required based on the court's finding that the United States will not be harmed by the injunction and issuance of the same is in the best interests of the public.

**IT IS SO ORDERED.** The District Executive is directed to enter this order and forward copies to counsel.

DATED this ___ of December, 2005.

_____
ALAN A. McDONALD
Senior United States District Judge

**ORDER GRANTING MOTIONS TO AMEND
COMPLAINT AND FOR PRELIMINARY INJUNCTION- 17**