FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAY 04 2006

JAMES R LARSEN, CLERK
_____DEPUTY
YAKIMA, WASHINGTON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF MOSES LAKE,<br>a Washington municipal corporation,<br><br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF<br>AMERICA, et al.,<br><br><br><br>Defendants. | No. CV-04-0376-AAM<br><br>**ORDER GRANTING<br>MOTIONS FOR PARTIAL<br>SUMMARY JUDGMENT** |

**BEFORE THE COURT** are defendant Boeing Company's Motion For Partial Summary Judgment (Ct. Rec. 199) and defendant Lockheed Martin Corporation's Motion For Partial Summary Judgment (Ct. Rec. 207). These motions were heard with oral argument on April 20, 2006. Steven G. Jones, Esq., argued on behalf of plaintiff City of Moses Lake ("Moses Lake"). Mark W. Schneider, Esq., argued on behalf of defendant Boeing Company. Robert W. Loewen, Esq., argued on behalf of defendant Lockheed Martin Corporation.

## I. BACKGROUND

On December 30, 2005, this court issued an order granting summary judgment to the United States defendants on Moses Lake's Federal Tort Claims Act (FTCA)

**ORDER GRANTING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT- 1**

claims, finding those claims were barred by the two year FTCA statute of limitations. (Ct. Rec. 180). Boeing Company ("Boeing") and Lockheed Martin Corporation ("Lockheed"), now seek summary judgment on the common law tort claims asserted against them by Moses Lake (nuisance, trespass and negligence), contending those claims are barred by applicable Washington statutes of limitations. Boeing and Lockheed assert they are entitled to summary judgment for the same reasons cited by this court in its order granting summary judgment to the United States defendants.

## II. FACTS[1]

The City of Moses Lake is located near the former Larson Air Force Base (LAFB). During World War II and the Cold War, LAFB was used to assemble , station, and maintain hundreds of military aircraft. As a contractor for the United States Air Force, Boeing assembled and maintained these aircraft. LAFB was also surrounded by intercontinental ballistic missiles ("ICBMs") manufactured by Glen L. Martin Company, a predecessor to Lockheed. ICBMs and their components were assembled, fueled and maintained at LAFB and its associated facilities.

After closing LAFB, the United States conveyed almost all of the land and properties that comprised LAFB to Moses Lake in 1966. In a separate transaction in June 1967, the United States conveyed LAFB's drinking water system, a sewer system, and a waste water treatment plant. The drinking water system originally consisted of five wells (ML 21, ML 22, ML 23, ML 28, and ML 29, a.k.a. "The Larson System"), now situated within a City-defined water distribution zone known as "the Larson Zone." In 1982, Moses Lake constructed a sixth Larson Zone well known as ML 24.

---

[1] This recitation of "Facts" borrows heavily from the "Facts" section of this court's December 30, 2005, although there are some additional facts recited which are unique to Boeing and Lockheed.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 2**

1    In 1988, Moses Lake was informed by the Washington Department of Social
2    and Health Services (DSHS), now known as the Department of Health (DOH), that
3    samples taken from three of its wells tested positive for trichloroethylene (TCE).
4    Moses Lake learned of the contamination through required testing and regulatory
5    action under what is commonly known as the Safe Drinking Water Act (SDWA), 42
6    U.S.C. §300f, et seq.  The testing of the wells through 1988-89 showed levels of TCE
7    in wells ML 21, ML 22, and ML 28 at concentrations above the MCL (maximum
8    contaminant level) of 5 ppb (parts per billion).

9    As a result of a July 1988 meeting between DOH and Moses Lake, DOE
10   determined that Moses Lake should sample the three wells on a quarterly basis and
11   notify the public of the contamination.  DOH advised Moses Lake that the adequacy
12   of the casing and sealing of the three wells should be examined.  Also in July 1988,
13   a meeting was held in Moses Lake with participants from the United States
14   Environmental Protection Agency (EPA), DOH, and the Washington State
15   Department of Ecology (DOE) discussing TCE in the three city wells.  DOH again
16   recommended Moses Lake investigate well casing and sealing.  The need for public
17   notification and partial well sealing was reiterated by DOH in a follow up letter to
18   Moses Lake.    Although Moses Lake initially objected to both DOH
19   recommendations, it did take ML 22 out of service in August 1988, and on December
20   14, 1988, published a press release advising the public of the TCE contamination and
21   that it was "continu[ing] to work with DSHS, EPA and Ecology to monitor the city's
22   water supply to determine the source of the contamination."

23   In 1988, Moses Lake was provided information about the initial stages of a
24   CERCLA (Comprehensive Environmental Response, Compensation, and Liability
25   Act) investigation. In September 1988, DOE issued a Preliminary Assessment Report
26   for Grant County Municipal Airport discussing the TCE contamination in relation to
27   former occupants of the airport and concluding that DOE's work should be
28   coordinated with DOH's ongoing investigation of drinking water contamination and

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 3**

the investigation by the U.S. Army Corps of Engineers (USACE) into past practices at LAFB. In November 1988, DOE provided Moses Lake with the EPA's Potential Hazardous Waste Site Disposition Report which recommended the USACE conduct an historic site investigation of LAFB activities. DOE and DOH officials met with the city and explained this report would further the CERCLA investigation process.

On January 5, 1989, the Acting Municipal Services Director for Moses Lake provided the City Manager a plan outlining the steps necessary to reduce the levels of TCE in the wells to below the MCL, while still maintaining adequate water production capacity. The plan provided that the city would line and seal the upper portions of ML 22 so that the well could draw water from the deeper, clean portion of the aquifer. The city would study other forms of treatment and monitoring for the other aging municipal wells. The plan also provided that anticipated lost production capacity due to the proposed sealing would be addressed by constructing an additional well, repairing an old well (ML 29), and constructing a reservoir to create additional storage capacity. In July 1989, Moses Lake applied for a $1.4 million loan from the State of Washington Public Works Trust Fund to construct "a reservoir, well and associated water lines on the Larson system." The application was prepared for the 1990 funding cycle and the loan was granted. By the end of 1989, the city's Municipal Services Director recommended the city retain a consultant to assist in the review of CERCLA documents and "identify the course of the contamination for potential future litigation."

In January 1990, the USACE determined that what was to become known as the Moses Lake Wellfield Contamination Site ("Site") was eligible for funding for further environmental investigation as a Formerly Used Defense Site (FUDS) under the Defense Environmental Restoration Program (DERP). 10 U.S.C. §2701. In January 1991, Moses Lake hired a consulting firm, Golder & Associates (Golder), to undertake an investigation to assess the contamination to the extent possible and to propose options to assure a clean water supply to the Larson System. In March 1991,

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 4**

Moses Lake was told the USACE had budgeted approximately $1 million for an environmental investigation at LAFB, and that the USACE anticipated starting the investigation, at the earliest, in October 1991. Also, in March 1991, USACE's lead civil investigator at the site, John Vogel, informed Moses Lake he had hired Dames & Moore to drill 20 monitoring wells to determine the extent of the TCE contamination, and that the work would begin in July or August 1991. The USACE initially targeted four possible TCE source areas for investigation, but told the city in May 1991 that their original plan "had been modified to include a wider evaluation of potential contaminant sources in the Larson area . . . . [and] [i]f source areas are found in this initial program that can be traced to the military, then additional investigations would be undertaken." On October 28, 1991, Golder delivered its *Report to the City of Moses Lake on Hydrogeological Evaluation of Larson Area, Moses Lake, Washington.*

