UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF MOSES LAKE,<br>a Washington municipal corporation, ) | No. CV-04-0376-AAM |
| ) | |
| ) | **ORDER GRANTING** |
| ) | **DEFENDANT LOCKHEED'S,** |
| Plaintiff, ) | **MOTION FOR SUMMARY** |
| ) | **JUDGMENT, *INTER ALIA*** |
| vs. ) | |
| ) | |
| The UNITED STATES OF ) | |
| AMERICA, et al., ) | |
| ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**BEFORE THE COURT** are Defendant Lockheed Martin Corporation's Motion For Summary Judgment Or, In The Alternative, Summary Adjudication Of Plaintiff's CERCLA And MTCA Causes Of Action (Ct. Rec. 238), and Plaintiff City Of Moses Lake's Motion For Summary Judgment Of Liability Under CERCLA And MTCA Against Defendant Lockheed Martin Corporation (Ct. Rec. 242).

Oral argument was heard on September 29, 2006. Steven G. Jones, Esq., argued for City Of Moses Lake ("Moses Lake"). Robert W. Loewen, Esq., argued for Lockheed Martin Corporation ("Lockheed").

**I. BACKGROUND**

On December 30, 2005, this court issued an order granting summary judgment to the United States defendants on Moses Lake's Federal Tort Claims Act (FTCA)

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    1**

claims, finding those claims were barred by the two year FTCA statute of limitations. (Ct. Rec. 180).[1]   On May 4, 2006, this court issued an order granting summary judgment to defendants Boeing Company ("Boeing") and Lockheed on the common law tort claims asserted against them by Moses Lake (nuisance, trespass and negligence), finding those claims barred by applicable Washington statutes of limitations (Ct. Rec. 234).

Moses Lake has also brought cost recovery and contribution claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq., and under Washington's Model Toxics Control Act ("MTCA"), RCW Chapter 70.105D.  These claims are asserted against the United States, Boeing and Lockheed.  Lockheed now seeks summary judgment on the cost recovery claims, contending that as to it, those claims are barred by the statutes of limitations applicable to CERCLA and MTCA claims.  Lockheed also contends that certain response costs alleged to have been incurred by Moses Lake after 1994 are not recoverable under either CERCLA or MTCA because they were not "necessary."

Moses Lake has filed a cross-motion for summary judgment, asking this court to find as a matter of law that Lockheed is liable as an "operator" and/or as an "arranger" under CERCLA and MTCA.

## II. FACTS[2]

The City of Moses Lake is located near the former Larson Air Force Base

---

[1]  Moses Lake is also referred to as the "City" herein.

[2]  These are the facts recited in the court's order granting summary judgment to Boeing and Lockheed on Moses Lake's common law tort claims (Ct. Rec. 234), with some modifications (i.e., ML 21 not sealed until 1994) and additions (post-1994 projects).

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-*   **2**

("LAFB"). During World War II and the Cold War, LAFB was used to assemble, station, and maintain hundreds of military aircraft. As a contractor for the United States Air Force, Boeing assembled and maintained these aircraft. LAFB was also surrounded by intercontinental ballistic missiles ("ICBMs") manufactured by Glen L. Martin Company, a predecessor to Lockheed. ICBMs and their components were assembled, fueled and maintained at LAFB and its associated facilities.

After closing LAFB, the United States conveyed almost all of the land and properties that comprised LAFB to Moses Lake in 1966. In a separate transaction in June 1967, the United States conveyed LAFB's drinking water system, a sewer system, and a waste water treatment plant. The drinking water system originally consisted of five wells (ML 21, ML 22, ML 23, ML 28, and ML 29, a.k.a. "The Larson System"), now situated within a City-defined water distribution zone known as "the Larson Zone." In 1982, Moses Lake constructed a sixth Larson Zone well known as ML 24.

In 1988, Moses Lake was informed by the Washington Department of Social and Health Services ("DSHS"), now known as the Department of Health ("DOH"), that samples taken from three of its wells tested positive for trichloroethylene ("TCE"). Moses Lake learned of the contamination through required testing and regulatory action under what is commonly known as the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f, et seq. The testing of the wells through 1988-89 showed levels of TCE in wells ML 21, ML 22, and ML 28 at concentrations above the MCL (maximum contaminant level) of 5 ppb (parts per billion).

As a result of a July 1988 meeting between DOH and Moses Lake, DOH determined that Moses Lake should sample the three wells on a quarterly basis and notify the public of the contamination. DOH advised Moses Lake that the adequacy of the casing and sealing of the three wells should be examined. Also in July 1988, a meeting was held in Moses Lake with participants from the United States Environmental Protection Agency ("EPA"), DOH, and the Washington State

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 3**

Department of Ecology ("DOE") discussing TCE in the three City wells. DOH again recommended Moses Lake investigate well casing and sealing. The need for public notification and partial well sealing was reiterated by DOH in a follow up letter to Moses Lake. Although Moses Lake initially objected to both DOH recommendations, it did take ML 22 out of service in August 1988, and on December 14, 1988, published a press release advising the public of the TCE contamination and that it was "continu[ing] to work with DSHS, EPA and Ecology to monitor the city's water supply to determine the source of the contamination."

In 1988, Moses Lake was provided information about the initial stages of a CERCLA investigation. In September 1988, DOE issued a Preliminary Assessment Report for Grant County Municipal Airport discussing the TCE contamination in relation to former occupants of the airport and concluding that DOE's work should be coordinated with DOH's ongoing investigation of drinking water contamination and the investigation by the U.S. Army Corps of Engineers ("USACE") into past practices at LAFB. In November 1988, DOE provided Moses Lake with the EPA's Potential Hazardous Waste Site Disposition Report which recommended the USACE conduct an historic site investigation of LAFB activities. DOE and DOH officials met with the City and explained this report would further the CERCLA investigation process.

On January 5, 1989, the Acting Municipal Services Director for Moses Lake provided the City Manager a plan, known as the "Larson Potable Water Supply Project" (aka "the Larson Project"), outlining the steps necessary to reduce the levels of TCE in the wells to below the MCL, while still maintaining adequate water production capacity. The plan provided that the City would line and seal the upper portions of ML 22 so that the well could draw water from the deeper, "clean" portion of the aquifer. The City would study other forms of treatment and monitoring for the other aging municipal wells. The plan also provided that anticipated lost production capacity due to the proposed sealing would be addressed by constructing an additional

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-  4**

well, repairing an old well (ML 29)[3], and constructing a reservoir to create additional storage capacity.[4]  In July 1989, Moses Lake applied for a $1.4 million loan from the State of Washington Public Works Trust Fund to construct "a reservoir, well and associated water lines on the Larson system."  The application was prepared for the 1990 funding cycle and  the loan was granted.  By the end of 1989, the City's Municipal Services Director recommended the City retain a consultant to assist in the review of CERCLA documents and "identify the course of the contamination for potential future litigation."

In January 1990, the USACE determined that what was to become known as the Moses Lake Wellfield Contamination Superfund Site ("Site") was eligible for funding for further environmental investigation as a Formerly Used Defense Site ("FUDS") under the Defense Environmental Restoration Program ("DERP").  10 U.S.C. §2701. In January 1991, Moses Lake hired a consulting firm, Golder & Associates ("Golder"), to undertake an investigation to assess the contamination to the extent possible and to propose options to assure a clean water supply to the Larson System. In March 1991, Moses Lake was told the USACE had budgeted approximately $1 million for an environmental investigation at LAFB, and that the USACE anticipated starting the investigation, at the earliest, in October 1991.  Also, in March 1991, USACE's lead civil investigator at the site, John Vogel, informed Moses Lake he had hired Dames & Moore to drill 20 monitoring wells to determine the extent of the TCE contamination, and that the work would begin in July or August 1991.  The USACE initially targeted four possible TCE source areas for investigation, but told the City in May 1991 that its original plan "had been modified to include a wider evaluation

---

[3] Construction of the ML 29 project began on March 6, 1989 and was completed on May 15, 1989.

[4] Construction of Reservoir 7 began in October 1991 and was completed in August 1992.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 5**

of potential contaminant sources in the Larson area . . . . [and] [i]f source areas are found in this initial program that can be traced to the military, then additional investigations would be undertaken." On October 28, 1991, Golder delivered its *Report to the City of Moses Lake on Hydrogeological Evaluation of Larson Area, Moses Lake, Washington*.

In or about March 1992, Vogel proposed the USACE take an "intermediate remedial action" ("IRA") and construct extensions to two of the City's wells so water could be drawn from the lower areas of the aquifer believed to be free of TCE contamination. In a press release, the USACE advised that it was requesting Department of Defense ("DOD") funds to reconstruct or replace two city wells and to treat the water from two other public wells. Vogel recommended the IRA be funded by the USACE, consistent with his conclusion the DOD was at least partially responsible for contaminating the wellfield. Vogel requested funding in the amount of $1,630,200. In June 1992, EPA wrote to support the USACE's proposal. Vogel obtained local approval from the USACE's Seattle District for this proposed IRA and then submitted his recommendation and the funding request to senior USACE officials. The USACE managers at the Missouri River Division rejected Vogel's request in June 1992 and instead said the USACE would commence identification of and negotiation with other potentially responsible parties ("PRPs") at the Site.

On April 14, 1992, the Moses Lake City Council adopted Resolution No. 1675, "A Resolution Declaring An Emergency And Waiving The Statutory Bidding Requirements Because Of The Emergency." In this resolution, Moses Lake acknowledged: (1) that its municipal water system was contaminated with TCE levels above the MCL set by EPA; (2) that it had been attempting to determine the source of the contamination and, along with state and federal agencies, examining methods for eliminating the contamination; and (3) that DOE would "not allow use of Well 28 until the upper water sources are prevented from entering the well." The City Council declared an emergency to address the contamination and the fact "there may not be

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 6**

enough water to supply the population in the [Larson Subdivision] area during the summer if Well 28 is not rehabilitated as soon as possible." ML 28 was sealed off permanently from the upper aquifer between April and November 1992.

In October 1992, EPA placed the wells, the adjacent privately owned Skyline Water System, and a number of individual residential wells, on the CERCLA National Priorities List ("NPL" or "Superfund") to be collectively addressed by EPA as the "Moses Lake Wellfield Contamination Superfund Site." 42 U.S.C. §9605(a)(8). The EPA contacted PRPs pursuant to CERCLA §104(e), 42 U.S.C. §9604(e). Both Boeing and Lockheed were named as PRPs and were contacted by EPA.

Moses Lake retained legal counsel who, in August 1993, wrote a letter to Boeing requesting that Boeing execute a tolling agreement "[i]n order to preserve the City's claims." Boeing entered into a tolling agreement with Moses Lake. Lockheed, however, never entered into a tolling agreement with Moses Lake.

Between 1989 and 1994, Moses Lake sealed and lined the shallow zones of ML 21[5], ML 22 and ML 28, and constructed the new reservoir (Reservoir No. 7). With the completion of these projects, Moses Lake closed out its Public Works Trust Fund loan.

Since the discovery of TCE in ML 21, ML 22 and ML 28, the Larson System wells have been tested routinely. Sampling data maintained by DOH shows that since 1992, the levels of TCE in ML 21 and ML 28 have decreased to below the MCL or to "non detect." For the last ten years, ML 21 and ML 28 have been at "non detect" for TCE. Because ML 22 was taken out of service by Moses Lake, DOH test results end in 1991. At that time, ML 22 was just slightly above non-detect and less than 1 ppb for TCE. For the ten year period from 1994 to 2004, ML 24 and ML 29 tested at

---

[5] Construction on ML 21began on May 25, 1993 and was completed on January 18, 1994. A certified Construction Report was submitted to DOH on April 18, 1994.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 7**

non-detect for TCE, and for the same ten year period, TCE levels in ML 23 were less than 2 ppb with several non-detect values. Between 1988 and 1992, ML 24 always tested at non-detect levels, and ML 23 and ML 29 never exceeded the MCL, unlike ML 21, ML 22 and ML 28.

In 1997, Moses Lake installed a new water main on Patton Boulevard to provide an additional, larger connection between ML 28 and Reservoir 7. This enabled simultaneous operation of ML 24 and ML 28 at a greater flow rate than was previously possible.

In 1997, the Moses Lake City Council approved a plan to connect the Knolls Vista water zone to the Larson Zone. Construction of the Knolls Vista intertie began in July 1997 and was completed in March 1998.