In or about March 1992, Vogel proposed the USACE take an "intermediate remedial action" (IRA) and construct extensions to two of the city's wells so water could be drawn from the lower areas of the aquifer believed to be free of TCE contamination. In a press release, the USACE advised that it was requesting Department of Defense (DOD) funds to reconstruct or replace two city wells and to treat the water from two other public wells. Vogel recommended the IRA be funded by the USACE, consistent with his conclusion the DOD was at least partially responsible for contaminating the wellfield. Vogel requested funding in the amount of $1,630,200. In June 1992, EPA wrote to support the USACE's proposal. Vogel obtained local approval from the USACE's Seattle District for this proposed IRA and then submitted his recommendation and the funding request to senior USACE officials. The USACE managers at the Missouri River Division (MRD) rejected Vogel's request in June 1992 and instead said the USACE would commence identification of and negotiation with other potentially responsible parties (PRPs) at the site.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 5**

1    On April 14, 1992, the Moses Lake City Council adopted Resolution No. 1675,
2    "A Resolution Declaring An Emergency And Waiving The Statutory Bidding
3    Requirements Because Of The Emergency" ("Emergency Resolution").    In this
4    resolution, Moses Lake acknowledged: (1) that its municipal water system was
5    contaminated with TCE levels above the MCL set by EPA; (2) that it had been
6    attempting to determine the source of the contamination and, along with state and
7    federal agencies, examining methods for eliminating the contamination; and (3) that
8    DOE would "not allow use of Well 28 until the upper water sources are prevented
9    from entering the well."   The City Council declared an emergency to address the
10    contamination and the fact there "there may not be enough water to supply the
11    population in the [Larson Subdivision] area during the summer if Well 28 is not
12    rehabilitated as soon as possible."

13    In October 1992, EPA placed the wells, the adjacent privately owned Skyline
14    Water System, and a number of individual residential wells, on the CERCLA
15    National Priorities List ("NPL" or "Superfund") to be collectively addressed by EPA
16    as the "Moses Lake Wellfield Contamination Site." 42 U.S.C. §9605(a)(8). The EPA
17    contacted PRPs pursuant to CERCLA §104(e), 42 U.S.C. §9604(e). Both Boeing and
18    Lockheed were named as PRPs and were contacted by EPA.

19    Moses Lake retained legal counsel who, in August 1993, wrote a letter to
20    Boeing requesting that Boeing execute a tolling agreement "[i]n order to preserve the
21    City's claims." Boeing executed the tolling agreement, effective August 2, 1993. The
22    agreement provided:

23          Each party agrees that the statute of limitations and any
              other applicable statutory or common law time limitations
24          or defenses shall be tolled during the term of this Agreement
              with respect to any action . . . arising out of any damages
25          suffered as a result of environmental contamination at or in
              the immediate vicinity of the Moses Lake Wellfield
26          Contamination Superfund Site in Moses Lake, Washington
              (the "Site"), including, without limitation, damage to the
27          City's municipal drinking water wells.

28    (Ex. 13 to Ct. Rec. 203).   The agreement also provided, however, that it "shall not

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 6**

limit or affect any defense based on the statute of limitations, laches or any other applicable statutory or common law time limitations to the extent such defense could have been asserted before August 2, 1993." (*Id.*). Lockheed never entered into a tolling agreement with Moses Lake.

Between 1989 and 1992, Moses Lake sealed and lined the shallow zones of ML 21, ML 22 and ML 28. In 1991, Moses Lake began construction of the new reservoir.[2] Since the discovery of TCE in ML 21, ML 22 and ML 28, the Larson System wells have been tested routinely for the last seventeen years. Sampling data maintained by DOH shows that since 1992, the levels of TCE in ML 21 and ML 28 have decreased to below the MCL or to "non detect." For the last ten years, it appears ML 21 and ML 28 have been at "non detect" for TCE. Because ML 22 was taken out of service by Moses Lake, DOH test results end in 1991. At that time, ML 22 was just slightly above non-detect and less than 1 ppb for TCE. For the ten year period from 1994 to 2004, ML 24 and ML 29 have tested at non-detect for TCE, and for the same ten year period, TCE levels in ML 23 were less than 2 ppb with several non-detect values. Between 1988 and 1992, ML 24 always tested at non-detect levels, and ML 23 and ML 29 never exceeded the MCL, unlike ML 21, ML 22 and ML 28.

## III. DISCUSSION

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975). Under Fed. R. Civ. P.

---

[2] A DERP Project Executive Summary from October 1992 stated as follows: "By deep sealing the existing city wells, and construction of a new water reservoir, the City of Moses Lake has restored the supply of safe drinking water to their customers."

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 7**

1  56, a party is entitled to summary judgment where the documentary evidence
2  produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby,*
3  *Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727,
4  732 (9th Cir. 1985). Summary judgment is precluded if there exists a genuine dispute
5  over a fact that might affect the outcome of the suit under the governing law.
6  *Anderson*, 477 U.S. at 248.

7      The moving party has the initial burden to prove that no genuine issue of
8  material fact exists.. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S.
9  574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under
10  Rule 56, "its opponent must do more than simply show that there is some
11  metaphysical doubt as to the material facts." *Id.* The party opposing summary
12  judgment must go beyond the pleadings to designate specific facts establishing a
13  genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548
14  (1986).

15      In ruling on a motion for summary judgment, all inferences drawn from the
16  underlying facts must be viewed in the light most favorable to the nonmovant.
17  *Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a
18  party who fails to make a showing sufficient to establish an essential element of a
19  claim, even if there are genuine factual disputes regarding other elements of the
20  claim. *Celotex*, 477 U.S. at 322-23.

21

22      **B. RCW 4.16.160**

23      A three year statute of limitations governs trespass claims. RCW 4.16.080(1).
24  A two year statute of limitations applies to nuisance and negligent injury to property
25  causes of action. RCW 4.16.130; *Bradley v. American Smelting and Refining Co.*,
26  104 Wn.2d 677, 684, 709 P.2d 782 (1985); *White v. King County*, 103 Wash. 327,
27  329, 174 P. 3 (1918).

28      Moses Lake does not dispute that if these statutes of limitation apply to its

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 8**

permanent tort claims against Boeing and Lockheed, they would bar those claims since the claims accrued as early as 1988, the tolling agreement with Boeing was not effective until August 2, 1993, and the pending lawsuit was not filed until October 2004. Moses Lake, however, contends these statutes of limitations do not apply because of the common law doctrine of *nullum tempus* which is that "[t]he State, acting in its sovereign capacity, is immune from the application of limitation periods to action brought for the benefit of the State." *Bellevue Sch. Dist. No. 405 v. Brazier Constr. Co.*, 103 Wn.2d 111, 114, 691 P.2d 178 (1984). "This immunity from operations of statutes of limitation" exists under the public policy that, "while the sovereign [i]s engrossed in the cares and duties of his office, the public should not suffer by the negligence of his servants." *Id.* (internal citation and quotations omitted).

The common law doctrine of *nullus tempus* has been codified in Washington at RCW 4.16.160[3] :

> The limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasimunicipality of the state, in the same manner as to actions brought by private parties: PROVIDED, That, except as provided in RCW 4.16.310, there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim or right predicated upon the lapse of time shall ever be asserted against the state: AND FURTHER PROVIDED, That no previously existing statute of limitations shall be interposed as a defense to any action brought in the name or for the benefit of the state, although such statute may have run and become fully operative as a defense prior to February 27, 1903, nor shall any cause of action against the state be predicated upon such a statute.

A municipality is entitled to the benefit of RCW 4.16.160 if its action was taken in a sovereign capacity as opposed to a proprietary capacity. *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1582 (9th Cir. 1994). Municipal actions are

---

[3] RCW 4.16.160, while applicable to Washington statutes of limitation, has no application to the FTCA statute of limitations and therefore, could not have been asserted against the United States defendants.