Beginning in 1995, the EPA began negotiating a proposed agreement with Moses Lake to connect the Skyline Water System customers to Moses Lake's water system. Under the terms of the proposed agreement, Moses Lake was to receive additional water rights, would charge the Skyline residents a higher commercial rate, and would receive from the EPA an agreement that Moses Lake would be protected from any litigation concerning TCE contaminated water in the area. The USACE was responsible for design and construction, and Moses Lake charged the USACE fees and received reimbursement for review and approval of USACE's plans and specifications. The EPA selected another alternative in 1999 which was to construct a new well in the Skyline area that would draw water from the deeper aquifer (Roza 2). The new well was drilled in 2001, but was found to be contaminated with TCE at levels equal to or slightly above the MCL. EPA proposed that a second well be drilled. EPA received comments from Skyline residents opposing the connection of the City's water system with the private Skyline Water System. On May 28, 2002, EPA received a letter from Moses Lake's consultant (Golder), complaining about the already completed well. Moses Lake's comments were received after the EPA had already made the decision to drill the second well. Moses Lake has not experienced

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 8**

any TCE contamination problem in its wells as a result of the drilling of the second Skyline well.

Since Moses Lake filed this lawsuit in October 2004, it now alleges it has incurred "necessary" response costs with regard to the current construction of a new reservoir (Reservoir 9) and modification of Reservoir No. 7.[6]  Reservoir 9 is being built to in order to improve the water pressure in the Larson area.  Reservoir 7 needs to be raised to the elevation at which the new Reservoir 9 is being built so that the new reservoir will work properly (increase the water pressure).[7]  The City now apparently also alleges that the rebuild of ML 23 in 1999 was a "necessary" cost in response to the TCE contamination of the Larson Zone wellfield.

## III. DISCUSSION

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S.

---

[6] These projects apparently started in 2000 and have yet to be completed.

[7] Moses Lake previously brought these items up in its response to the motions of Boeing and Lockheed with regard to common law tort claims and admitted the allegations with regard to construction of Reservoir No. 9 and modification of Reservoir No. 7 went beyond the allegations contained in the First Amended Complaint.  It asked for leave to filed a Second Amended Complaint, but this court did not allow such relief.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-*  **9**

at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists.. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

### B. Statutes of Limitations- Costs Incurred Between 1989 and 1994

An action for cost recovery under CERCLA must be brought "within 3 years after completion of [a] removal action" or "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. §9613(g)(2)(A)-(B). A lawsuit seeking recovery of "remedial action costs" under MTCA "must be brought within three years from the date remedial action confirms cleanup standards are met." RCW §70.105D.080. Lockheed contends Moses Lake's response actions were completed by 1994, when potable water was restored in the Larson Zone. Since Moses Lake's lawsuit was not filed until October 18, 2004, and since it had no tolling agreement with Lockheed, Lockheed asserts the lawsuit is barred under the applicable CERCLA and MTCA statutes of limitations.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    10**

### 1. CERCLA

Moses Lake's CERCLA cost recovery action is brought under 42 U.S.C. §9607 which provides "a cause of action for private parties to seek recovery of cleanup costs." *Key Tronic Corp. v. United States*, 511 U.S. 809, 818, 114 S.Ct. 1960 (1994). (See Paragraph 6.2 of First Amended Complaint, Ct. Rec. 182). §9607(a) specifies that those persons potentially responsible for the pollution in question (otherwise known as "Potentially Responsible Parties" or "PRPs") are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan" and "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. §9607(a)(1)-(4)(A) and (B) (emphasis added).[8]

Relying on *California Department of Toxic Substances v. Neville Chemical Company*, 358 F.3d 661, 663 (9th Cir. 2004), Moses Lake contends the statute of limitations has yet to accrue on its CERCLA cost recovery action and will not accrue until the EPA issues its Record of Decision ("ROD") setting forth the "remedial action plan" for the Moses Lake Wellfield Contamination Superfund Site ("Site"). *Neville* was a cost recovery action brought by the State of California, not by a private party, such as a municipal corporation like the City of Moses Lake. In *Neville*, the defendant maintained that its "initiation of physical on-site construction of the remedial action" occurred in April 1994 when it started excavating extraction wells and therefore, the six year statute of limitations for "remedial action" commenced on that date. The State of California argued that no "remedial action" could have occurred until the final "remedial action plan" was approved by its Department of Toxic Substances Control

---

[8] Moses Lake also alleges a CERCLA contribution cause of action under 42 U.S.C. §9613(f)(1) against all defendants, contending that if it is found liable under §9607 for any response costs, defendants are liable to the City for their equitable shares of the City's total response costs. (See Paragraph 7.2 of First Amended Complaint).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA*-  **11**

on May 8, 1995 and therefore, the limitations period commenced on that date.  The Ninth Circuit Court of Appeals sided with the State and held the limitations period could not accrue until final adoption of the "remedial action plan" required by CERCLA.

The court noted CERCLA's definition of "remedial action" as "actions consistent with permanent remedy taken instead of or in addition to removal actions," 42 U.S.C. §9601(24), and concluded that "[f]or an action to be 'consistent with permanent remedy,' a permanent remedy must already have been adopted." *Id*. at 667. According to the court:

> Neither party can know for sure whether a given action is consistent with permanent remedy until that permanent remedy is determined.  The first point at which both parties can be certain that any construction is consistent with a permanent remedy is when a permanent remedy is actually selected.  In this case, as in most cases, the permanent remedy was selected when the final RAP [Remedial Action Plan] was approved.

*Id*. In other words, "[i]nitiation of physical on-site construction of the remedial action can only occur after the remedial action" is adopted.  *Id*. at 671.

In a footnote, the court observed that in cases where private parties conduct the clean-up of a site without governmental or agency oversight and then pursue response costs under CERCLA, "there will most likely still be a remedial action plan in place." *Id*. at n. 3, citing 40 C.F.R. §300.700 (providing that private parties should follow the public notice and comment procedures required of government actors).  Since, however, no non-governmental response cost suit was before the court, it declined to address the limitations period applicable to such suits.  *Id*.

Lockheed contends that *Neville* has no application to the case at bar because what Moses Lake, as a "private party," did between 1989 and 1994 constituted "removal action," not "remedial action."  "Removal action" is subject to a three year limitations period commencing upon completion of said action.  Furthermore, even if what Moses Lake did constituted "remedial action," Lockheed contends it was

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 12**

independent of EPA's ongoing "remedial action" and was taken pursuant to Moses Lake's own "remedial action plan" which was "in place" no later than 1994. Thus, Lockheed says the six year limitations period applicable to "remedial action" commenced no later than 1994 and expired in 2000, well before the present lawsuit was filed by Moses Lake.

Whether a response action is a "removal action" or a "remedial action" is a question of law for the court. *Carson Harbor Village, Ltd. v. Unocal Corporation*, 287 F.Supp.2d 1118, 1157 (C.D. Cal. 2003). "Provision of alternative water supplies" can constitute either "remedial action" as defined in 42 U.S.C. §9601(24), or "removal action" as defined in 42 U.S.C. §9601(23). In *United States v. W.R. Grace & Co.*, 429 F.3d 1224 (9th Cir. 2005), the Ninth Circuit Court of Appeals held that EPA's characterization of a cleanup as a "removal action" was supported by the administrative record and withstood scrutiny under the modified level of deference afforded by the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164 (2001). According to the court:

> The administrative posture of CERCLA presents two types of agency interpretations. One is the National Contingency Plan [NCP] which carries the force of law. The second relates to informal agency interpretations, which at a minimum receive respect, and depending on the interplay of *Mead* and *Brand X*[9], may even deserve *Chevron*[10] deference. Whichever of these applies, we reach the same result: We hold that the EPA has rationally construed CERCLA and that construction deserves our respect. [Citation omitted]. **As interpreted by the EPA, the removal/remedial distinction boils down to whether the exigencies of the situation were such that the EPA did not have time to undertake the procedural steps required for a remedial action, and, in responding to a time-sensitive threat, the EPA sought to minimize and stabilize imminent harms to**

[9]*National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 125 S.Ct. 2688 (2005).

[10]*Chevron U.S.A. Inc. v. National Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778 (1984).

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 13**

1       **human health and the environment.**  The EPA did so here.

2  *Id*. at 1241.  (Emphasis added).

3       The one consistent thread in the decisions dealing with whether an action is

4  "remedial" or "removal" in nature is that "removal actions generally are immediate

5  or interim responses, and remedial actions generally are permanent responses."

6  *Neville*, 358 F.3d at 667, quoting *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d

7  917, 926 (5th Cir. 2000).  *See also Carson Harbor Village*, 287 F.Supp.2d at 1158

8  (property owner's cleanup of tar-like and slag materials was "remedial action"

9  because there was no evidence that the materials posed the type of threat to human

10  health and welfare that required immediate action); *Advanced Micro Devices, Inc. v.*

11  *National Semiconductor Corp.*, 38 F.Supp.2d 802, 810 (N.D. Cal. 1999)(removal

12  actions are "short-term action[s] taken to halt the immediate risks posed by hazardous

13  wastes"); *Channel Master Satellite Systems, Inc.  v. JFD*, 748 F.Supp. 373, 385 (E.D.

14  N.C. 1990) ("The courts have consistently found that the removal category was to be

15  used in that limited set of circumstances involving a need for rapid action, while non-

16  urgent situations are to be addressed as remedial actions").

17       Lockheed asserts that Moses Lake's "Larson Potable Water Supply Project" fits

18  the definition of a "removal action" because what Moses Lake sought to do was to

19  address the "immediate problem" of abating the TCE contamination above the MCL

20  in its wells, rather than abating the contamination in the aquifer or the "Site" as a

21  whole.[11]  In this regard, Lockheed notes that per *Grace*, the fact that some of the

22  measures taken by Moses Lake might have effected a permanent solution for a

23

24       [11] Indeed, Moses Lake acknowledges that its "restoration of safe drinking

25  water to its customers is not a permanent solution or abatement of the

26  contamination problem of the Site as a whole,"  (City's Response To Statement of
   Material Facts, Ct. Rec. 263 at p. 40), and does not dispute that "[a] complete

27  remedy of the TCE contamination for the entire superfund site was "beyond the

28  scope" of Plaintiff's response efforts.  (*Id*. at p. 41).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    14**

particular location (i.e., the Larson Zone), does not mean those measures are not "removal actions."  429 F.3d at 1247.  In *Grace*, the "removal action"- removing exposed piles of vermiculite- did not fully eliminate the public health threat or amount to a full-blown remediation, *Id.*, and Lockheed says the same is true here in that what Moses Lake did concerning its Larson System of wells did not eliminate the pubic health threat of the TCE contamination in the aquifer or amount to a full-blown remediation of the same.  Rather, it is EPA's Draft Proposed Plan and its eventual Final Proposed Plan which seek to remedy contamination of the aquifer- the "Site"- as a whole.[12]

---

[12] In this court's "Order Granting Motions To Amend Complaint And For Preliminary Injunction" (Ct. Rec. 181), it found that EPA's Draft Proposed Plan constituted "remedial action" because it was part and parcel of the selection of a permanent remedy for the Moses Lake Wellfield Contamination Superfund Site. This court reasoned as follows:

> For approximately the past 18 years, the United States has concerned itself with cleaning up the Moses Lake site.  It was over 13 years ago that the site was placed on the NPL by the EPA.  The TCE (trichloroethylene) contamination discovered in 1988 in certain of the city's wells was abated by approximately 1992, **remedying that immediate problem**. Moses Lake asserts there is now a threat of contamination to its new wells, as revealed by sampling results from late 2004 and early 2005, but the EPA has not characterized this as an "immediate" threat necessitating "immediate" action by way of the proposed plan.  The proposed plan does not represent a "short-term action taken to halt [an] immediate risk."  The EPA makes no claim the proposed plan is "rapid action" intended to address an urgent situation.  Indeed, it would be difficult for EPA to make such a claim considering the RI/FS [Remedial Investigation/Feasibility Study] process began in March 1999 pursuant to the IAG [Interagency Agreement]

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 15**

As compared to EPA's Proposed Plan for a "permanent" solution to the TCE contamination in the aquifer, what Moses Lake did between 1989 and 1994 in abating the contamination in its Larson Zone wellfield certainly bears all of the hallmarks of a "removal action"- an interim response to minimize and stabilize imminent harms to human health.  This is so whether or not Moses Lake's action between 1989 and 1994 is viewed as an independent interim action, or as part and parcel of EPA's broader "remedial action" to remedy contamination of the aquifer- the "Site"- as a whole. And whether it was independent interim action, or part and parcel of EPA's broader "remedial action," a CERCLA lawsuit to recover costs incurred in connection with such "removal action" would need to have been commenced no later than 1997, three years after completion of the "removal action" in 1994.

The only way Moses Lake can successfully argue that its October 2004 lawsuit is timely is to rely on *Neville* and contend that what it did between 1989 and 1994 constitutes "remedial action" that is not independent of EPA's final "remedial action plan" for the entire Moses Lake Wellfield Contamination Superfund Site.  If that is the case, the limitations period will not commence until EPA issues its ROD approving the final "remedial action plan" for the Site.