**ORDER GRANTING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT- 9**

brought "for the benefit of the state," and hence in the municipality's sovereign capacity, when those actions arise out of the exercise of powers traceable to the sovereign powers of the state which have been delegated to the municipality. *Washington Public Power Supply System ("WPPSS") v. General Electric Company*, 113 Wn.2d 288, 293, 778 P.2d 1047 (1989). In determining whether an action is sovereign or proprietary, the court "may look to constitutional **or** statutory provisions indicating the sovereign nature of the power, and . . . may consider . . . traditional notions of powers which are inherent in the sovereign." *Id.* at 296 (emphasis added). "Relevant to this analysis are the general powers and duties under which the municipality acted, the purpose of those powers, and whether the activity or its purpose is normally associated with private or sovereign concerns." *Id.* When a municipal corporation assists in the government of the state as an agent of the state to promote the public welfare generally, the municipal corporation acts in a sovereign capacity. When, however, it regulates and administers the local and internal affairs of the territory which is incorporated, for the special benefit and advantage of the urban community embraced within the boundaries of the municipal corporation, it acts in a proprietary capacity. *Id.* at 295-96. It is the "**character or nature**" of the conduct" of the municipality, not the effect of that conduct, which determines whether RCW 4.16.160 applies. *Id.* at 292-93 (emphasis added). According to the Washington Supreme court, "[w]e have never sought to define 'benefit of the state' in terms of beneficial effect." *Id.* at 293. "While the duality of municipal function is well understood, the classification of particular activities as governmental or proprietary has proved to be more difficult." *Id.* at 296. "Each case is determined in light of the particular facts involved." *Id.*

In *WPPSS*, the Washington Supreme Court held the Supply System, in contracting with GE for the Nuclear Steam Supply System, was not acting "for the benefit of the state" within the meaning of RCW 4.16.160 because it was not exercising a delegated sovereign power. Said the court:

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 10**

[A]lthough the State may facilitate the production of electrical energy, there is no indication in the constitution or the statutes that supplying electric energy is a sovereign function of the State. Likewise, the production of electricity has not traditionally been considered a power or duty which is inherent in the sovereign. Rather, it was considered either a private business or a proprietary municipal function for the advantage of each community. (Citation omitted).

Because of the increasing need for electrical energy, single PUDs or cities were no longer capable of developing energy resources for their communities. Consequently, joint operating agencies were authorized to perform this function. However, the increased need for electricity and the concomitant need for increasing participation by more individual PUDs and cities does not transform the development, production, and supply of electric energy into an exercise of a sovereign power of the State.

*WPPSS*, 113 Wn.2d at 301.

In arriving at its conclusion, the court contrasted the situation with that in the *Bellevue* case where a school district was allowed to bring an action for breach of a construction contract against the builders of a high school completed 20 years earlier. In *Bellevue*, the state supreme court observed:

The duty and power to educate the people are not only inherent qualities of sovereignty but are expressly made an attribute of sovereignty in the state of Washington by the state constitution. Const. art. 9, §§ 1, 2. The state exercises its sovereign powers and fulfills its duties of providing education largely by means of a public school system under the direction and administration of the State Superintendent of Public Instruction, State Board of Education, school districts and county school boards.

School districts are, by law, municipal corporations with direct authority to establish maintain and operate public schools and to erect and maintain buildings for that and allied purposes. In essence, a school district is a corporate arm of the state established as a means of carrying out the state's constitutional duties and exercising the sovereign's powers in providing education. The state has thus made the local school district its corporate agency for the administration of a constitutionally required system of free public education.

*Id.* at 294-95, quoting *Bellevue*, 103 Wn.2d at 115-16.

In *Louisiana-Pacific*, the Ninth Circuit Court of Appeals held the Port of Tacoma had acted in a sovereign capacity in leasing certain logyards. According to the court:

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 11**

1    The Washington Constitution provides that areas designated
2    by the port commission, up to 2000 feet from the harbor line,
     "shall be reserved for landings, wharves, streets, and *other*
3    *conveniences of navigation and commerce*." Wash. Const. Art.
     XV, § 1 (emphasis added). The Constitution also specifically
4    provides for the leasing of these areas. *Id.* at § 2. We read the
     phrase "other conveniences of navigation and commerce" to
5    include logyards. Washington statutory law also contemplates
     the development of "commercial transportation, transfer,
6    handling, storage and terminal facilities, and industrial improve-
     ments" by the port districts. RCW 53.04.010. The port districts
7    may lease these properties "for such purposes and upon such
     terms as the port commission deems proper." RCW 53.08.080.

8    Furthermore, we find it important that in leasing the property
     the Port did not act as a private party would act, leasing the land
9    to any party offering the best terms. Instead the Port leased the
     property for logyards and subject to certain conditions designed
10   to further harbor development. In leasing the logyards, the
     Port implemented part of its comprehensive harbor improvement
11   plan. Non-monetary concerns motivated the Port in leasing the
     property, supporting the Port's contention that the action was
12   more sovereign than proprietary. Because the Port acted in its
     sovereign capacity in leasing the logyards, the statute of
13   limitations does not run against it.

14   24 F.3d at 1582.

15       Moses Lake contends the conduct of its City Council in taking "formal action

16   to adopt a resolution declaring a public health emergency in response to the TCE

17   contamination demonstrates the City was acting in a 'governmental' capacity."

18   According to Moses Lake, "[t]he Council's action constituted a formal exercise of the

19   City's police power to address a public health hazard and to vindicate the public's

20   right to uncontaminated water, as contrasted with the normal maintenance and

21   operation of its water system." Furthermore, Moses Lake says its action was

22   motivated solely by non-monetary concerns, akin to the situation in *Louisiana-*

23   *Pacific*. Moses Lake contends that multiple Washington statutes delegate state police

24   power to municipalities to protect public health and the water supply, citing RCW

25   35A.70.010 ("Every code city shall have authority to protect waters within the city

26   or comprising part of the city's water supply pursuant to the authority provided

27   therefore by [relevant RCWs]"); RCW 35A.70.070(6) ("Every code city may exercise

28   the powers authorized and shall perform the duties imposed upon cities of like

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 12**

1  population relating to the public health and safety as provided by Title 70 RCW and,

2  without limiting the generality of the foregoing, shall . . . exercise control over water

3  pollution as provided in chapter 35.88"); and RCW 35.88.010(granting cities

4  authority over water supply sources "[f]or the purpose of protecting the water

5  furnished to inhabitants of cities and towns from pollution[.]").