Lockheed asserts that even if *Neville's* rule applies to cost recovery actions by private parties and what Moses Lake did between 1989 and 1994 constitutes "remedial action," Moses Lake's lawsuit is still untimely because that action was not taken pursuant to EPA's "remedial action plan" to clean up the Site as a whole, but was taken pursuant to the City's own "remedial action plan" (the "Larson Potable Water

----

entered into by EPA and the USACE. . . .  The RI lasted until 2003, and the FS from August 2004 to February 2005.

(Order at p. 12)(Emphasis added).

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    16**

Supply Project") to clean up its individual wells. Lockheed contends Moses Lake's "remedial action plan" was effectively the 1991 Golder Report. If the six year limitations period for "remedial action" commenced in 1991, it expired well before Moses Lake filed this lawsuit in 2004. If *Neville's* rule does not apply to cost recovery actions brought by private parties, Lockheed contends the limitations period commenced in 1989 with the initiation of physical on-site construction of the "remedial action," and the lawsuit is even more untimely.

Moses Lake asserts it has never adopted its own "remedial action plan," but from the very beginning when TCE was discovered at the Site, has "worked at the direction of and in cooperation with federal and state agencies to investigate and address that contamination." While Moses Lake may have cooperated with federal and state agencies in investigating and addressing the contamination of its Larson Zone wells, and was willing to entertain and follow recommendations from those agencies, the undisputed facts reveal that Moses Lake charted its own course in taking action to restore safe drinking water in its wells. It is undisputed that Moses Lake did not conduct its abatement projects pursuant to any enforcement orders, consent decrees, administrative orders or interagency agreements with the EPA, USACE, or Washington's DOE [Department of Ecology].[13] Moses Lake concedes it proceeded

---

[13] It appears government-sponsored cleanups under MTCA are entrusted to DOE exclusively, with no specific role assigned to DOH. The "lead agency" in a government-sponsored response action under CERCLA can be a state, or the political subdivision of a state, operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA, or designated pursuant to a Superfund Memorandum of Agreement (SMOA) entered into subpart F of the NCP or other agreements. 40 C.F.R. §300.5. There is no evidence of this ever having occurred in the case at bar. EPA is the lead agency in charge of cleanup of the Moses Lake Wellfield Contamination Superfund Site. It was not until October 1992, that EPA placed the Site on the NPL, well after Moses Lake had commenced the Larson Potable Water Supply Project to remedy the

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 17**

on its own because it believed that neither state or federal agencies were acting quickly enough.  According to Brian Hinthorne, the City's Project Engineer for the Larson Project, Moses Lake "was faced with a situation where it had lost a well because it had tried to seal off the contaminated zones, two or more of the City's wells were contaminated and there wasn't any action by . . . federal or state agencies to provide clean water to the affected water system." (Costanzo Decl., Ct. Rec. 249, Ex. 20, Hinthorne Dep. at 100:19-101:10).  Moses Lake "made [its] own decisions based on what information was out there."  (*Id*. at 104:19-20).

In its December 30, 2005 order granting summary judgment to the United States on Moses Lake's FTCA claims, this court found that:

> The remedial measures commenced by Moses Lake indicate it was not banking on any assurances by the United States that there would be federal funding.  Moses Lake started to abate the nuisance (the contamination of ML 21, ML 22, and ML 28) before federal funding was proposed and continued to abate it after funding was rejected by the USACE.

(Ct. Rec. 180 at p. 19).  In its brief submitted in response to Lockheed's motion, Moses Lake confirms this is true: "After Vogel's supervisors at the Corps rejected his proposal to have the Corps pay for the remediation of the City's wells, the City had no choice but to spend its own money to seal off the wells in the Roza 1 aquifer and to drill into the Roza 2 aquifer in the hope of obtaining an alternative water supply that was not contaminated by TCE."  (Ct. Rec. 261 at p. 6).[14]

There is no genuine issue of material fact that Moses Lake's "Larson Potable Water Supply Project" was accomplished without governmental or agency oversight,

---

contamination in individual wells.

[14] The wells previously drew water from the Roza 1 aquifer, the shallower portion of the aquifer.  To remedy the TCE contamination problem in those wells, the wells were sealed off from the shallow aquifer and drilled into the deeper Roza 2 aquifer.

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    18**

confirmed by the fact that Moses Lake seeks recovery of costs under CERCLA as a "private party." As such, if what Moses Lake did between 1989 and 1994 constitutes "remedial action" under CERCLA, the six year limitations period commenced no later than 1991 with the issuance of the Golder study which was Moses Lake's "remedial action plan" for abating TCE contamination in its Larson Zone wellfield.

### 2. MTCA

Moses Lake's "Third Cause of Action" is for "Cost Recovery And Contribution Under MTCA Against Boeing And Martin." The MTCA provides:

> A person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. . . . Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action.

RCW §70.105D.080. (Emphasis added).[15] A claim under MTCA for recovery of cleanup costs must be brought within three years "from the date remedial action confirms cleanup standards are met." *Id*.

---

[15] Unlike CERCLA, MTCA treats all recoverable response actions as "remedial actions," instead of distinguishing between "removal" and "remedial" actions. MTCA defines "remedial action" at RCW 70.105D.020(21) as:

> [A]ny action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance and any health assessments or health effects studies conducted in order to determine the risk or potential risk to human health.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 19**

1    Relying on *Pacific Sound Resources v. Burlington Northern Santa Fe Railway

2    Corp.*, 125 P.3d 981, 130 Wn.App. 926 (2005), Moses Lake contends that like the

3    limitations period on its CERCLA cost recovery claim, the limitations period on its

4    MTCA cost recovery claim will not commence, at the earliest, until EPA issues its

5    ROD approving a final "remedial action plan" for the Moses Lake Wellfield

6    Contamination Superfund Site.

7    *Pacific Sound* was an action for recovery of cleanup costs under the MTCA

8    brought by the Port of Seattle ("Port"), a municipal corporation, and Pacific Sound

9    Resources ("PSR"), a non-profit corporation.  The Washington Court of Appeals,

10   Division I, was confronted with the issue of what type of remedial action "confirms

11   when cleanup standards are met."  The court of appeals rejected reliance on approval

12   of the RI/FS (Remedial Investigation/Feasibility Study) as the remedial action that

13   "confirms cleanup standards are met," and concluded that the earliest decision

14   triggering the statute of limitations was EPA's issuance of a ROD on September 30,

15   1999.  According to the court:

16          Because the RI/FS is not an official action by the lead
            agency, adoption of the RI/FS as a remedial action did
17          not trigger the running of the statute of limitations in
            this case.  We conclude the earliest official agency action
18          that could have triggered the statute of limitations was
            on September 30, 1999 when EPA formally selected
19          cleanup levels and remedies in the ROD.  Consequently,
            PSR and the Port timely filed their lawsuit on September
20          25, 2002.

21   *Id*. at 940-41.

22   *Pacific Sound* involved governmental or agency oversight from the beginning

23   of the cleanup.  In August 1984, the EPA issued an administrative order directing PSR

24   to investigate contamination at the facility.  In January 1990, EPA issued another

25   order to PSR directing it to prepare an RI/FS.  As part of the RI/FS, PSR conducted

26   extensive investigations, including soil and groundwater sampling.  In March 1990,

27   PSR notified EPA it did not have sufficient funds to complete the RI/FS.  Because

28   PSR could not continue with cleanup efforts, EPA assumed primary responsibility for

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    20**

the Site under CERCLA. In May 1994, EPA listed the site on the NPL for cleanup under CERCLA. In August 1994, PSR and EPA entered into a consent decree which required PSR to contribute all its assets to the PSR Environmental Trust and to pay for cleanup actions at the site. The Port subsequently agreed, pursuant to an administrative order, that it would assume responsibility to continue cleanup efforts at the site, including completing the RI/FS. On September 30, 1999, EPA issued a ROD. Based on the RI/FS analysis, EPA formally adopted a cleanup plan for the entire site and selected containment remedies in the ROD. On September 25, 2002, PSR and the Port sued several defendants, including Burlington Northern Santa Fe Railway Corp., for cleanup costs contribution under the MTCA.

The "remedial action" undertaken by Moses Lake between 1989 and 1994 was "independent" of any governmental or agency oversight. It was an "independent remedial action," defined by MTCA as "remedial actions conducted without department [Department of Ecology] oversight or approval, and not under an order, agreed order, or consent decree." RCW 70.105D.020(8).[16] Lockheed argues that unlike *Pacific Sound* where EPA action was needed to define the "cleanup standards" that must be "met" to trigger the statute, the only relevant standard in the case at bar- providing water to the Larson Zone that met the MCL- was verified by the City and the DOH when they determined that water from the Larson Zone could be safely distributed to the public. This court agrees.

Lockheed observes that RCW 70.105D.080 does not mention a lead agency in its formula for triggering the statute of limitations. The statute does not say anything

---

[16] Washington Administrative Code ("WAC") regulations also refer to "interim actions," including "independent interim actions." WAC 170-340-430 and 170-340-515. An interim action is distinguished from a cleanup action in that an interim action only partially addresses the cleanup of the site. It is the equivalent of a "removal action" under CERCLA. Even though "interim," such an action is still "remedial" under MTCA.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 21**

about the Department of Ecology or any other governmental agency "confirm[ing] cleanup standards are met." An action must be brought "within three years from the date the remedial action confirms cleanup standards are met." The nature of the "remedial action" serves to confirm whether cleanup standards are met.

If there is no agency oversight or approval because the remedial action undertaken is "independent," an official agency decision is not necessary to trigger the statute of limitations. An official agency decision was necessary to trigger the statute of limitations in *Pacific Sound* because that case did not involve "independent remedial action." In *Pacific Sound*, the court of appeals noted that "development of the cleanup standards begins with the RI/FS" and that "cleanup standards are not officially adopted until the remedy is selected in the Cleanup Action Plan ("CAP") under the MTCA or in the ROD under CERCLA." 130 Wn.App. at 937. Consequently, until the cleanup standards were officially adopted, it was not possible to determine if remedial action confirmed those standards had been met. Since the case at bar involves an "independent remedial action," it was not necessary to wait for an official adoption of cleanup standards in a CAP or a ROD in order to commence the running of the statute of limitations.

Washington Administrative Code ("WAC") regulations define "cleanup standards" as the standards adopted under RCW 70.105D.030(2). WAC 173-340-200.[17] The Department of Ecology is required to "[p]ublish and periodically update minimum cleanup standards for remedial actions at least as stringent as the cleanup standards under section 121 of the federal cleanup law, 42 U.S.C. Sec. 9621, and at least as stringent as **all applicable state and federal laws, including health-based standards under state and federal law**." RCW 70.105D.030(2)(e). (Emphasis

---

[17] The definition of "cleanup standards" in this WAC provision refers to subsection (d) of RCW 70.105D.030(2), but subsection (d) refers to establishing reasonable deadlines for initiating an investigation of a hazardous waste site. Subsection (e) discusses "cleanup standards."

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    22**

added).  An MCL of 5 ppb of TCE was the applicable "cleanup standard" when Moses Lake undertook "independent remedial action" between 1989 and 1994 to restore safe drinking water in its Larson System of wells, and it remains the standard.[18]  This "cleanup standard" did not need to be "confirmed" by EPA or DOE at the time Moses Lake undertook its "independent remedial action."  It was and remains the standard officially adopted by the State of Washington since it is undisputed that Moses Lake is in compliance with all DOH regulations and has been authorized by DOH to deliver water from its Larson Zone wells to its customers since it completed the rehabilitation of ML 21 in April 1994. (City's Response To Lockheed's Statement of Material Facts No. 38, Ct. Rec. 262 at p. 11).[19]

Moses Lake's cost recovery action under MTCA seeking to recover costs from Lockheed incurred between 1989 and 1994 is barred by the applicable three year statute of limitations.  The reasoning is the same as that which supports the conclusion that the CERCLA cost recovery action for those costs is barred by the applicable CERCLA statutes of limitations:   the action was undertaken by Moses Lake independently, without governmental or agency oversight or approval, and therefore, an official agency decision at some subsequent date is not necessary to commence the running of the limitations period.  More specifically, commencement of the limitations period for the purposes of either CERCLA or MTCA does not require awaiting EPA's issuance of a ROD identifying its selected remedy for the Moses Lake Wellfield Contamination Superfund Site.

---

[18] It is the standard adopted by the EPA in its National Primary Drinking Water Regulations pursuant to the Safe Drinking Water Act.  It is a "health-based standard under state and federal law."