6  Boeing and Lockheed contend that in rehabilitating its water system, Moses

7  Lake acted in its proprietary capacity as the operator of a municipal water utility

8  company and therefore, RCW 4.16.160 is of no avail to the city.  Relying on cases

9  such as *Bellevue* and *Louisiana-Pacific*, Boeing and Lockheed contend RCW

10  4.16.160 "applies only in very limited circumstances in which a municipal

11  corporation acts 'in the name' of or 'for the benefit of' the state by carrying out

12  inherent state sovereign functions- such as educating children, managing harbors and

13  ports, levying taxes, exercising the power of eminent domain, and similar functions

14  recognized as state sovereign functions by the Washington Constitution."[4]

15  There does not need  to be a constitutional source for sovereign power since

16  in *WPPSS*, the state supreme court recognized that "constitutional or statutory

17

18  [4] *Gustaveson v. Dwyer*, 83 Wash. 303, 305 (1915), was discussed in the

19  *WPPSS* case as support for the proposition that the Washington Supreme Court

20  had, in the past, "looked solely to the nature and character of the power, the

exercise of which resulted in the action[,] to determine whether a statute of

21  limitation defense was foreclosed by the statute." *WPPSS*, 113 Wn.2d at 293.  In

22  *Gustaveson*, the court determined that a county had acquired certain land not

23  voluntarily, but "in the exercise of a **mandatory duty** prescribed by the state and

in the exercise of the **sovereign power** of taxation."  83 Wn.2d at 306 (emphasis

24  added).  Consistent with *Gustaveson*, in *Tacoma v. Hyster Co.*, 93 Wash. 815, 613

25  P.2d 784 (1980), the court determined that collecting taxes was the exercise of a

26  sovereign power, thus precluding Tacoma from being subject to a statute of

limitations.  And in *Gasaway v. City of Seattle*, 52 Wash. 44, 100 P. 991, 994

27  (1909), the court recognized the power to condemn land as an attribute of

28  sovereignty possessed by the state.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 13**

provisions" will suffice. It is also true, however, that in Washington, operation of a municipal water system has not traditionally been considered a power or duty which inheres in the sovereign, but rather a proprietary activity for the advantage of each community. *Russell v. City of Grandview*, 39 Wn.2d 551, 553, 236 P.2d 1061 (1951)(city engaged in operation of water system acts in its proprietary capacity and is liable for negligence the same as any private corporation engaged in the same business). In *Russell*, the Washington Supreme Court noted that cities are limited governmental arms of the state, and when permitted by the state to engage in activities normally performed by private enterprise, they depart from their governmental functions. The court added it was immaterial that some of the water was used in fire protection and in connection with health and sanitation because the negligence alleged did not arise in the performance of such functions. *Id.* [5] And in *Port of Seattle v. International Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 322, 324 P.2d 1099 (1958), the court, relying on *Russell*, observed that "public health and safety are not the basis for distinguishing between governmental and proprietary functions of a municipality; rather, the primary consideration is to determine whether the municipal corporation is acting as a representative of the state in the particular capacity, or is merely seeking to further its own corporate ends." The court observed that the fact a municipal water system is classified as proprietary indicates public health and safety are not the determining factor. *Id.*

---

[5] The court has considered the recent Washington Court of Appeals opinion, *Stiefel v. City of Kent*, 2006 WL 1064159 (April 24, 2006). *Stiefel* reaffirmed *Russell*, but found *Russell* was not controlling "because the Stiefels are not alleging any deficiency in the delivery of the domestic water supply, but rather the negligent operation and maintenance of City and County fire protection services." *Id.* at *3. "Fire protection services" are not at issue in the case at bar. What is at issue is "delivery of the domestic water supply" which, for the reasons set forth herein, ultimately constitute a proprietary function, not a governmental or sovereign function.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 14**

1    Moses Lake seemingly concedes that "the normal maintenance and operation
2    of its water system" is not a sovereign function.  Therefore, the critical inquiry is
3    whether the 1992 resolution passed by the City Council is distinguishable from the
4    day-to-day propriety activity of operating a municipal water system.  In an effort to
5    establish as much, Moses Lake cites an Oklahoma case, *Town of Cyril v. Mobil Oil
6    Corporation*, 11 F.3d 996 (10th Cir. 1993).  In *Cyril*, a municipality brought an action
7    against oil companies to recover damages for contamination of groundwater.  The
8    district court held the tort claims were barred by the statute of limitations because the
9    municipality did not bring the suit in its sovereign capacity and therefore, was not
10   entitled to sovereign immunity from the statute of limitations.  The Eleventh Circuit
11   Court of Appeals disagreed, quoting the Oklahoma Supreme Court in *Oklahoma City
12   Mun. Improvement Auth. v. HTB, Inc.*, 769 P.2d 131, 134-35 (Okla. 1989), that it is
13   irrelevant that the "operation of a waterworks is a proprietary function . . . the
14   character of the plaintiff's function does **not** control."  *Id.* at 998 (emphasis added).
15   Instead, the focus should be upon the "ultimate right at issue" and the question is
16   whether failing to enforce that right "affects public as distinguished from private
17   enterprise."  *Id.*, quoting *HTB*, 769 P.2d at 134-35.  In *HTB*, the plaintiffs brought an
18   action for damages allegedly caused by defendants' negligent design and construction
19   of part of a municipal water system.  The Oklahoma Supreme Court found it
20   inconceivable that the rights at issue could be anything but public rights since water
21   is fundamental to existence and this necessity entitles the general public to expect an
22   adequate water supply.  769 P.2d at 136.

23   Oklahoma common law, focusing on the public right and "benefit" at issue, is
24   clearly contrary to Washington law which examines the nature or character of the
25   municipality's conduct.[6]  Furthermore, Oklahoma does not have a statute like RCW

26

27   ⁶ Washington common law represents the majority viewpoint as recognized
28   by the dissent in *HTB*.  769 P.2d at 141 and n. 26.

**ORDER GRANTING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT- 15**

4.16.160 which begins with the general proposition that "[t]he limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasimunicipality of the state, in the same manner as to actions brought by private parties." Moses Lake cites a number of other cases from other jurisdictions, in addition to *Cyril*, but relegates them to mention in footnotes. They all appear similar to *Cyril* in that the focus is on the vindication of "public rights," as opposed to the nature or character of the municipality's conduct.

Boeing and Lockheed contend the statutory provisions cited by Moses Lake do not delegate inherent sovereign power, but merely enumerate the powers which a municipality may exercise. Indeed, the statutory provisions cited by Moses Lake appear to merely grant Moses Lake authority to protect the city water supply, which it "may" exercise. RCW Chapter 35A.70 falls under RCW Title 35A which is the "Optional Municipal Code."[7] This is to be contrasted with the mandatory constitutional duties involved in *Bellevue* ("The state has thus made the local school

---

[7] RCW 35A.01.010 provides:

> The purpose and policy of this title is to confer upon two optional classes of cities created hereby the broadest powers of local self-government consistent with the Constitution of this state. Any specific enumeration of municipal powers contained in this title or in any other general law shall not be construed in any way to limit the general description of power contained in this title, and any such specifically enumerated powers shall be construed as in addition and supplementary to the powers conferred in general terms by this title. All grants of municipal power to municipalities elected to be governed under the provisions of this title, whether the grant is in specific terms or in general terms, shall be liberally construed in favor of the municipality.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 16**

1   district its corporate agency for the administration of a constitutionally required

2   system of free public education") and *Louisiana-Pacific* ("The Washington

3   Constitution provides that areas designated by the port commission, up to 2000 feet

4   from the harbor line, 'shall be reserved for landings, wharves, streets, and other

5   conveniences of navigation and commerce'"), and the mandatory statutory duty

6   involved in *Gustaveson* (land acquired by county "in the exercise of a mandatory duty

7   prescribed by the state and in the exercise of the sovereign power of taxation").