[19] DOH has an Office of Drinking Water which is responsible for enforcing drinking water standards in the State of Washington.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 23**

### 3.  Conclusion

Statutes of limitations are about "fairness" to the parties.  While Moses Lake certainly acted appropriately in promptly restoring safe drinking water in the Larson System of wells, it is not an "unfair" result that Moses Lake is time-barred from recovering response costs from Lockheed related to that effort.  In October 1992, Lockheed had been named a PRP by EPA with regard to the Site.  Moses Lake had to know that Lockheed was a party potentially responsible for the TCE contamination in its Larson System of wells.  Boeing had also been named a PRP and Moses Lake negotiated a tolling agreement with Boeing.  For whatever reason, a tolling agreement was not negotiated with Lockheed.  As such, it was incumbent upon Moses Lake to commence a CERCLA/MTCA cost recovery action against Lockheed as soon as possible, but no later than April 1997 to preserve the MTCA action and also the CERCLA action, if what Moses Lake did between 1989 and 1994 constituted "removal" instead of "remedial action."  If it was "remedial action," Moses Lake needed to commence the CERCLA cost recovery action no later than October 1997, six years after its "remedial action plan," the Golder Study, was issued.

### C.  "Necessary" Response Costs After 1994

Under CERCLA, 42 U.S.C. 9607(a)(1)-(4)(B), Moses Lake seeks recovery of "any other necessary costs of response incurred by any other person consistent with the national contingency plan."  As part of its *prima facie* case, Moses Lake bears the burden of establishing that the release or threatened release of a hazardous substance "has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan.'"  *Carson Harbor Village v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).  In determining whether response costs are "necessary," the focus is "not on whether a party has a business or other motive for cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat."  *Carson*

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   24**

*Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001).  MTCA is consistent with CERCLA, allowing recovery of costs of "remedial action" to "identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment."  RCW 70.105D.020(21).

Lockheed contends response costs incurred by Moses Lake after 1994 were not "necessary" because by that time, Moses Lake had achieved the objectives of its Larson Project in that it had restored a potable water supply to its Larson Zone customers, and restored water quantity in the Larson Zone to pre-TCE levels (the levels existing prior to discovery of TCE in the wells).  According to Lockheed, the post-1994 costs were not incurred in "response" to the contamination of the City's wells, but were merely for standard improvements to the City's water utility.  Indeed, it is undisputed that the result of the Larson Project was a "more than adequate potable water supply." Capacity data Plaintiff submitted to the DOH in its 1994 Water System Plan, which DOH approved, confirmed that water quantity in the Larson Zone had been restored to pre-TCE levels.  Moses Lake's 2001 Water System Plan confirmed that the Larson Zone had the most surplus water capacity above and beyond the maximum daily demand of any of Moses Lake's water zones.  (City's Response To Lockheed's Statement Of Material Facts Nos. 71, 117 and118, Ct. Rec. 262 and 263 at pgs. 26 and 41).  Finally, as already noted, none of the Larson Zone wells, nor any of the City's wells for that matter, have tested above the MCL for TCE since 1994.

Moses Lake contends it is premature for the court to entertain Lockheed's motion with regard to "damages" since this case has been bifurcated into liability and damages phases, and the liability phase is not yet complete.  What has been bifurcated are the liability and damages trials.  This court did not bifurcate discovery with regard to liability and damages.  Fact discovery, for both liability and damages, closes on November 3, 2006, and has been ongoing since December 2004.  It is reasonable to believe that by now, all of the evidence related to specific costs, including installation of the supplemental water main on Patton Boulevard (completed in 1997), installation

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 25**

of the intertie to connect the Larson Zone to the Knolls Vista Zone (completed in 1998), construction of Reservoir No. 9 and modification of Reservoir No. 7 (construction started in 2000), and comment on the Skyline System well (2002), has been developed. As such, it is not unfair to put Moses Lake to its proof on this issue.

### 1. Lost Water Rights, Lost Water Capacity and Lost Revenues

Moses Lake concedes it cannot seek recovery under CERCLA and MTCA for these items. Moses Lake contends damages for these items are recoverable under common law tort, but acknowledges the court has already granted summary judgment against Moses Lake on all of its tort claims.

### 2. Post-1994 Construction Projects

Citing deposition testimony from City Engineer Gerry McFaul and City Water Manager William L. Maddox, Moses Lake says there is evidence in the record that the Patton Boulevard water line and the Knolls Vista intertie were constructed in response to the need to transfer water to the Larson Zone to remedy quantity problems resulting from TCE contamination. McFaul testified the purpose of the intertie "was to make sure that we could pump water from the Knolls Vista Zone up into the Larson Zone **if** we did not have enough water." (McFaul Dep. at p. 47, Lines 23-25, Ex. 8 to Jones Declaration, Ct. Rec. 265), (Emphasis added).[20] Maddox testified that the purpose of the intertie was "to move water to Larson, and to allow water to come into Knolls." (Maddox Dep. at p. 118, Lines 9-11, Ex. 10 to Jones Declaration, Ct. Rec. 265). Neither McFaul or Maddox, however, testified that at anytime after 1994, the quantity of potable water in the Larson Zone has been an issue or that it has been less than

---

[20] In a December 31, 2003 memorandum he authored, McFaul stated the intertie makes it "possible to pump water up to the Larson Zone from the Knolls Vista Zone **in case we run into more production problems in the Larson Zone**." (Ex. 2 to Costanzo Dec., Ct. Rec. 247)(Emphasis added).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    26**

1    what was available prior to the discovery of TCE in the Larson System of wells.

2         Lockheed cites evidence that the purpose of the Patton Boulevard line and the

3    intertie was to increase the supply of water to the Knolls Vista Zone, not the Larson

4    Zone.  Gary Harer, Moses Lake Municipal Services Director, testified that in 1996,

5    the City was considering constructing a new well in the Knolls Vista Zone, or

6    pumping ML 24 and ML 28 harder to get an additional supply of water to the Knolls

7    Vista Zone.  It is undisputed that with the addition of the Patton Boulevard line, it was

8    no longer necessary to pump ML 24 and 28 harder because the flow from those wells

9    had been increased.  (City's Response To Lockheed's Statement Of Material Facts

10   Nos. 122 and 123, Ct. Rec. 263 at pp.43-44).

11        It is undisputed that Knolls Vista has suffered from water shortages unrelated

12   to TCE contamination since at least 1982, and in the early 1990s, had lost its primary

13   well (ML 9) due a taste and odor problem caused by hydrogen sulfide.  An intertie

14   between the Larson Zone and the Knolls Vista Zone was considered a solution to the

15   loss of ML 9, and the City's Water System Plan recommended installing an intertie

16   between the Knolls Vista and Larson Zones to improve the pressure at the fairgrounds

17   located in the Knolls Vista Zone.  In 1997, the Moses Lake City Council approved

18   new residential developments and a five acre park with several ballfields to be

19   constructed in the Knolls Vista Zone.  At this same time, new industry demand Moses

20   Lake had hoped for in the Larson Zone never materialized.  The idea of an intertie

21   between the Larson Zone and the Knolls Vista Zone had previously been rejected

22   because of the perception that it would result in spreading TCE from the Larson Zone

23   into the Knolls Vista Zone.  It is undisputed that in four separate memoranda to the

24   City Council, Harer instructed the City Council that the purpose of the intertie was to

25   serve the Knolls Vista Zone.[21]  Neither Harer, or anyone else, ever informed the City

26

27        _____

28        [21] Harer now claims in deposition testimony that he gave false statements to
     the City Council and never told them the purported "true" reason for the intertie

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA* -    27**

Council that the purpose of the intertie was to serve the Larson Zone. Furthermore, it is undisputed that even now, it is not possible to deliver water from the Knolls Vista Zone to the Larson Zone due to the Larson Zone's higher hydraulic elevation. (City's Response To Lockheed Martin's Statement Of Material Facts Nos. 127, 128, 129, 130, 134, 136 and 137, Ct. Rec. 263 at pp. 45-52).

While credibility is normally an issue which should not be resolved on summary judgment, "[i]n rare instances, credibility may be determined without an evidentiary hearing where it is possible to 'conclusively' decide the credibility question based on 'documentary testimony and evidence in the record.'" *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 (9th Cir. 2005), quoting *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988). This is one of those instances, even more so because this court is the trier of fact on CERCLA and MTCA liability and damages. The deposition testimony of McFaul and Maddox cited by Moses Lake does not suffice to raise a genuine issue of material fact that the Patton Boulevard line and the Knolls Vista intertie were constructed as a "necessary" response to the TCE contamination in the Larson Zone wells, specifically to get more water to the Larson Zone to make up for quantity lost because of TCE contamination and the subsequent rehabilitation projects undertaken to remedy that contamination (i.e., taking ML 22 out of service; sealing off ML 21 and 28 from the upper aquifer). Their testimony is conclusory and not supported by any documentation produced contemporaneously with the construction of the Patton Boulevard line and the Knolls Vista intertie. It is directly at odds with the contemporaneous documentation, as corroborated by Harer in his deposition testimony, revealing unequivocally that these projects were a response to chronic water shortage problems in the Knolls Vista and had nothing to do with TCE contamination in the Larson Zone wells. This is not surprising considering the

_____

(supplying water to the Larson Zone). (City's Response To Lockheed Martin's Statement Of Material Facts No. 135, Ct. Rec. 263 at pp. 50-51).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 28**

undisputed fact that upon completion of the Larson Project in 1994, potable water quantity had been restored to pre-TCE levels and has not diminished since that time.[22]

Likewise, the rebuilding of ML 23 in 1999 was not undertaken in response to TCE contamination because by 1994, all of the wells had been cleaned up and potable water, in adequate quantity, had been restored to Larson Zone customers.  As this court noted in its May 4, 2006 order:  "ML 23 has never tested above the MCL, including at anytime after 1988." (Ct. Rec. 234 at pp. 23-24).

With regard to construction of the new Reservoir 9 and modification of Reservoir 7, Lockheed cites deposition testimony from Harer indicating that this is to increase the amount of pressure, is a matter of convenience, is not a health or safety issue, and the motivating factor is so the port district can persuade industries to build in the Larson Zone.  Moses Lake presents no evidence to dispute this and instead resorts to a discussion of its pre-1994 projects which restored safe drinking water in the Larson Zone wells.  (City's Response To Lockheed Martin's Statement Of Material Facts No. 146, Ct. Rec. 263 at pp. 55-56).[23]

---

[22]Moses Lake suggests this court has already made a finding that the new water mains and interties between the Larson Zone and the Knolls Vista Zone were taken in response to contamination of the City's wellfield by TCE.  Until now, this court has not been presented with the issue of what were "necessary" costs in response to the TCE contamination.  The only thing the court could have said in its previous orders is that Moses Lake alleged it had certain "necessary" response costs.

[23] McFaul previously submitted a declaration to the court (Ct. Rec. 217) in which he alleged the construction of Reservoir 9 and the modification of Reservoir 7 were necessary because the City was "concerned about drilling new wells to increase production capacity within [the Larson Zone] based on the contamination of the groundwater aquifers within that zone by TCE."  Once again, however, it is undisputed that the current production capacity within the Larson Zone is adequate and all of the wells in operation within the zone are no longer contaminated with

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 29**

1    The costs incurred by Moses Lake with regard  to installation of the
2  supplemental water main on Patton Boulevard, installation of the intertie to connect
3  the Larson  Zone to the Knolls Vista Zone, construction of the new Reservoir 9 and
4  modification of Reservoir 7, and rebuild of ML 23, were not in response to TCE
5  contamination in the City's Larson Zone wellfield and therefore, were not
6  "necessary."

7

8         **3.  Costs In Providing Public Comment On The Skyline Proposal**

9    Moses Lake seeks to recover costs paid to its consultant, Golder, to prepare a
10  letter complaining about EPA's chosen remedy for the Skyline system, that being a
11  new well.  Moses Lake cites to deposition testimony from McFaul and Maddox that
12  this action was taken to ensure that implementation of EPA's plans would not
13  adversely affect the City's water system and would not allow contamination of the
14  City's wellfield by TCE coming from the Skyline wellfield.  Moses Lake says that
15  review of EPA's remediation at the Skyline Water District benefitted the "entire
16  cleanup" since Skyline is part of the overall Superfund Site and it "also served the
17  purpose of facilitating a prompt and effective cleanup by ensuring that efforts taken
18  at one area of the Site did not contribute to contamination at another, such as the
19  City's wells."

20    Lockheed argues fees paid to Golder to prepare comments pursuant to a
21  standard public comment period were not response costs because neither "removal"
22  or "remedial action" by Moses Lake was involved.[24]  Instead, says Lockheed, the

23
_____

24
25  TCE.  McFaul also indicated in his declaration that Reservoir 7 was not built tall
    enough to keep "desirable" water pressure in this zone.  What is "desirable" and
26  what is "necessary" are obviously two different things.

27    [24] "Response" includes "removal" and "remedial action."  42 U.S.C.
28  §9601(25).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    30**

comments were made to a "removal" or "remedial action" undertaken by EPA. Lockheed also contends that since public comment is not compelled, it is not "necessary." All of this makes logical sense to the court and is supported by the fact that in the 25 plus years that CERCLA has existed, there has never been a case addressing the issue and finding that costs of making public comments either can or cannot be considered response costs.