8       Article XI, Section 11 of the Washington Constitution provides: "Any county,

9   city, town or township may make and enforce within its limits all such local police,

10  sanitary, and other regulations as are not in conflict with general laws." This is a

11  "direct delegation of police power . . . [and] requires no legislative sanction for its

12  exercise so long as the subject matter is local, and the regulation reasonable and

13  consistent with the general laws." *Deatmore v. Hindley*, 83 Wash. 322, 326-27, 145

14  P. 462 (1915). See also *Spokane County Health District v. Brockett*, 120 Wn. 2d 140,

15  147-48, 839 P.2d 324 (1992), and *Pestel, Incorporated v. County of King*, 77 Wn.2d

16  144, 159, 459 P.2d 937 (1969).[8]  Moses Lake notes that in *State ex rel. Case v.*

17  *Howell*, 85 Wash. 281, 288-89, 147 P. 1162 (1915), the Washington Supreme Court

18  said this about a municipality's exercise of police powers:

19          It will hardly be questioned that the municipalities of the
        state in the exercise of all those functions relating to the
20          public peace, health, and safety, in short in the exercise
        of their police powers, are but arms, auxiliaries, or agencies
21          of the state performing governmental functions and
        exercising sovereign powers of the state.
22

23  Citing a number of previous decisions from other jurisdictions, including a decision

24  from the United States Supreme Court, the *Howell* court added:

25  _____

26      [8] *Brockett* and *Pestel* are among a number of Washington cases cited by
    counsel for Moses Lake in a Supplemental Declaration (Ct. Rec. 225). All of
27  these cases, with the exception of *Brockett*, precede the *WPPSS* decision, and none
    of them involve application of RCW 4.16.160.
28

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 17**

> While these decisions are broader in their assertion of
> legislative control over the affairs of municipal corporations
> than would be warranted in this state by reason of the fact
> that our cities are guaranteed a large measure of local self-
> government by the [state] Constitution, they are none the
> less authority on the issue here, that municipalities in all
> their governmental functions are agencies of the state
> exercising sovereign powers of the state.

*Id.* at 289.

    *Howell* did not involve application of RCW 4.16.160, and it precedes the state supreme court's decision in *WPPSS* by almost 75 years. In any event, assuming that "governmental functions" are the equivalent of "sovereign functions," *Howell* is not inconsistent with the decision in *WPPSS*. A municipality can also engage in a "proprietary function," and when it does, it is not protected by RCW 4.16.160. The operation of a municipal water system has not traditionally been considered a power or duty which inheres in the sovereign, but rather a proprietary activity for the advantage of each community. Moses Lake is not compelled by the state constitution or state law to operate a municipal water system. It voluntarily chose to do so.[9] Moreover, "public health and safety are not the basis for distinguishing between governmental and proprietary functions of a municipality." The fact Resolution No. 1675 was, in part, prompted by public health and safety (supply drinking water from ML 28 that would not exceed the MCL) did not transform a proprietary function into a sovereign function.[10]

---

[9] Water purveyors in Washington do not have to be municipalities. They can be private entities. (Harer Dep. at p. 135, Ex. O to Ct. Rec. 220). Moses Lake does not serve water to all of the residents of Moses Lake. Some of the residents are served by private wells and some are served by "small," presumably private, water purveyors. (*Id.* at p. 204, Ex. 2 to Ct. Rec. 223).

[10] If a municipality chooses to undertake supplying water to its inhabitants, of course it has a duty to make sure it is safe to drink, *City of Tacoma v. Welcker*, 65 Wn.2d 677, 685 (1965), but that does not mean that duty is traceable to

**ORDER GRANTING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT- 18**

1    Resolution No. 1675 did not cite or rely upon any of the statutory provisions

2  cited by Moses Lake (i.e., RCW 35A.70.10, RCW 35A.70.070, RCW 35.88.10 et

3  seq.). Instead, the resolution refers to RCW 35.22.620(6) and RCW 35A.11.020

4  which recognize "an exception to the bidding requirements for first class cities and

5  code cities in the event of an emergency." Of course, RCW 35A.11.020 is part of

6  Title 35A "Optional Municipal Code. Taken at face value, "waiving bidding

7  requirements" certainly appears more "proprietary" than "sovereign." In this regard,

8  it is noted that as early as 1988, four years prior to the resolution, ML 21, ML 22, and

9  ML 28 had tested above the MCL for TCE. The purpose of the resolution was to

10  waive the bidding requirements for the work involved in sealing the shallow zone or

11  "upper sources" of ML 28 because "[t]he use of this well is necessary in order to meet

12  the summer water needs in the Larson Subdivision." (Resolution at Paragraph 6, Ex.

13  21 to Ct. Rec. 215). Those "needs" included more than just supplying safe drinking

14  water from ML 28. This is apparent from paragraph 7 of the resolution which states

15  that "[t]he cost to rehabilitate Well 28 in such a fashion as to make it **usable and**

16  **have it produce sufficient water** for the population in the Larson Subdivision area

17  will cost between $100,000 and $150,000." (Emphasis added). During his

18  deposition, Philip Bloom, Moses Lake's Municipal Services Director in 1992,

19  acknowledged that a purpose of the resolution was to get ML 28 "back in operation

20  during the summer peak irrigation [season]." (Bloom Dep. at p. 185, Ex. 1 to Ct. Rec.

21  223). Furthermore, during his deposition, the current Municipal Services Director,

22  Gary Harer, confirmed that Moses Lake supplies water to rate paying "customers"

23  and that improvements to the Larson System wells have been for the benefit of these

24  "customers." (Harer Dep. at pp. 204-05, Ex. 2 to Ct. Rec. 223). These "customers"

25  include individuals who are not citizens of Moses Lake and who live outside city

26  _____

27  delegated sovereign powers mandatory in nature, as opposed to enumerated

28  optional powers.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 19**

1  limits. Even the "Larson Zone" is outside city limits. (*Id.* at p. 93, Ex. 2 to Ct. Rec.
2  225).    Moses Lake contends its actions, including Resolution No. 1675, were
3  motivated by non-monetary concerns (supplying safe drinking water), and while that
4  is likely true to some extent, it is also true that a municipality cannot charge for water
5  it cannot supply, whether for drinking or irrigation purposes, thereby diminishing the
6  amount of revenue.

7      Based on the particular facts and circumstances present in this case, the court
8  must conclude the actions of Moses Lake taken with respect to the Larson System of
9  wells, including the passage of Resolution No. 1675, represent regulation and
10 administration of the local and internal affairs of Moses Lake for the special benefit
11 and advantage of the urban community embraced within the boundaries of the
12 municipal corporation of Moses Lake. The actions of Moses Lake were not taken as
13 a representative of the State of Washington, but ultimately were taken to further its
14 own corporate ends. Because Moses Lake acted in a proprietary capacity, it is not
15 entitled to invoke RCW 4.16.160 to salvage permanent tort claims against Boeing and
16 Lockheed (i.e., allow Moses Lake to seek and collect damages from Boeing and
17 Lockheed incurred any earlier than October 2001).

18
19      **C. Continuing Torts**
20     Under Washington law, Moses Lake's recovery for a continuing trespass is
21 limited to damages incurred within three years preceding the filing of suit. *Bradley*,
22 104 Wn.2d at 695.  Recovery for a continuing nuisance or a continuing negligent
23 injury to property is limited to damages incurred within two years preceding the filing
24 of suit.  Thus, in this case, the limitations period for any continuing trespass by
25 Boeing and Lockheed is from October 18, 2001 to October 18, 2004. The limitations
26 period for any continuing nuisance or negligent injury to property is from October 18,
27 2002 to October 18, 2004.

28     Moses Lake contends this court, in its December 30, 2005 order, stated Moses

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 20**

Lake's continuing tort claims were viable so long as Moses Lake could show:   (1) continuing contamination of its wells by TCE and (2) substantial damages relating to that contamination within the  limitations period.  Moses Lake says it can make that showing and submits certain declarations in support thereof (Declaration of William L. Maddox and Declaration of Gerry McFaul).