To be recoverable as response costs, consultant's fees must be "closely tied to the actual cleanup, must benefit the entire cleanup and not cost allocation or liability shifting, and cannot be primarily protective of the plaintiff's interest." *Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 93 F.Supp.2d 177, 190 (D. Conn. 2000). Lockheed contends that in offering public comments about the well in the private Skyline district, Moses Lake expressed concern about its own interest, not that of the Skyline residents, and this is borne out by the fact that the well had already been completed when Moses Lake offered its comments. Moses Lake does not deny that its comments reflected concern about investment in its own Larson Zone wells, but says that does not matter because the comments were intended to benefit the cleanup of the Site as a whole. In support of its argument, Moses Lake cites *In re Combustion, Inc.*, 968 F.Supp. 1112, 1115 (W.D. La. 1996)("[a]ctivities financed by private litigants that are closely tied to the actual cleanup, significantly benefit the entire cleanup, and serve a statutory purpose by facilitating a prompt and effective cleanup are the type of cost expenditures that CERCLA recognizes to be included in cost recovery actions"). As Lockheed notes, *Combustion* had nothing to do with offering public comment about an "already completed remedial action" (the Skyline well having already been drilled). In the *Combustion* case, the plaintiffs had "organized to conduct various investigations and assessments of the Combustion Site and subsequently financed and completed a removal action that cleared the Site process and pond areas of the sources or potential sources for releases of hazardous substances." *Id*. at 1115.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA***- 31**

When Moses Lake, via Golder, offered comments on the already completed Skyline well, the Larson Potable Water Supply Project had long been completed and a safe and adequate amount of drinking water was being supplied to Larson Zone customers from the Larson Zone wells. That "cleanup" had been accomplished. The issue now, of course, is cleaning up the aquifer as a whole. The record indicates that Moses Lake's comments were not closely tied to cleanup of the aquifer as a whole, but instead to preserving the cleanup of its own wells in the Larson Zone. (City's Response To Lockheed Martin's Statement Of Material Facts Nos.166 and 167, Ct. Rec. 263 at pp. 61-62, and City's Statement Of Material Facts T and W, Ct. Rec. 263 at pp. 69-71). Furthermore, it would be difficult to conclude the comments significantly benefitted the cleanup of the aquifer as a whole and facilitated a prompt and effective cleanup of the same when EPA has not yet even issued a final proposed plan, let alone a final "remedial action plan."

For all of these reasons, the court concludes as a matter of law that the costs of providing these public comments were not "necessary."

**D. Declaratory Relief**

Because Moses Lake is time-barred from seeking recovery from Lockheed of costs incurred prior to 1994, and because certain response costs incurred after 1994 were not "necessary," Lockheed is entitled to summary judgment on Moses Lake's claims for declaratory relief under CERCLA (42 U.S.C. §9613(g)(2)) and MTCA (RCW 7.24.010 and RCW 70.105D.080) with regard to those particular costs.

//

//

**E. Liability Under CERCLA and MTCA**

The court will address Lockheed's liability, even though Moses Lake's action seeking recovery for costs incurred between 1989 and 1994 is time-barred, and certain costs incurred by Moses Lake after 1994 were not "necessary" and therefore, are not

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA* -    32**

recoverable.  The reason is that Moses Lake has also asserted contribution claims against Lockheed, seeking to have Lockheed pay its equitable share of any response costs for which Moses Lake may be found liable.  While it appears Moses Lake has yet to be found liable for any response costs, this may well change with issuance of EPA's final "remedial action plan" which is intended to address cleanup of the aquifer- the "Site"- as a whole.

### 1.  Additional Facts

In November 1957, the U.S. Air Force ("USAF") completed construction of an 8-place hangar (also referred to as Building 5-820, Building 5820, and Building 8-20) on the Larson Air Force Base ("LAFB").  From approximately August 1960 to September 1962, Lockheed occupied a space in this hangar while acting as prime integrating contractor to the U.S. military for the initial activation of nine Titan 1 Intercontinental Ballistic Missiles ("ICBMs").  This "space" was the Combined Guided Missile Assembly and Technical Supply Facility, also known as the Missile Assembly and Maintenance Shop ("MAMS facility").  ICBM launch complexes (also known as "missile silos" or "silo sites") were located outside of the LAFB near Warden, Royal City, and Batum, Washington.  Support facilities at LAFB and the missile silos outside of LAFB became one of five sites constructed in the United States between the late 1950s and early 1960s to house and support Titan ICBMs, and was referred to as "T-4," meaning the fourth Titan I facility that was constructed as part of the USAF Titan missile program.  In January 1962, Lockheed delivered the first of at least nine Titan I missiles to LAFB.  Lockheed returned to LAFB in May 1964 for a six week "Titan I update."  LAFB was eventually deactivated in 1966.

The Titan I missile was fueled by a propellant mixture of liquid oxygen (LOX) and RP-1 fuel.  Because hyrdocarbon deposits on components are combustible and potentially explosive when exposed to LOX, contractor and military specifications required that Titan I missiles' RP-1 burning engines, parts, components and all related

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    33**

systems and subsystems be flushed and cleaned with TCE to remove any residual hydrocarbon deposits and vapors.

The MAMS facility consisted of LOX pre-cleaning and cleaning facilities (also known as the hydro-pneumatic and propulsion shops), electrical shops, and a warehouse. The Lockheed layout entitled "Shop-Missile Assembly and Maintenance Layout, T-4, Squadron V," specified that eight degreasers, one vapor degreaser, and one vent hood for a vapor degreaser were located in the hyrdo-pneumatic shop, and also specified that a decontaminating unit was located in the propulsion shop.[25]   The bill of materials specified in the Lockheed layout included the general layout of the MAMS facility, which included degreasers, and indicated that the materials listed were those that Lockheed installed in the hydro-pneumatic shop.

The Lockheed schematic entitled "Equipment Installation- Shop, Missile Assembly and Maintenance Layout T-4, Squadron V (Layout Plan)" showed another version of the bill of materials which included a vapor degreaser and vapor degreaser lip vent hood, as well as two trichlor tanks identified by Lockheed drawing identification numbers. Lockheed designed and manufactured the "trichlor tanks" in the MAMS facility and was responsible for installing the tanks.

Lockheed personnel served on committees that oversaw work for the Titan I Missile Program at LAFB and surrounding silo sites, including the Facility Transfer Board and Technical Approval Team. Lockheed developed design and performance specifications for the U.S. military and associate contractors applicable to the Titan I Missile Program, including specifications for ground equipment, loading propellant systems, and the interfaces between the contractor, the associate contractor's products, and other products being used in the system.

Pursuant to its investigation conducted in the early 1990s, the U.S. Army Corps of Engineers ("USACE" or "Corps") identified areas within and around the 8-place

---

[25] TCE (trichloroethylene) is a solvent which is used as a degreaser.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    34**

hangar where the MAMS facility was located as possible point sources for TCE contamination.

### 2. *Prima Facie* Case Under CERCLA and MTCA

To obtain summary judgment on a cost recovery or contribution claim under CERCLA, a plaintiff must show there are no genuine issues of material fact as to the following elements: 1) the defendant falls within one of the four classes of persons subject to liability under 42 U.S.C. §9607(a); 2) the contaminated "site" is a "facility" under CERCLA; 3) a "release" or "threatened release" of a "hazardous substance" occurred at the "facility;" and 4) the release or threatened release caused the plaintiff to incur response costs. *Kaiser Aluminum & Chemical Corporation v. Catellus Development Corporation*, 976 F.2d 1338, 1340 (9th Cir. 1992). Summary judgment under MTCA requires establishment of essentially the same elements. *Weyerhauser v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 661, 15 P.3d 115 (2001).

### a. Liable Persons

42 U.S.C. §9607(a) lists the categories of persons who can be liable under CERCLA for response costs. They include: (1) "the owner and operator of a vessel or a facility;" (2) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;" (3) "any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances;" and (4) "any person who accepts or accepted any hazardous substance for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release which causes the incurrence of response costs, of a hazardous substance."

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    35**

Under MTCA, "joint and several liability . . . extends broadly to current owners and operators of a facility, persons who owned or operated a facility at the time hazardous substances were disposed or released, and any other person who caused the disposal or release of the hazardous substance at any facility." *Weyerhauser*, 142 Wn.2d at 661, citing RCW 70.105D.040(1), (2).

### (1) "Operator" Liability- §9607(a)(2)

The well-settled rule is that "operator" liability only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment. *Kaiser Aluminum*, 976 F.2d at 1341, citing *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir. 1992) (authority to control the source of contamination "is the definition of 'operator' that most courts have adopted"); and *CPC Int'l, Inc. v. Aerojet-General Corp.*, 731 F.Supp. 783, 788 (W.D. Mich. 1989)(The "most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that party is able to exert over the activity causing the pollution").

In *Kaiser Aluminum*, the Ninth Circuit rejected an excavator's contention that he could not be held liable as an "operator." The excavator relied on the Seventh Circuit's decision in *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir. 1988). The Ninth Circuit found *Hines* did not stand for the proposition that a contractor can never be liable as an operator, noting that in *Hines*, the contractor was not liable as an operator because, although he designed and built the wood treatment plant, he had no authority to control the day-to-day operation of the plant after it was built. It was during the operation of the plant that the hazardous materials were released. *Kaiser Aluminum*, 976 F.2d at 1341. In *Kaiser Aluminum*, the Ninth Circuit found the excavator could be held liable as an operator because the activity which produced the contamination (excavation and grading of the development site) occurred during, not after, the construction process. The allegation was that the

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   36**

1   defendant had excavated the tainted soil, moved it away from the excavation site, and

2   spread it over uncontaminated portions of the property.  *Id*. at 1342.

3       Moses Lake cites *FMC Corporation v. United States Department of Commerce*,

4   29 F.3d 833 (3rd Cir. 1994), where the owner of a facility brought an action against the

5   United States seeking indemnification under CERCLA for some portion of response

6   costs based on the government's role in the operation of the facility during World War

7   II.  The district court found the government was liable as an owner, operator and

8   arranger.  Applying Third Circuit law, the Third Circuit affirmed, finding the

9   government had "substantial control" over the facility and "active involvement" in the

10  activities there.  The court concluded the government qualified as an "operator" of the

11  facility because:

12          The government determined what product the facility would
            manufacture, controlled the supply and price of the facility's
13          raw materials, in part by building or causing plants to be built
            near the facility for their production, supplied equipment for
14          use in the manufacturing process, acted to ensure that the
            facility retained an adequate labor force, had the authority to
15          remove workers, participated in the management and
            supervision of the labor force, had the authority to remove
16          workers who were incompetent or guilty of misconduct,
            controlled the price of the facility's product, and controlled
17          who could purchase the product. . . . [T]he government
            reasonably cannot quarrel with the conclusion that the
18          leading indicia of control were present, as the government
            determined what product the facility would produce, the
19          level of production, the price of the product, and to whom
            the product would be sold.

20  *Id*. at 843.[26]

21      Four years later, in *United States v. Bestfoods*, 524 U.S. 51, 66-67, 118 S.Ct.

22  1876 (1998), the U.S. Supreme Court reviewed and clarified the definition of

23  "operator:"

24

25  _____

26      [26] The Third Circuit, sitting en banc, was "equally divided" on whether the
    government also qualified an an "arranger" and therefore, without discussion,
27  affirmed the judgment of the district court holding the government liable as an
    "arranger."  *Id*. at 845-46.
28

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   37**

> [A]n operator is simply one who directs the workings of, manages or conducts the affairs of a facility. **To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.**

(Emphasis added). "This requirement of control over the cause of contamination is consistent with the pre-*Bestfoods* Ninth Circuit standard set forth in *Kaiser Aluminum*." *Coeur d'Alene Tribe v. ASARCO Incorporated*, 280 F.Supp.2d 1094, 1126 (D. Idaho 2003).

Based on the broad remedial nature of CERCLA, the term "operator" is not limited to the primary or most responsible person or entity, but everyone who is potentially responsible. *Id*. at 1127. "The remedy that Congress felt it needed for CERCLA is sweeping: everyone who is potentially responsible for hazardous waste contamination may be forced to contribute to the costs of cleanup." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21, 109 S.Ct. 2273 (1989). "For operator liability, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility." *Coeur d'Alene*, 280 F.Supp. 2d at 1127. The question is whether under the totality of the circumstances, did the person or entity "manage, direct or conduct operations specifically related to pollution." *Id*. CERCLA liability may be inferred from the totality of the circumstances and need not be proven by direct evidence. *Id*., citing *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 808 (8th Cir. 1995)(determination of operator liability under 42 U.S.C. §9607(a)(2) is a fact-intensive inquiry requiring consideration of the totality of the circumstances). The requirements for "operator" liability under the MTCA, RCW 70.105D.040(1), are not materially different from those under CERCLA.