This court stated the following in its order:

> To the extent Moses Lake has any "continuing tort" claims, it would be limited to recovery of damages incurred within the two years preceding filing of its administrative claim in December 2003. . . . All of the damages claimed in the December 2003 administrative claim filed by Moses Lake were incurred prior to December 2001.  In other words, they were not incurred within the two years preceding the filing of the administrative claim (i.e., costs for rehabilitation of the ML 21, ML 22 and ML 28 wells and construction of the reservoir). . . .
>
> Moses Lake discovered its injury in 1988 or 1989 and then proceeded to seal its contaminated wells and build a new reservoir.  That permanently abated the problem at the time which was the contamination of wells ML 21, ML 22 and ML 28.  Those wells have tested at "non-detect" for TCE during the last ten years.  Moreover, as is apparent from the December 2003 administrative claim (as amended by the April 2004 claim), Moses Lake has set forth a detailed breakdown of the damages it incurred in abating the contamination of wells ML 21, ML 22 and ML 28. . . .  The extent of those damages is therefore ascertainable in a single action and as such, the contamination of wells ML 21, ML 22 and ML 28 has to be considered a permanent injury.  As discussed above, the December 2003 administrative claim (as amended  April 2004) is untimely with respect to that permanent injury.
>
> What about the threat to the city's new production wells because of the recent sampling data or the potential loss of water rights?[11]  That does not qualify as a "continuing tort."  If anything, it represents a potentially new tort claim which has yet to accrue because there has been no injury as yet.  There is no allegation that these wells have in fact been contaminated or  the water rights have in fact been lost.  There is only a "threat" of contamination

---

[11] Sampling by the USACE in late 2004 and early 2005 showed TCE in the range of 80 ppb in the upper (shallow) aquifer from which Moses Lake used to draw its drinking water, and 30 ppb in the lower (deeper) aquifer from which it currently draws its drinking water.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 21**

and a "threat" of the loss of water rights.  If and when there is a contamination problem and/or an actual loss of water rights, and the city can then be deemed to know of its injury and its cause, it can submit an FTCA administrative claim for the damages associated with said contamination and loss of water rights.  Until then, the "threat" can be addressed by the remedial process of CERCLA and the equitable relief available pursuant to that statute.

This court did not say that Moses Lake could reassert continuing tort claims against the United States at such time at it could establish that TCE impacted its wells and that it had suffered damages as a result of that contamination.  This court found there were no continuing tort claims against the United States, reasoning that the contamination of ML 21, ML 22 and ML 28 above MCL levels was permanently abated by the sealing of the shallow zones of those wells, and the construction of a new reservoir.  ML 21, ML 22 and ML 28, prior to sealing, drew water from the shallow aquifer.  Water is now drawn, via the original Larson System wells (including ML 21, ML 22,  and ML 28) and new production wells, from the deeper aquifer in which the reservoir (Reservoir No. 7) is located.

Moses Lake apparently contends the contamination was not permanently abated, claiming that since ML 21 was rebuilt in 1993, TCE was detected in both 1993 and 2003; that since ML 23 was rebuilt in 1999, TCE was detected in both 2001 and 2002; and that since ML 28 was rebuilt in 1991, TCE was detected in 1992. (Declaration of William L. Maddox, Ct. Rec. 216).  Maddox, the City's Water Manager for the past 22 years, acknowledges that none of these detects were in excess of the MCL (Maximum Contaminant Level) set by the Safe Drinking Water Act (SDWA) at 5 parts per billion (ppb), but contends it is inaccurate to say the wells that were rebuilt in response to the initial identification of TCE in 1988 have tested at "non-detect" since that time. Maddox appears to take issue with the statement in this court's order that ML 21, ML 22 and ML 28 "have tested at 'non-detect' during the last ten years."  (Order at p. 22).

Mr. Maddox is not revealing anything new to this court.  Furthermore, the

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 22**

court's statement is accurate because the "last ten years" refers to the period from 1994 to 2004. In this court's order (at p. 6), it noted:

> Since the discovery of TCE in ML 21, ML 22 and ML 28, the Larson system wells have been tested routinely for the last seventeen years. Sampling data maintained by DOH shows that since 1992, the levels of TCE in ML 21 and ML 28 have decreased to below the MCL or to "non detect." **For the last ten years, ML 21 and ML 28 have been at "non detect" for TCE.** Because ML 22 was taken out of service by Moses Lake, DOH test results end in 1991. At that time, the well was just slightly above non-detect and less than 1 ppb for TCE. For the ten year period from 1994 to 2004, ML 24 and ML 29 have tested at non-detect for TCE, and for the same ten year period, TCE levels in ML 23 were less than 2 ppb with several non-detect values. Between 1988 and 1992, ML 24 always tested at non-detect levels, and ML 23 and ML 29 never exceeded the MCL, unlike ML 21, ML 22 and ML 28.

(Emphasis added).

This information came from Remy J.-C. Hennet, an expert retained by the United States, who observed that State test results for the ten year period from 1994 to 2004 showed that ML 21 and ML 28 had tested at "non-detect." According to Hennet, the results did show a detect for ML 21 in 1993 and 1994, but no detects since, seemingly contradicting the claim of Maddox that there was a detect in 2003.[12] In any event, all of those detects were below the MCL. According to Hennet, for ML 28, the results did show detects in 1992 and 1993, although below the MCL.

What about ML 23? In its FTCA administrative claim submitted to the United States, Moses Lake did not ask for any specific damages pertaining to ML 23. There was no discussion about ML 23 in conjunction with the motion filed by the United States. The reason appears to be that ML 23 has never tested above the MCL,

---

[12] With his declaration, Maddox did not include the data which purportedly supports his assertion that there was a detect in ML 21 in 2003. Moses Lake Municipal Services Director Gary Harer testified he was not aware of any detects in ML 21 or ML 28 since the sealing of those wells from the upper aquifer. (Harer Dep. at p. 136, Ex. O to Ct. Rec. 220).

**ORDER GRANTING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT- 23**

including at anytime after 1988.[13] Hennet acknowledges that for the ten year period 1994-2004, there have been detects of TCE in ML 23, although at levels less than 2 ppb, and with several non-detect values as well.

Moses Lake appears to ask this court to reconsider the summary judgment granted to the United States on the continuing tort claims, but it relies on evidence with which this court is already familiar, and for the first time with regard to the United States, brings up ML 23 and seeks new damages not sought in the FTCA administrative claim.[14]

In his declaration, Maddox also refers to ML 19, which is one of Moses Lake's "new production wells." According to Maddox, ML 19 was acquired by Moses Lake in 2003 and "is located south of the Larson System wells [ML 21, ML 22, ML 23, ML 24, ML 28 and ML 29] and . . . [t]esting on this well showed the presence of TCE in both 2004 and 2005." Maddox does not assert, however, that this testing has showed a level of TCE in excess of the MCL. And indeed, Municipal Services Director Harer admits that TCE levels in ML 19 have never required Moses Lake to report the contamination to a state or federal agency. Moses Lake continues to operate ML 19 to supply drinking water because "it's way below the MCL." (Harer Dep. at p.122, Ex. O to Ct. Rec. 220).

Moses Lake contends that within the past three years (presumably October

---

[13] Harer testified there was no concern about ML 23 and it is still providing drinking water to the citizens of Moses Lake. (Harer Dep. at p. 137; Ex. O to Ct. Rec. 220). He also acknowledges that since the completion of the rehabilitation projects on ML 21 and ML 28, Moses Lake has not undertaken any further projects on it wells with regard to contamination, or notified the public about remaining contamination. *Id.* at pp. 141-142.