In *Coeur d'Alene*, the Idaho district court in assessing "operator" liability of the United States government, applied both the "actual control" test in *Best Foods* and the broader "authority to control" test from *East Bay Mun. Util. Dist. v. United States*

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 38**

1 *Dept. of Commerce*, 142 F.3d 479 (D.C. Cir. 1998). In applying the "actual control"

2 test, it found the government did not "manage, direct or conduct operations

3 specifically related to pollution, that is, operations having to do with the leakage or

4 disposal of hazardous waste, or decisions about compliance with environmental

5 regulations." Even applying the broader "authority to control" test, the court found

6 the government did not exercise its authority to control the mines and mills during

7 World War II and therefore, was not an "operator." 280 F.Supp.2d at 1130. The

8 Third Circuit's decision in *FMC*, which preceded the Supreme Court's decision in

9 *Best Foods*, also appears to have employed a broader "authority to control" test,

10 finding liability based on "authority to control" a facility's operations not specifically

11 having to do with the leakage or disposal of hazardous waste. *East Bay* also preceded

12 the decision in *Best Foods* by approximately one month.

13 According to Moses Lake, evidence of Lockheed's "control" is that Lockheed

14 installed equipment into the "clean room" during the activation phase of the Titan I

15 program at LAFB, and "Lockheed's layout for the MAMS included bills of materials

16 setting forth the equipment that Lockheed designed, installed and activated in the

17 MAMS facility, including eight TCE degreasers, one TCE vapor degreaser, one TCE

18 vapor degreaser hood, one decontaminating unit for the hydro-pneumatic and

19 propulsion shops, and two trichlor tanks." Furthermore, Moses Lake says that

20 "Lockheed's design drawings depict the plumbing interfaces that Lockheed connected

21 to the foregoing equipment, equipment that utilized TCE, and instructed Lockheed

22 personnel on the method of connecting those interfaces to the facility's plumbing."

23 Moses Lake also contends Lockheed's liability as an "operator" is established by

24 virtue of evidence which it says shows that Lockheed personnel helped develop the

25 specifications that governed the operation of missile maintenance facilities,

26 specifications which were required to be followed by all USAF personnel.

27 While all of this may be relevant circumstantial evidence concerning "operator"

28 liability, it must be noted that design and installation of equipment do not necessarily

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 39**

equate to managing, directing or conducting "operations" having to do with leakage or disposal of hazardous waste. Equipment cannot produce any "hazardous waste" until it is "operated" by someone, perhaps by the entity that designed and installed the equipment, and/or perhaps by someone else under the management or direction of the entity that designed and installed the equipment. "[O]perator liability . . . depends upon authority to control decisions about how to dispose of waste, not mere physical control over the instrumentality that causes disposal or release." *Taliesen Corporation v. Razore Land Company*, ___ P.3d ___, 2006 WL 2717266 (Wash App. Div. 1, Sept. 25, 2006) at *10, citing *Kaiser Aluminum*, 976 F.2d at 1340-41. "Disposal" refers "only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Catellus Development Corporation v. United States of America*, 34 F.3d 748, 750 (9th Cir. 1994), quoting *3550 Stevens Creek Associates v. Barclays Bank of California*, 915 F.2d 1355, 1362 (9th Cir. 1990).[27] It follows that

---

[27] In *Catellus*, the Ninth Circuit rejected an argument by an entity that it did not "arrange" to dispose of spent batteries because it did not control the eventual disposition of their remnants. The spent batteries constituted waste and therefore, were "disposed" upon their delivery to another party. According to the court:

> Requiring continued ownership or control for section 107(a)(3) [arranger] liability would make it too easy for a party, wishing to dispose of a hazardous substance, to escape by a sale its responsibility to see that a substance is safely disposed of. Such a requirement "would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA." [Citation omitted]. It is sufficient that the substance had the characteristic of waste, as we have defined it above, at the point at which it was delivered to another party.

*Id*. at 752 .

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    40**

specifications that govern the operation of missile maintenance facilities are relevant only insofar as they show that Lockheed managed or directed not just any "operations," but operations having to do with the leakage and disposal of hazardous waste.

Lockheed has presented evidence which raises a genuine issue of material fact whether it managed, directed or conducted operations at the MAMS facility having to do with the leakage or disposal of hazardous waste. This evidence is recited in its "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of Facts Nos. 46 (Lockheed did not write procedures on how to use the equipment); 50 (Lockheed responsible for installing the decontaminating unit without any chemicals and did not use or demonstrate the equipment prior to acceptance by the USAF); 63 (LOX cleaning done during the construction and operations phase, but not during the activation phase which was Lockheed's responsibility); and 67 (Lockheed would answer questions of USAF personnel on an as-needed basis, but this did not involve day-to-day supervision or authority over USAF operations inside the MAMS clean room).

Lockheed has also presented evidence raising a genuine issue of material fact whether it was responsible for specifications that governed operation of missile maintenance facilities, including MAMS, as opposed to the USAF, and even then whether any specifications for which it may have been responsible were specifically applicable to LOX cleaning with TCE, and handling, storage, and disposal of the same from the MAMS facility. (Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of Material Facts Nos. 33, 34, 35, 86, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, and 112).

Moses Lake cites deposition testimony from former Lockheed employee Don Krebs that military grade TCE was stored in a 500 to 700 gallon tank outside of the

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA* **-    41**

8-place hangar which fed the vapor degreaser in the MAMS facility through piping from the outdoor TCE tank into the hangar, and that the "clean room" housed twenty-gallon stainless steel tanks filled with TCE, which Lockheed personnel used for pre-rinsing prior to vapor degreasing missile parts; that TCE use and disposal by Lockheed personnel occurred within the "clean room;" that he personally observed Lockheed personnel operate a vapor degreaser at MAMS and hand-clean missile parts using "military grade" TCE and that once hand-cleaning was completed, Lockheed personnel dumped the spent TCE into drains located within MAMS which ultimately discharged into the ground.

In response, Lockheed has produced evidence, including testimony from other witnesses, which legitimately calls Krebs' credibility into question. Lockheed claims it never used or disposed of TCE at LAFB, one reason being that LOX cleaning was not necessary during the "activation" phase because parts to be installed at the remote missile complexes and the MAMS were LOX cleaned and bagged at the factory.[28] (Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of

──────────────

[28] Lockheed offers evidence that the remote missile complexes have not been identified as a source of TCE contamination. (Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of Material Fact No. 11). Moses Lake did not offer a reply to Lockheed's response to Statement of Material Fact No. 11 (Ct. Rec. 295).

Lockheed also offers evidence that when it returned to T-4 for six weeks in May 1964, this was pursuant to a separate contract to update certain ground equipment located at the remote missile silo complexes, located at least 25 miles away from LAFB. According to this evidence, during the six week update, if any parts needed to be cleaned, they were given to the USAF for cleaning, including cleaning in the MAMS facility. (Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of Material Fact No.12).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA* -    42**

Material Facts Nos. 43, 57, 58, 65, 66, 69, 70, 71, 72, 73, 74, 75, 77, 79, 80, 81, 87, 111, 112, and 115,[29] and testimony of Lester Lippy, Lloyd "Smokey" Stover, and Garland Ransom quoted at pp. 6-7 of Lockheed response brief, Ct. Rec. 266). Lockheed suggests that if anyone is responsible for TCE contamination emanating from the MAMS facility, it is the USAF which Lockheed says was responsible for the plumbing set-up and for LOX cleaning during the "operations" phase which followed completion of the "activation" phase for which Lockheed was responsible.

Credibility is generally not something that can or should be resolved on summary judgment. *Earp*, 431 F.3d at 1169 ("Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations, although in rare instances, credibility may be determined without an evidentiary hearing where it is possible to conclusively decide the credibility question based on documentary testimony and evidence in the record). This is not a situation where the credibility question can be conclusively decided based on the documentary testimony and evidence in the record.

### (2) "Arranger" Liability- §9607(a)(3)

In addition to being an "operator," an entity may also qualify as an "arranger," or it may be a situation where there is no "operator" liability, but there is "arranger" liability. With regard to "operator" liability, the relevant question is "control" over "operations" having to do with leakage or disposal of hazardous waste. With regard to "arranger" liability, the relevant question is "control" over "disposal" arising from something other than "operation" of a facility, for example, by way of some

---

[29] In its Reply Statement of Facts (Ct. Rec. 295), Moses Lake asserts that a Declaration of Karl Easterly, Lockheed Quality Control Supervisor at T-4 at LAFB between November 1960 and September 1962, was not been filed by Lockheed. In fact, it was filed by defendants and is located as Ex. T to Ct. Rec. 270, Declaration of Sarah Schlosser.

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   43**

contractual relationship or transaction. "Control" over "disposal" is the key in both cases, and "operator" and "arranger" liability theories simply recognize there are different means of exercising such "control." While designing and installing equipment may not make an entity an "operator," it may suffice to make the entity an "arranger."

"Arranger" liability under CERCLA requires a person to: 1) own or possess waste and arrange for its disposal; or 2) have the authority to control and to exercise some actual control over the disposal of the waste. *Coeur d'Alene*, 280 F.Supp.2d at 1132, citing *United States v. Shell Oil*, 294, F.3d 1045, 1055, 1057-59 (9th Cir. 2002). "No court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue." *Shell Oil*, 294 F.3d at 1058. MTCA follows CERCLA's interpretation of "arranger." *Seattle City Light v. Wash. Dept. Of Transportation*, 98 Wn.App. 165, 172, 989 P.2d 1164 (1999).

As discussed above with regard to "operator" liability, there is clearly a genuine issue of material fact whether Lockheed itself owned or possessed waste. This particular issue turns on the credibility of Mr. Krebs.[30] The more difficult question is whether even if Lockheed itself did not own or possess waste and arrange for its disposal, did it otherwise have authority to "control" and exercise "control" over the "disposal" of TCE at the MAMS facility?

In *Berg v. Popham*, 412 F.3d 1122 (9th Cir. 2005), the Bergs filed an action alleging Maytag was liable for contribution pursuant to CERCLA and Alaska's version of the same, seeking costs incurred in remediation resulting from discovery

---

[30] Although Moses Lake claims that for "arranger" liability purposes, it is not asserting that Lockheed owned or possessed TCE (Moses Lake Reply Brief, Ct. Rec. 294 at p. 11), Krebs' allegation of use and disposal of TCE by Lockheed personnel at the MAMS facility appears to amount to an allegation of at least "possession."

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 44**

of PCE (perchloroethylene) emanating from sewer lines in the ground connected to the Bergs' dry-cleaning business. The Bergs alleged: 1) they owned a dry cleaning business; 2) the dry cleaning equipment was purchased from Norge corporation, whose successor-in-interest was Maytag; 3) Norge recommended that the Bergs use PCE in the equipment as part of the dry cleaning process; 4) Norge designed the layout of the equipment and installed the dry cleaning equipment and a water and PCE separator system that "facilitated spillage, leakage and direction of [PCE] into the city sewer system." The U.S. District Court for the District of Alaska granted, in part, a motion to dismiss filed by Maytag, concluding that Maytag could not be an arranger or transporter under CERCLA or the Alaska statute and therefore, the Bergs' complaint failed to state a claim upon which relief could be granted. The Bergs appealed to the Ninth Circuit, but only with regard to the question of liability under the Alaska statute.

On appeal to the Ninth Circuit, the Bergs argued the plain language of Alaska's version of CERCLA allowed for the suit "since Norge did by contract arrange for disposal of PCE through the piping system it installed at the Bergs' dry cleaning plant, by and through the Norge dry cleaning machines it installed plumbed to the sewers." The language in the Alaska statute with regard to "arranger" liability differed from CERCLA's language regarding "arranger" liability and so the Ninth Circuit certified certain questions to the Alaska Supreme Court regarding interpretation of the Alaska statute. According to the Alaska Supreme Court:

> In light of the textual distinctions between the federal and state statutes, and based upon our review of the legislative history of section .822, we adopt a standard of arranger liability that is broader than that of the Ninth Circuit. **Like most courts assigning arranger liability under CERCLA, we hold that arranger liability under AS 46.03. 822(a)(4) requires some "actual involvement in the decision to dispose of waste" that was substantial or integral. However, we note that actual involvement in a decision to dispose of waste can encompass involvement in deciding *how* to dispose of waste or in facilitating such disposal. Involvement in deciding how to dispose of waste can, in turn, include actions such as designing, install-**

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    45**

**ing, or connecting a system that disposes of waste on behalf of a third party.**

*Id*. at 1127, quoting *Berg v. Popham*, 113 P.3d 604, 609 (Alaska 2005)(Emphasis added).  The Ninth Circuit summarized this as follows:

> The Alaska Supreme Court held: Alaska Statute 46.03.822(a)(4) does not require that a person own, possess, have authority to control, or a duty to dispose of hazardous substance for that person to face arranger liability for the release of that substance. Rather, under 46.03.822(a)(4), any person who was actually involved in a decision to dispose of, or a decision how to dispose of, a hazardous substance may be liable.