[14] Mr. Maddox indicates ML 23 was rebuilt in 1999. Therefore, had Moses Lake sought to recover the costs of that project from the United States, it could have mentioned it in its administrative claim.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 24**

2001 to October 2004), it has incurred "substantial damages" attributable to the contamination of its wells by TCE which are recoverable via a continuing tort theory. In support thereof, Moses Lake submits the declaration of Gerry McFaul (Ct. Rec. 217) who has been the City Engineer for Moses Lake for the past 13 years. Mc Faul says Moses Lake has hired Golder & Associates "to undertake design of modifications and improvements to the City's water system" within the past three years. Furthermore, according to McFaul:

> The current improvements that are being undertaken are the modification of Reservoir No. 7[15] and the design of a new reservoir within the Larson Zone, Reservoir No. 9. Modification of Reservoir No. 7 and the need to construct an additional reservoir within the Larson Zone are required because the City is very concerned about drilling new wells to increase the production capacity within that zone based on the contamination of the ground-water aquifers within that zone by TCE. In addition, at the time Reservoir 7 was constructed in response to the initial discovery of TCE within the Larson Zone, that reservoir was not built tall enough to keep desirable water pressure in this zone.

(McFaul Declaration at Paragraph 2).

This declaration was not submitted in response to the motion filed by the United States, but there is no apparent reason why it could not have been submitted then. Moses Lake admits it is new evidence which "goes beyond the allegations set forth in its Complaint and First Amended Complaint and, to the extent necessary to conform its pleadings to the fact elicited in discovery, . . . requests leave to filed a Second Amended Complaint in order to formally assert these allegations."

(Plaintiff's Combined Response, Ct. Rec. 214, at p. 18, n. 56). The damages alluded to by McFaul are wholly different from and newer than the damages set forth in the FTCA administrative claim submitted by Moses Lake. Moses Lake asserts these

---

[15] Reservoir No. 7 was the reservoir Moses Lake began constructing in 1991 in response to the TCE contamination above the MCL discovered in ML 21, 22 and 28 in 1988.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 25**

1  different and newer damages are recoverable in tort from Boeing, Lockheed, and the

2  United States, as are other consequential damages arising from TCE contamination,

3  including diminution of property values impacting the city's tax base, and economic

4  damages or potential defense costs associated with the imposition of any institutional

5  controls ultimately required by EPA's proposed remedy for the site.

6       Moses Lake has not explicitly or impliedly challenged the court's finding in the

7  December 30, 2005 order that "[a]ll of the damages claimed in the December 2003

8  administrative claim [against the United States] were incurred prior to December

9  2001 [and] . . . were not incurred within the two years preceding the filing of the

10  administrative claim (i.e., costs for rehabilitation of the ML 21, ML 22 and ML 28

11  wells and construction of the reservoir)."  In its motion, the United States argued that

12  Moses Lake had not alleged any damages that would be recoverable under a

13  continuing nuisance or trespass theory as none of the damages it suffered occurred

14  in the two year period prior to filing of the December 2003 FTCA administrative

15  claim.  Moses Lake responded by asserting that the challenge of the United States to

16  the continuing tort claims was "not on statute of limitations grounds, but by attacking

17  the substance of those claims, i.e., the damages recoverable by the City under those

18  theories of liability."  (Ct. Rec. 120 at pp. 15-16).  Moses Lake noted the USACE

19  sampling results from late 2004/early 2005 showing TCE concentration of up to 30

20  ppb in the lower (deeper) aquifer and asserted:

21           The City **will** almost certainly suffer substantial damages
             based on the **continuing** presence of TCE in its wellfield,
22           including the **possible** need to completely abandon its existing
             wellfield, which is located within the boundaries of the TCE
23           plume.  Regardless of the ultimate extent of the City's
             damages, however, the time to discuss those damages is not on
24           a motion directed to statute of limitations.  Because the
             evidence establishes the validity of the City's continuing
25           tort claims, those claims are not time-barred and the Court
             therefore has jurisdiction to determine the merits of those
26           claims along with the City's damages at such time as they are
             properly brought before the Court at trial, or on an appropriately
27           filed dispositive motion.

28  (*Id.* at p. 19)(emphasis added).

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 26**

1    In reply, the United States correctly observed that Moses Lake did not deny
2    that it lacked damages during the two year statutory period. It was incumbent upon
3    Moses Lake, in response to the motion filed by the United States, to produce evidence
4    that it incurred damages within the two year period prior to December 2003. The
5    United States made that an issue in its motion and Moses Lake, instead of showing
6    that it had suffered damages within that two year period, contended it "**will** almost
7    certainly suffer substantial damages based on the continuing presence of TCE in its
8    wellfield, including the possible need to completely abandon its existing wellfield,
9    which is located within the boundaries of the TCE plume." This was an admission
10   that no damages were incurred between December 2001 and December 2003.[16]

11   There is no basis for reconsideration with regard to the order granting summary
12   judgment to the United States. Even if the continuing existence of some
13   contamination in the aquifers, and some detects of TCE in ML 19 and ML 23 not
14   above the MCL, create an issue of material fact regarding the existence of an injury
15   for liability purposes (which it does not, as discussed *infra*), Moses Lake failed to
16   establish that it incurred any damages within the two year period prior to December
17   2003. The declaration of Mr. Maddox is not new evidence. The declaration of Mr.
18   McFaul is new, but could have been submitted by Moses Lake in response to the

19

20

_____

21   [16] Confirmation is found by examining the itemization of damages set forth
22   in the December 2003 administrative claim. All of the items listed occurred prior
     to December 2001 and are related to the TCE contamination of ML 21, ML 22 and
23   ML 28 above MCL, first discovered in 1988: Well 29 Water Line Construction;
24   Well 22 Rehabilitation; Larson Feasibility Study (the first Golder study); Well 28
25   Rehabilitation; Reservoir 7 Construction; Well 21 Rehabilitation; Patton
     Boulevard Line; Knolls Vista to Larson Intertie; Skyline Wells; State of
26   Washington Public Works Trust Fund Loan Costs and Interest; Cost To Replace
27   Lost Capacity; Water Rights Losses at $2,000/Acre Foot; Lost Revenue Due To
28   Water Rationing, and "Diminution In Value Of Property."

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 27**

motion filed by the United States. There was no clear error by the court.[17]

Because Moses Lake is time-barred from recovering from the United States those damages set forth in the FTCA administrative claim, it is likewise time-barred from recovering those same damages from Boeing and Lockheed. The fact that the limitations period extends back two additional months to October 2001 with regard to Boeing and Lockheed does not make any difference as all of the damages were incurred prior to October 2001.

In determining there were no continuing tort claims against the United States, this court focused on the permanent abatement of TCE contamination from ML 21, ML 22 and ML 28 that was above the MCL, noting that ML 22 was taken out of service and there were no detects of TCE in ML 21 and ML 28 from 1994 through 2004 following rehabilitation of those wells. The papers Moses Lake filed in response to the United States' motion gave the court no reason to believe the threat to the public's drinking water supply from the individual wells was not the proper focus. Indeed, even now Moses Lake refers to "continuing contamination of its **wells** by TCE" (emphasis added), although contending that for the purposes of determining abatability and the existence of injury, it is not necessary that the contamination

---

[17] " '[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Pyramid Lake Paiute Tribe v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 790); see *Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985); see also *Keene Corp. v. International Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982) (reconsideration available "to correct manifest errors of law or fact or to present newly discovered evidence"). Such motions are not the proper vehicle for offering evidence or theories of law that were available to the party at the time of the initial ruling. *Fay Corp. v. Bat Holdings I, Inc.*, 651 F. Supp. 307, 309 (W.D. Wash. 1987); see *Keene Corp.*, 561 F. Supp. at 665-66.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 28**

1  exceed the MCL.