*Id*. at 1128.

Moses Lake cannot argue that the language in Washington's MTCA is identical to that of Alaska's statute, because it is not.  Moreover, MTCA follows CERCLA's interpretation of "arranger."  *Seattle City Light*, 98 Wn.App. at 172 ("MTCA does not define the term 'arranger,' but CERCLA contains the same term").  Instead, Moses Lake suggests there is both Washington and Ninth Circuit authority finding "arranger" liability based on the standard articulated by the Alaska Supreme Court in *Berg*.[31]

Moses Lake cites *Modern Sewer Corp. v. Nelson Distributing, Inc.*, 125 Wn.App. 564, 571-72, 109 P.3d 11(2005), which held that the unintentional discharge of gasoline constituted an arranging for disposal under MTCA.  Moses Lake seems to suggest the fact that "arranger" liability under MTCA includes both intentional and unintentional disposal is somehow the equivalent of Alaska's rule that "actual involvement in a decision to dispose of waste can encompass involvement in deciding

---

[31] According to Moses Lake: "[T]he City asserts that Lockheed's arranger liability is based on its control of **processes** that resulted in the disposal of TCE at the Site." (Moses Lake Reply Brief, Ct. Rec. 294 at p. 11)(Emphasis added).  That is the standard that comes from the Alaska Supreme Court based on its interpretation of Alaska's statue and is not the same as the Ninth Circuit standard for "arranger" liability which refers to "control" over the "disposal" itself.  "Control" over the "process"- the "operation"- that results in "disposal" may, however, result in "operator" liability under CERCLA.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   46**

*how* to dispose of waste or in facilitating such disposal." As Lockheed points out, however, the issue is not "intent," but "control." The fact that a disposal of hazardous substances is unintentional does not mean there was no "control" of the disposal in accordance with the Ninth Circuit rule (authority to control and exercise of control). The *Modern Sewer* case bears this out. There, a gasoline supplier, intending to fill an underground storage tank with gasoline, mistakenly delivered the gasoline into a monitoring well with the result that gasoline was pumped directly into the groundwater. The Washington Court of Appeals found the gasoline supplier was an "arranger." Under the Ninth Circuit standard, the fact the disposal was unintentional did not preclude the conclusion that the gasoline supplier had authority to control the gasoline and in fact, exercised actual control over its disposal.

None of the other cases cited by Moses Lake regarding "arranger" liability are inconsistent with the Ninth Circuit standard. In *California Department of Toxic Substances Control v. Payless Cleaners*, 368 F.Supp.2d 1069 (E.D. Cal. 2005), defendant property owners brought third party claims under CERCLA against an alleged successor-in-interest to a franchisor (Maytag) that allegedly manufactured and provided dry-cleaning equipment and PCE previously used on the property. The district court held this sale of dry cleaning machines and PCE did not subject the successor-in-interest to "arranger" liability under CERCLA. *Id.* at 1077-78. After addressing the "vendor" theory of "arranger" liability,[32] the court addressed the

---

[32] Moses Lake does not argue a "vendor"theory of "arranger" liability. The vendor of a useful product which through its normal course produces a hazardous substance, such as a battery, is not an "arranger" under CERCLA. *Payless Cleaners*, 368 F.Supp.2d at 1077, citing *Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562, 566 (9th Cir. 1994). A sale of a "useful product," however, does not establish a complete defense from "arranger" liability. If a transaction involved in the sale of a useful product includes an arrangement for the ultimate disposal of a hazardous substance, "arranger" liability may be found. *Id.*, citing *Cadillac Fairview*, 41 F.3d at 566. "Liability is not limited to those who own

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 47**

"controller" theory, that being "where a party did not own or possess hazardous substances at the time of their disposal nor otherwise arranged for disposal through a transaction, it may still be held liable as an arranger where it had the authority or duty to control the disposal and actually did dispose of waste." *Id*. at 1078, citing *Shell Oil*, 294 F.3d at 1056-58. The court discussed the factual situation in *Shell Oil* in which oil companies sought to hold the U.S government liable for contribution on the grounds that it controlled the arrangement of oil waste disposal. The government had assisted oil refineries in exchanging and blending various chemicals to create "avgas" fuel, which produced a hazardous waste byproduct. When the refineries faced a challenge in discarding the large quantities of resulting acid waste, the government attempted to solve the problem by facilitating the lease of a large storage tank. The Ninth Circuit rejected the oil companies' contention that the government had "sufficient control over the process" such that it should be considered an arranger. 294 F.3d at 1055. Rather, it concluded the government did not exercise the requisite control because "it never specifically ordered or approved the dumping" of the acid.

---

hazardous substances, who actually dispose of or treat such substances, or who control the disposal or treatment process." *Id*., citing *Cadillac Fairview*, 41 F.3d at 565. A vendor of a product may be liable as an "arranger" when the disposal of waste is a "substantial part" of the transaction. *Id*. at 1078, citing *Cadillac Fairview* (where defendant rubber companies shipped styrene to chemical company to remove contaminants for return shipment of clean styrene, substantial part of transaction constituted arrangement for disposal of a hazardous substance because, even though the companies created a useful product for sale, the removal and release of the hazardous substance was the purpose of the transaction). In *Payless Cleaners*, the district court found there was no allegation of facts to support a finding that a substantial part of Maytag's sale of the dry cleaning machines involved an arrangement for the disposal of waste water. Instead, Maytag's transaction could only be described as the sale of a useful good which, through its normal use, created a waste byproduct and therefore, Maytag could not be liable as a CERCLA "arranger" under the "vendor" liability theory.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    48**

*Id*. at 1051.  A narrower scope of "controller arranger" liability was provided for by the circuit:  party may be held liable on the basis of control only when it has the authority or duty to control the disposal, and when it or its agent, also exercise actual control.  *Id*. at 1057-58.

The *Payless Cleaners* court held the fact that Maytag had control over the design of its dry cleaning machines and provided instructions on their use was insufficient to hold Maytag liable as an arranger:

> Maytag's design of the machines to produce and discharge PCE waste water and its equipment manual requiring certain layout and drain arrangements . . . fall short of the require-ments set out in *Shell Oil*.  Indeed, these facts alone are analogous to the facts upon which the Ninth Circuit refused to find arranger liability, i.e. that the government recommended to the oil companies the form of waste disposal and leased a tank for that purpose.  Here, Maytag's manual instructions for the machines' installation are akin to a recommendation, and not an exercise of control over the ultimate decision on how to dispose of the PCE.  Although the machines were designed to discharge waste water through a hose, the [third-party plaintiffs] could have connected that hose to and collected the waste in a tank, or disposed of the waste through other means.  In sum, these facts do not by themselves establish Maytag's actual authority and control over the disposal of the PCE, rather, that control remained with the [third-party] plaintiffs.

368 F.Supp.2d at 1080.  The court went on to find, however, that other facts alleged by the third-party plaintiffs were sufficient to state a claim for "controller arranger" liability.  The third-party plaintiffs alleged that Maytag had authorized and approved the discharge of the waste water into the sewer system.  According to the court: "If Maytag chose the locations of the floor drains and then inspected to ensure that the waste water was disposed into the sewer system, then the [third-party plaintiffs] did not exercise independent decisionmaking regarding the disposal, but rather, at the very least, shared this control with Maytag."  *Id*.  Furthermore, the third-party plaintiffs alleged that Maytag physically installed the dry cleaning machines, including physically connecting the discharge piping to the building drain, which was itself connected to the sewer system.  This fact, along with the facts concerning Maytag's role as a franchisor, established that it had the authority to and did actually control the

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA*-    **49**

1    disposal of the PCE-laden waste water into the sewer.  *Id*.

2        Another case relied upon by Moses Lake is *Vine Street LLC v. Keeling*, 361

3    F.Supp.2d 600 (E.D. Tex. 2005).  There, the plaintiff alleged that a laundromat had

4    coin-operated dry-cleaning machines and that the defective design and operation of

5    these machines caused PCE (also known as "PERC") to escape into the soil,

6    contaminating the property and adjacent lots.  Plaintiff sued, among others, Maytag,

7    which was the successor-in-interest of the company (Norge) which had manufactured

8    the machines.  The suit was brought under CERCLA and the Texas Solid Waste

9    Disposal Act.  Maytag moved for summary judgment.  The plaintiff submitted an

10   affidavit from a professor of chemical engineering which raised at least three bases for

11   establishing "arranger" liability:  1) Norge's user manuals for its dry cleaning systems

12   instructed operators to plumb waste water containing PERC directly into an open

13   sewer; 2) design and engineering defects in the dry cleaning equipment caused the

14   release of free phase PERC; 3) Norge separators had no user controls, could not be

15   operated by the dry cleaner, and simply functioned as current conditions dictated, and

16   thus the release of PERC was inherent in the operation of Norge designed separators.

17   The court found the affidavit was sufficient to raise genuine issues of material fact

18   whether Maytag was an "arranger,"and therefore, denied summary judgment.  *Id*. at

19   606-07.

20       Moses Lake also cites *Burlington Northern Railroad Company v. Woods

21   Industries, Inc.*, 815 F.Supp. 1384 (E.D. Wash. 1993).  Nothing in that decision is

22   inconsistent with the current Ninth Circuit standard regarding "controller arranger"

23   liability, Judge Van Sickle noting the critical question "is whether the defendant had

24   authority to control the handling and disposal of hazardous substances.  *Id*. at 1392.

25   Judge Van Sickle denied a motion for summary judgment finding:

26           [A] reasonable jury could find that Hansen instructed
             Woods to use contaminated building materials to fill
27           the northern end of the basement, and that Woods
             complied.  Although Hansen may not be responsible
28           for bringing hazardous waste to the facility, Hansen

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*- 50**

> allegedly caused the waste to be dispersed across the site. This amounts to arranging for disposal.

*Id.*, citing *Kaiser Aluminum*, 976 F.2d at 1342 ("applying principle in the context of §9607(a)(2)[operator liability]").

Finally, Moses Lake points to the undersigned's decision in *Pakootas v. Teck Cominco*, 2004 WL 2578982 (E.D. Wash. 2004), but there, "arranger" liability was discussed only in the most general terms and no finding was made regarding liability. This court quoted from the *Coeur d'Alene Tribe* case that "control is not a necessary factor in every arranger case [and] [t]he Court must consider the totality of the circumstances . . . to determine whether the facts fit within CERCLA's remedial scheme." 280 F.Supp.2d at 1131. That is a correct statement in the context of "vendor" liability (see n. 32 *supra*), but not in the context of "controller arranger" liability which is at issue in the instant case. Nothing this court said in *Pakootas* is contrary to the prevailing Ninth Circuit standard regarding "controller arranger" liability.

Lockheed has presented evidence sufficient to raise a genuine issue of material fact whether it exercised the requisite amount of "control" over "disposal" of TCE at the MAMS facility such as to make it liable as an "arranger." See Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement of Facts Nos. 42 (changes to the plumbing and industrial waste systems at 8-Place Hangar were part of the facilities design and installed by the U.S. Army Corps of Engineers' facilities construction contractors; the "brick and mortar people" had built the plumbing; drawings provided to Lockheed for installation of equipment did not detail the waste system or where the connection went, such as the alleged outdoor TCE tank; drawings provided to Lockheed depicted merely the instructions for hooking the equipment into the pre-existing plumbing system at the MAMS ); 45 (equipment installed at MAMS was owned by USAF before it even arrived at LAFB); 55 (unclear whether "trichlor"

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    51**

tanks is a reference to trichloroethylene (TCE) or trichlorocthane (TCA)); 59 (bill of materials drawings pertaining to MAMS facility show every piece of equipment Lockheed was responsible for installing and do not depict storage tanks of any kind, above ground or underground; Lockheed had no input into the industrial waste and plumbing systems installed at 8-Place Hangar and the plumbing drawings depict only the existing interfaces necessary for Lockheed to install the equipment); and 61 (drawings do not depict where interfaces lead).