2      In Washington, trespass occurs when a person "intentionally (a) enters land in

3  the possession of the other, or causes a thing or third person to do so, or (b) remains

4  on the land, or (c) fails to remove from the land a thing which he is under a duty to

5  remove." *Bradley*, 104 Wn.2d at 681-82, quoting RESTATEMENT (SECOND) OF

6  TORTS §158 (1965). In *Bradley*, the Washington Supreme Court stated that one of

7  the necessary elements of a trespass claim based on emission of imperceptible

8  airborne pollutants is substantial damages to the *res* upon which the trespass occurs.

9  *Id*. at 691-92. Here, an initial question arises whether there could be any trespass to

10 the aquifers since Moses Lake does not "exclusively possess" the aquifers, but rather

11 "exclusively possesses" the wells at best. "If the intrusion interferes with the right

12 to exclusive possession of property, the law of trespass applies [whereas] [i]f the

13 intrusion is to the interest in use and enjoyment of property, the law of nuisance

14 applies." *Id*. at 690-92. The state supreme court got involved in *Bradley* pursuant to

15 questions certified from the Western District of Washington. After the supreme court

16 answered the questions, the federal district court considered whether plaintiffs'

17 property had been injured by arsenic or cadmium emitted by defendant's smelter. It

18 was undisputed that any arsenic or cadmium deposited on plaintiffs' land was

19 imperceptible to human senses and that the presence of these materials had no

20 demonstrable effect on plaintiffs' property. As such, the injury to plaintiffs' property,

21 if any, consisted of a "hidden hazard." *Bradley v. American Smelting & Refining*

22 *Company*, 635 F.Supp. 1154,1157 (W.D. Wash. 1986). While the amounts of arsenic

23 and cadmium exceeded normal background concentrations, the defendant submitted

24 expert opinion evidence that these concentrations did not present a danger. On the

25 other hand, the plaintiffs failed to submit any evidence that an actual danger existed.

26 Therefore, the court concluded there was no injury to the plaintiffs' property,

27 including no diminution in the value of the property. *Id*.

28      "Nuisance" is "an obstruction to the free use of property, so as to essentially

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 29**

interfere with the comfortable enjoyment of life and property." RCW 7.48.010. "In order to recover for nuisance, a plaintiff must show substantial interference with the use and enjoyment of his land." *Bradley*, 635 F.Supp. At 1157. In *Bradley*, the plaintiffs conceded the arsenic and cadmium on their property was imperceptible to human senses and that the presence of these materials did not cause them any physical discomfort. They asserted, however, that they were worried about possible health risks and this worry interfered with their use and enjoyment of their property. Because no actual health risk existed, the question was whether mere anxiety was a "substantial harm on which recovery for nuisance may be based." The court answered in the negative because the plaintiffs had not experienced any ill health or physical discomfort, and there had been no invasion or threatened invasion of plaintiffs' security because there was no evidence of a health risk. *Id.* at 1158.

While *Bradley* involved airborne pollutants and the case at bar involves waterborne pollutants, both qualify as "intangible" pollutants.[18] The TCE in the aquifers and in ML 19 and ML 23 is imperceptible to human senses and no health risk is presented by it at this time since all of the wells test below the MCL. Proof enough is that Moses Lake continues to supply drinking water via its wells, including ML 19, 21, 23, and 28. Moses Lake has not presented any evidence of an actual existing danger. Like the plaintiffs in *Bradley*, Moses Lake is merely worried about possible health risks, specifically that if it drills new wells, they may become contaminated

---

[18] If there is a direct and tangible invasion of another's property, there is an infringement of the right to exclusive possession (a trespass), and the law presumes damages. If the invasion is indirect and intangible, the proper remedy lies in an action for nuisance, based on interference with the right of use and enjoyment of the land. If, however, the intangible invasion causes substantial damage to the plaintiff's property, this damage is considered an infringement on the plaintiff's right to exclusive possession, and an action for trespass may be brought. *Gill v. LDI*, 19 F.Supp.2d 1188, 1198 (W.D. Wash. 1998), citing *Mock v. Potlatch Corporation*, 786 F.Supp. 1545, 1548 (D. Idaho 1992).

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 30**

1   with TCE in excess of the MCL.  Accordingly, it has chosen to make improvements

2   to its system so it can keep pumping water from existing wells that have not exceeded

3   the MCL for many years.

4        The declarations of Maddox and McFaul do not constitute evidence of actual

5   and substantial injury or damage to property exclusively in the possession of Moses

6   Lake (trespass), nor evidence of substantial interference with Moses Lake's use and

7   enjoyment of its property (nuisance), nor evidence of injury to support a negligence

8   claim.[19]   Because of this failure of proof upon a requisite element of each of these

9   torts, there are no continuing tort claims against any of the defendants.  As stated in

10  the court's previous order, if and when one of the wells exceeds the MCL for TCE,

11  Moses Lake will have a cause of action because clearly then a health risk will exist.

12  The cause of action will accrue upon notice that the well exceeds the MCL for TCE,

13  as it accrued in 1988 with regard to ML 21, ML 22 and ML 28 when they tested

14  above the MCL for TCE.[20]

15

16  **IV. CONCLUSION**

17        RCW 4.16.160 does not apply to Moses Lake's tort claims against Boeing and

18  Lockheed and so those claims are subject to the applicable Washington statutes of

19  _____

20        [19] The elements of negligence are duty, breach, causation, and injury.  *Huff*

21  *v. Roach*, 125 Wn.App. 724, 729, 106 P.3d 268 (2005).  The injury element refers
    to "damage" as opposed to "damages" which are the monetary value of the injury
22  or damage proximately caused by the breach of alleged duty.  *Id.*

23

24        [20] Because there is no continuing harm, it is not necessary to address the
    issue of "reasonable abatability" of such harm.  This court reaffirms its finding
25  that the relevant contamination for determining injury and liability (the
26  contamination of ML 21, 22 and 28 above the MCL) was permanently abated
    many years ago with the rehabilitation of ML 21 and ML 28, the taking of ML 22
27  out of service, and the fact that none of those wells, or any other wells, have since
28  tested above the MCL.

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 31**

1  limitation. Moses Lake has only permanent tort claims against the United States,
2  Boeing and Lockheed. These claims accrued in 1988 when ML 21, ML 22 and ML
3  28 tested above the MCL. Once this contamination in excess of the MCL was
4  rectified, the trespass, the nuisance, and/or the negligent injury to property was
5  permanently abated. There was no more injury. There has been no continuing
6  nuisance, trespass or negligent injury as borne out by the fact that no wells have
7  exceeded the MCL since then, and Moses Lake continues to use these wells, and
8  other wells, to supply drinking water.

9      Even if the existence of some TCE in the aquifers and sub-MCL detects of TCE
10 in ML 19 and ML 23 were enough to create an issue of material fact regarding the
11 existence of injury, there would still be no basis for reconsideration of the order
12 granting summary judgment to the United States because Moses Lake incurred no
13 damages related to that contamination between December 2001 and December 2003.
14 Instead, the damages claimed by Moses Lake were related to the contamination of
15 ML 21, ML 22 and ML 28 first discovered in 1988. Boeing and Lockheed likewise
16 are not liable for those damages as they were incurred by Moses Lake prior to
17 October 2001.

18     Boeing's Motion For Partial Summary Judgment (Ct. Rec. 199) and
19 Lockheed's Motion For Partial Summary Judgment (Ct. Rec. 207) are **GRANTED**.
20 Boeing and Lockheed are awarded summary judgment on the common law tort claims
21 asserted against them by Moses Lake.

22     **IT IS SO ORDERED**. The District Executive is directed to enter this order
23 and forward copies to counsel.

24     **DATED** this 4th of May, 2006.

25

26

27                         ALAN A. McDONALD
                           Senior United States District Judge

28

**ORDER GRANTING MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT- 32**