While Lockheed designed the layout of the equipment in the MAMS facility and installed the equipment, there is no conclusive, undisputed evidence establishing that release of TCE waste into the ground was inherent in the operation of the equipment at the MAMS facility.[33]  There is no conclusive, undisputed evidence that Lockheed knew there was some kind of defect in the plumbing in the MAMS facility which would allow TCE waste to end up in the ground; that it knew the plumbing led to unlined ditches and pits that leached to the ground; or that it knew of or had the power to "control" TCE waste being poured down drains, showers and eye wash stations, ultimately being discharged to the ground, as opposed to some holding tank. There is no conclusive, undisputed evidence that Lockheed designed the plumbing system.  Furthermore, even if Lockheed designed the plumbing system, that may not amount to the requisite degree of "control" of "disposal" in the absence of some other evidence such as a design or engineering defect in the plumbing system, or knowledge that the waste would ultimately discharge to the ground via that system.  See *Concrete Sales And Service, Inc. v. Blue Bird Body Company*, 211 F.3d 1333, 1337 (11th Cir. 2000)("[W]hile Simplex's president understood that hazardous waste would be generated by PMI's electroplating of Simplex's parts, the McCords have not shown

_____

[33] There is no conclusive, undisputed evidence that Lockheed recommended the USAF use TCE in the equipment, but even if there were, that appears to not be enough by itself to establish "arranger" liability.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA* - **52**

that Simplex's president knew of or had the power to control PMI's disposal practices" so as to be liable as an "arranger" under CERCLA).

### (3) Conclusion

An entity is not liable as an "operator" or as an "arranger" unless it had the requisite degree of "control" over the "disposal" of hazardous waste through some means which placed it in a position such that it reasonably could have done something to prevent the resulting contamination, or to have corrected the same as soon as possible. Upon hearing all of the evidence at trial, including testimony from Mr. Krebs and others, the court, as trier of fact, may well be persuaded upon consideration of the "totality of the circumstances" that Lockheed exercised enough "control" over "disposal" at the MAMS facility that it is liable as an "operator" and/or as an "arranger." The court, however, cannot arrive at that conclusion as a matter of law at this time.

### b. Other Elements

Because there is a genuine issue of material fact whether Lockheed was an "operator" and/or an "arranger," the court need not concern itself now with whether the other *prima facie* elements of a CERCLA and MTCA cost recovery claim are established as a matter of law because no matter what, summary judgment will not be possible. Nevertheless, the court will offer a few comments about these other elements.

### (1) Contaminated Site Must Be A "Facility"

42 U.S.C. § 6901(9) of CERCLA and RCW 70.105D.020(4) of MTCA define "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." As such, Moses Lake contends the entire Moses Lake Wellfield Contamination Superfund Site

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    53**

qualifies as a "facility" under CERCLA and MTCA.  Frankly, it appears there is no dispute about the Site being a "facility" as defined by CERCLA.

What is problematic, however, is any suggestion by Moses Lake that a release of hazardous substances anywhere on the Site between August 1960 and September 1962, and in May 1964, should subject Lockheed to "operator" and/or "arranger" liability even if it did not have any "control" over the release (i.e., a release by Boeing at its plant on the Site).  Lockheed is subject to liability only if it exercised "control" over the "disposal" of hazardous substances somewhere on the Site.  If it is established that Lockheed did have the requisite degree of "control" over the "disposal" of TCE at the MAMS facility, it is liable and it is not further necessary for Moses Lake to establish that TCE at the Site specifically originated from the MAMS facility.[34]

### (2)  A "Release" or "Threatened Release" Of A Hazardous Substance Occurred At The "Facility"

It does not appear there is any dispute that TCE qualifies as a "hazardous substance" and that it was released by someone at sometime at the "facility," that being the Moses Lake Wellfield Contamination Superfund Site.  Again, however, Lockheed is not on the hook simply because a "release" occurred somewhere on the Site between August 1960 and September 1962 and/or in May 1964.  Another element Moses Lake must establish is that Lockheed was an "operator" and/or an "arranger" in that it exercised the requisite amount of "control" over the "disposal" of TCE at the MAMS facility.  If this "control" is established, Lockheed is on the hook even if Moses Lake cannot "fingerprint" the TCE contamination specifically to Lockheed.  This is consistent with the fact that the term "release" is broader than the term "disposal."  *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir.

---

[34]  The MAMS facility is a facility within a "facility," the latter "facility" being the entire Moses Lake Wellfield Contamination Superfund Site.

**ORDER GRANTING DEFENDANT LOCKHEED'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    54**

1  2001)("'release' is broader than 'disposal,' because the definition of 'release' includes
2  'disposing'").  See also 42 U.S.C. §9601(22) and (29).[35]

3

4    **(3)  The "Release" Or "Threatened Release" Caused The Plaintiff To**
5         **Incur Response Costs**

6

7    **(a)  CERCLA**

8         Under CERCLA, Moses Lake carries the burden of establishing that the release
9  or threatened release of a hazardous substance has caused it to incur response costs
10 that were "necessary" and "consistent" with the National Contingency Plan [NCP].
11 The NCP is a plan promulgated by the EPA that delineates specific steps private
12 parties must take in selecting a remedial action plan and cleaning up hazardous waste.
13 40 C.F.R. Part 300.  It is "designed to make the party seeking response costs choose
14 a cost-effective course of action to protect public health and the environment."
15 *Washington State Dep't. Of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 800
16 (9th Cir. 1995).  Private parties must plead and prove consistency with NCP, while a
17 government entity's costs are presumed to be consistent with the NCP.  *Carson*
18 *Harbor Village*, 287 F.Supp.2d at 1152 n. 15.  Private action is "consistent with the
19 NCP" if the action, evaluated as a whole, is in "substantial compliance" with certain
20 procedural requirements, and results in a "CERCLA-quality cleanup."  40 C.F.R.
21 §300.700(c)(3)(i).  The NCP's procedural requirements include, among other things,
22 that the party seeking response costs conduct a remedial site investigation (40 C.F.R.
23 §300.700(c)(5)(vii)), prepare a remedial investigation and feasibility study
24 ("RI/FS")(40 C.F.R. 300.700(c)(5)(viii), and provide an opportunity for public
25 comment (40 C.F.R. 300.700(c)(6)).  *Id.* at 1152.

26        Moses Lake contends NCP compliance is a damages issue, not a liability issue,

27

28        [35]  The terms, however, are not mutually exclusive.  270 F.3d at 882.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   55**

citing *CadillacFairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir. 1988) ("the question whether a response action is necessary and consistent with the criteria set forth in the contingency plan is a factual one to be determined at the damages stage of a section 107(a) action, rather than by the mechanism of prior governmental approval") and *Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377, 1389 (E.D. Cal. 1991)("[i]n this circuit . . . it has been specifically held that a failure to comply with the NCP is not a defense to liability, but goes only to the issue of damages," citing *Cadillac Fairview)*.

This court is inclined to believe NCP compliance is a liability issue, or a hybrid issue, based on *Carson Harbor Village*, 287 F.Supp.2d at 1153-54, a decision rendered subsequent to the decision in *Mid Valley Bank*. Whether it is a liability issue or a damages issue, however, there is a genuine issue of material fact whether there was "substantial compliance" with NCP in this case. According to Moses Lake, it has placed evidence into the record demonstrating: (1) active involvement by and consultation with EPA, the Corps and the Department of Ecology at the Site; (2) public notice of the remediation being considered; and (3) multiple public meetings at which members of the public were apprised of the remedial options being considered and could comment on them. Lockheed counters that there was no compliance with NCP because public meetings were not transcribed as required by 40 C.F.R. §300.430(f)(3)(E); public notices were not given before response action was taken as required by 40 C.F.R. §300.430(f)(3)(A)[36]; and Moses Lake seeks to piggyback its alleged response costs and EPA's separate activities at the Site. (Lockheed's "Statement Of Disputed Material Facts In Response To Plaintiff's Statement Of Material Facts" (Ct. Rec. 267) regarding Moses Lake's Statement Of Material Facts Nos. 139 and 140 at Ct. Rec. 267). In reply, Moses Lake says that in

---

[36] "Substantial compliance" with Section 300.430 is required by 40 C.F.R. §300.700(c)(3).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-* **56**

order to establish liability, all it has to do is prove that a single dollar of its response costs was incurred in compliance with the NCP, because damages are not at issue as yet in this case. To that end, Moses Lake submits the "Second Declaration of Stephen Johnson" (Ct. Rec. 298) on the issue of NCP compliance by the City. Johnson, a consultant retained by Moses Lake with prior experience working for the EPA and the Arizona Department of Environmental Quality, opines that "[s]ome of the City's costs were incurred consistent with the NCP, including at a minimum, costs related to water supply wells 22 and 29." (Paragraph 17). Specifically, Johnson opines that actions taken with regard to those wells "are consistent with removal actions EPA and state environmental agencies have taken at other sites in response to contamination of groundwater resources that serve as a municipal water supply." (Paragraph 23)(emphasis added).

Moses Lake does not specifically rebut Lockheed's assertions that public meetings were not transcribed and that public notices were not given before response action was taken. Furthermore, the court cannot find as a matter of law that Moses Lake "substantially complied" with the NCP based on an alleged expert opinion, the credibility of which Lockheed has not yet had an opportunity to challenge, and which should be resolved at trial as opposed to on summary judgment.

**(b) MTCA**

Under MTCA, "[r]ecovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent" of a cleanup conducted by or supervised by the Department of Ecology ("DOE"). RCW 70.105D.080. This "substantial equivalence" standard is different from the "substantial compliance" with NCP regulations standard under CERCLA. Whereas MTCA "calls for evaluation of the overall effectiveness of the remedial action, the national contingency plan sets forth a detailed process for showing that a party's cleanup costs are "not inconsistent" with the plan. *Taliesen,* 2006 WL 2717266 at *6.

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA-* **57**

1   In *Taliesen*, the failure of Taliesen to substantially follow MTCA's cleanup rules was
2   not necessarily fatal to its cost recovery action where the cleanup had to be evaluated
3   "in terms of its overall effectiveness rather than looking for substantial compliance
4   with requirements in a checklist." *Id*.

5       This less specific and less exacting standard may make it easier for Moses Lake
6   to prove "substantial equivalence" under MTCA with regard to the remedial action it
7   took pursuant to its Larson Project, but the court will not make that determination as
8   a matter of law at this time.   An obvious reason is that this particular issue under
9   MTCA was not briefed by any of the parties and only came to light with Moses
10  Lake's "Notice" filed October 3 (Ct. Rec. 342), advising the court of the *Taliesen*
11  decision.

12  **3.  Burden Of Proof Re Causation**

13      "Once plaintiff has proven a *prima facie* case, the burden of proof falls on the
14  defendant to disprove causation" in a CERCLA case.   *Westfarm Associates Limited*
15  *Partnership v. Washington Suburban Sanitary Commission*, 66 F.3d 669, 681 (4th Cir.
16  1995)(emphasis added).   "Causation" is not one of the elements of a plaintiff's *prima*
17  *facie* case (as opposed to "control" for the purposes of establishing "operator" and/or
18  "arranger" liability).   The burden of proof as to causation lies with the  defendant.
19  "The plaintiff must prove only that the contaminants which were once in the custody
20  [control] of the defendant could have traveled onto the plaintiff's land, and that
21  subsequent contaminants (chemically similar to the contaminants once existing in
22  defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup
23  costs." *Id*.   Once the plaintiff proves that, the defendant must come forward
24  with sufficient evidence from which a trier of fact could find that the defendant was
25  not the source of the contamination. *Id*.[37]   This burden is placed on the defendant in

26

27      [37] See also *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d
28  1053, 1066 (C.D. Cal. 2003)(plaintiff meets burden if it (1) identifies contaminant

recognition of the "synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source." *Id.*

Because there are genuine issues of material fact concerning at least two elements of a *prima facie* case of CERCLA and MTCA liability against Lockheed (whether Lockheed is an "operator" and/or an "arranger," and whether Moses Lake's response costs were incurred in "substantial compliance" with the NCP or incurred pursuant to remedial action that was the "substantial equivalent" of a cleanup conducted by or supervised by DOE), the court need not concern itself at the present with causation

## IV. CONCLUSION

Defendant Lockheed Martin Corporation's Motion For Summary Judgment Or, In The Alternative, Summary Adjudication Of Plaintiff's CERCLA And MTCA Causes Of Action (Ct. Rec. 238) is **GRANTED**. Lockheed is awarded judgment on Moses Lake's CERCLA and MTCA cost recovery causes of action with respect to the particular costs identified herein. Plaintiff City Of Moses Lake's Motion For Summary Judgment Of Liability Under CERCLA And MTCA Against Defendant Lockheed Martin Corporation (Ct. Rec. 242) is **DENIED**.

**IT IS SO ORDERED**. The District Executive is directed to enter this order and forward copies to counsel.

/ / /

---

at its site, (2) identifies the same (or perhaps a chemically similar) contaminant at the defendant' facility, and (3) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. If the plaintiff meets this burden, the defendant must then proffer evidence sufficient to create a genuine issue of fact as to its ability to disprove causation).

**ORDER GRANTING DEFENDANT LOCKHEED'S**
**MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-   59**

**DATED** this  16th  of October, 2006.


_____s/ Alan A. McDonald_____
ALAN A. McDONALD
Senior United States District Judge

**ORDER GRANTING DEFENDANT LOCKHEED'S
MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*-    60**